UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-10095DPW

|  |  |
|---|---|
| STATES RESOURCES CORPORATION<br>　　Plaintiff<br><br>v.<br><br>MICHAEL CAPIZZI, CATHERINE CAPIZZI,<br>THE ARCHITECTURAL TEAM, INC.,<br>GARRETT, INC., JOHN CONNOLLY, JR.,<br>MASSACHUSETTS DEPARTMENT OF<br>REVENUE, and JAMES GRUMBACH<br>　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT OF GARRETT, INC.**

**Introduction**

The Defendant and Plaintiff-in-Counterclaim, Garrett, Inc. ("Garrett"), hereby submits this memorandum in support of its Renewed Motion for Summary Judgment with respect to the plaintiff's interpleader action. By virtue of its Motion, Garrett seeks payment in the amount of $48,459.20 from the plaintiff, States Resources Corporation ("SRC"), for auctioneer services provided pursuant to a contract entered into between Garrett and SRC.

None of the other parties to this case is a party to the contract, particularly The Architectural Team, Inc. ("TAT"). Not only is TAT not a party to the contract, it has taken steps to interfere with the contract and Garrett's right to payment thereunder. The $48,459.20 represents 3.5% of the price for property sold at an auction marketed and "called" by Garrett on behalf of SRC in connection with its foreclosure on property located in Lincoln, Massachusetts.

1

SRC believes that a 3.5% commission is reasonable. Ex. 1, States Resources Response to Interrogatories Propounded By Garrett, Inc. ¶ 1. TAT is the only party in this case that objects to the payment, however, TAT does not have standing to do so.

Notwithstanding the histrionics espoused by TAT in all aspects of this case, a close examination of it reveals that, simply put, SRC, a first lien holder, and TAT, a second lien holder, are at war with each other over what TAT views was SRC's failure to obtain a high enough price at a foreclosure auction, resulting in TAT's lien not being satisfied completely. Unfortunately for Garrett, SRC hired it to conduct the auction. Garrett, as an agent of SRC, followed all directions given to it by SRC and successfully held an auction at which a price of $1.2 million was obtained – fully satisfying SRC's lien and partially satisfying TAT's. Garrett now is caught in the vitriolic crossfire between TAT and SRC over the remainder of TAT's unsatisfied lien. Although both SRC and TAT each have received hundreds of thousand of dollars as a result of Garrett's months of effort with respect to the auction, Garrett never has been paid for its effort or its out-of-pocket expenses.

## Statement of Material Facts

Garrett is a Massachusetts corporation engaged in the business of, among other things, conducting real estate auctions. Verified Counterclaim of Garrett, Inc., docketed on April 7, 2004, as Document No. 8 (hereinafter, "VCC") ¶¶ 1, 3. Garrett Healey is the president and sole stockholder of Garrett. Id. ¶ 3. Mr. Healey has been in the auction business for over thirty years. Id. He is a licensed and bonded auctioneer in several states, including Massachusetts, and "calls" the auctions for Garrett.[1]  Id.; Ex. 2, Copies of Mr. Healey's Auctioneer's Licenses; Ex. 3,

---

[1] Although it has been furnished with a copy of Garrett Healey's auctioneer license, issue in accordance with M.G.L. ch. 100, § 2, TAT inexplicably continues to allege that Garrett conducted the auction at issue without a license.

2

Garrett, Inc. Responses to Interrogatories Propounded by the Architectural Team, ¶ 1(a).  Mr. Healey also is a member the Certified Auctioneers Institute ("CAI").  Ex. 4, CAI Diploma.  Mr. Healy completed a four-year university program in order to become a CAI member.  Ex. 5, Deposition of Garrett Healey at p. 348.  Garrett regularly provides services to many local, state and federal agencies, major commercial lending institutions, and attorneys. VCC ¶ 3 and Ex. A thereto.

In  2002, the Law Office of Doonan, Graves & Longoria, LLC ("Doonan"), acting as an agent for SRC, contacted Mr. Healey for the purpose of hiring him and his company to conduct an auction in connection with SRC's foreclosure on property located at 236 Lincoln Road, Lincoln, Massachusetts ("the Property").  VCC ¶ 5; Ex. 6, Affidavit of John A. Doonan, ¶ 4. The Property was owned by Michael and Catherine Capizzi (the "Debtors").  VCC ¶ 5.  **At all material times, Garrett was acting as SRC's agent and upon directions from SRC**.  Ex. 6 ¶¶ 4-12.

Garrett and SRC agreed that Garrett would conduct the auction in return for a 3.5% commission on any sale to a third party, plus reimbursement for expenses.  VCC ¶ 6, and Ex. C thereto; Ex. 1 ¶ 2.  It is SRC's position that before SRC would be required to pay Garrett, the Court would have to approve any such payment.  Ex. 1 ¶ 2.  It is Garrett's position that such approval is not a condition precedent to SRC's obligation.  VCC ¶ 6.  This disagreement, however, is not material because Garrett hereby seeks a Court order requiring SRC to pay Garrett in the amount of $48,459.20.  **This figure is arrived by adding:  1) $42,000 (3.5% of the auction price), 2) $2,700 for Auctioneer's Fees, and 3) $3,759.20 in advertising costs**.  These charges and expenses are outlined in Garrett's invoice for the auction.  Ex. 7, Garrett Invoice; see also VCC at Ex. F thereto.

It is customary and usual practice in the real estate auction business for an auctioneer to receive a commission on the sale price received at auction. VCC ¶ 7. Garrett's standard rate is 3.5% of the sale price for sales over $500,000, VCC ¶ 7, which is consistent with what Mr. Healey believes other auctioneers charge.[2] Ex. 5 at p. 344 ("Our standard rate is 3.5[%]. . . . [T]he standard rate in the industry is from 2 to 5, 5.5 percent even.") It is also customary and usual practice for the auctioneer to paid all advertising and promotional costs and expenses. VCC ¶ 7.

Garrett engaged in all necessary promotions, marketing, and scheduling in order to successfully proceed with the auction. Ex. VCC ¶ 8; Ex. 3 ¶ 3(a). This included extensive telemarketing and mailings, as well as the use of published ads in the Boston Globe and its website, over an eight month period. Ex. 3 ¶ 3(a). The auction was scheduled and postponed on 5 occasions, apparently as a result of matters relating to Catherine Capizzi's filing of bankruptcy. VCC ¶ 9. Each time, Garrett undertook all necessary promotional, marketing and scheduling steps to accommodate the rescheduling. VCC ¶ 8. Doonan's office provided Garrett with all information concerning the Property, including that relating to acreage. Ex. 6 ¶ 5. Doonan's office approved all of the ads that Garrett placed on SRC's behalf.[3] Ex. 6 ¶ 6.

---

[2]    As an example of its histrionics, TAT has, in many e-mails to counsel, accused Garrett of price fixing. The record, however, is clear that **at no time has Mr. Healey or Garrett had knowledge of or been a party to any agreement among auctioneers to charge a certain price**. Ex. 5 at p. 350-351 ("**Q: (by Mr. Ring)** Well, do each one agree to 2.5 or 5 percent or just one? **OBJECTION (by Ms. Williams)**: **He has not stated there's been an agreement. I think that's very clear**. **Q: (By Mr. Ring) Let me withdraw that in deference to the keen observations of your attorney**. Is there any understanding that you understand there is among any of these groups as to charge in similar foreclosure situation [sic]? . . . **A: (By Mr. Healey)** I don't know that there's any – any rule, if that's what you're asking me."); see also p. 352-353 ("**A: (By Mr. Healey)** . . . just like there's no [manual] for what you charge for your fee, there's no [manual] for what I charge for my fee.")

[3]    A sample ad is attached hereto as Exhibit 8. The ad clearly identified the Auctioneer as Garrett D. Healey, as well as identifying his license number. Notwithstanding this, TAT claims

On July 24, 2003, Garrett held an auction for the Property on behalf of SRC. VCC ¶ 10. Garrett obtained a bid for the Property in the amount of $2,000,000 from a buyer by the name of Linda M. Micu. Id. SRC accepted the Micu offer and a $5,000 deposit from her. Id. The Micu deal ultimately fell through. Id. ¶ 11. Consequently, SRC requested that Garrett hold another auction for the Property. Id.

Sometime in early August 2003, Garrett received a letter, dated August 4, and a $50,000 check, from a Leonard Florence in which Mr. Florence stated that "he would like to" make an offer of $2,000,000 on the Property. Ex. 3 ¶ 6(a); Ex. 6 ¶ 8. **This letter was not received in conjunction with any auction held by SRC.** Mr. Healey informed Attorney Doonan of Mr. Florence's letter. Ex. 6 ¶ 8. Attorney Doonan later informed Mr. Healey that SRC could not accept any offer made outside of the auction process.[4] Ex. 6 ¶ 8.

On September 26, 2003 Garrett held another auction on behalf of SRC and Doonan. Id. ¶ 12. Garrett obtained a high bid of $1,200,000, which SRC and Doonan accepted. Id.

As a result of obtaining the $1,200,000 for SRC, SRC was able to satisfy the full amount owed to it by its Debtors at that time – $932,630.87. VCC ¶ 13. Doonan was paid for its fees and expenses from the auction proceeds as well. Id. Additionally, Doonan paid $210,096.33 to defendant Architectural Team, Inc., a creditor holding a secondary position to SRC. Id. ¶ 13.

---

that Mr. Healey was not licensed to conduct the auction of the Property. The ads indicated that the Property included "2 ½ acres", and gave the Book and Page Number of the Property at the Middlesex South Book Registry of Deeds. Although TAT received notice of all the auctions scheduled for the Property, it now complains that correct acreage is 6 acres and that it has been aware of this since 1989. Garrett obtained the information regarding acreage from Doonan and had no reason to believe it may have been inaccurate. Ex. 6 ¶ 5. In any event, the actual square footage of the property was announced at the Auction when the "Notice of Mortgage's Sale of Real Estate" was read and the Notice was published before the auction. Ex. 9.

[4] In the meantime, Garrett deposited the check into its escrow account it at Danvers Savings Bank and later returned the $50,000 to Mr. Florence, who had informed Mr. Healey that he was no longer interested in the Property. Ex. 3 ¶ 5(c); Ex. 5 p. 369-371.

SRC has a contractual right under its mortgage and note agreement with the debtor to pay all expenses of the auction, such as Garrett's fee, out of the funds received from the sale. Id. ¶ 13; Ex. 1 ¶ 9. Specifically, the Mortgage granted to SRC states:

> Statutory Power of Sale. This Mortgage is upon Statutory Condition, for any breach of which the Lender shall have the Statutory Power of Sale. **Lender shall be entitled to collect all reasonable costs and expenses incurred inpursuing [sic] the remedies provided in the paragraph 19, <u>including but not limited to,</u> reasonable attorney's fees**. Ex. 10, Mortgage Modification Agreement; Ex. 1 ¶ 9.

Thus, according to the Mortgage, SRC has the right to pay Garrett's commission and costs, as they are an expense of the sale. Indeed, but for Garrett, there would be no funds for any of the parties.

## Legal Argument

### I.     Applicable Standard.

A Court should grant summary judgment when a moving party shows by credible evidence that there is no genuine issue of material fact and that judgment should enter as a matter of law. <u>Community Nat'l Bank v. Dawes</u>, 369 Mass. 550, 554 (1976). As discussed below, the undisputed facts require that judgment be entered on behalf of Garrett.

### II.    Garrett Fulfilled All Its Obligations With Respect to the Auction of the Property And Has Charged A Reasonable Fee.

SRC the first mortgagee, through Doonan, hired Garrett to conduct the auction on the Property. SRC and Garrett agreed that Garrett would receive a 3.5% commission on the sale price, plus costs and expenses.[5]  **SRC – the only party to the contract other than Garrett- believes that a 3.5% commission is a reasonable fee**. Ex. 1 ¶¶ 1-2. Moreover, the evidence shows that it is common in Garrett's industry for auctioneers to be paid in the form of a

---

[5] It is SRC's position that this was subject to Court approval. Garrett contends that such approval was not necessary, however, by virtue of this Motion, Garrett hereby seeks such approval. Garrett reserves the right to argue that such approval is not necessary.

commission, as opposed to a flat fee. Often the commission is within the 2% to 5.5% range and is ultimately negotiated by the parties to the contract. Ex. 5 at p. 351; Ex. 9 p. 4. 3.5% is solidly within that range.

Doonan contacted Garrett regarding auctioning the Property in approximately late 2002. There is no dispute but that at all material times, Mr. Healey and Garrett were acting as agents for SRC and Doonan, and at the direction of SRC and Doonan. It is indisputable that during the months leading up to the final auction in September 2003, Garrett took steps necessary to auction the property, including but not limited to, all necessary telemarketing, promotion through mailers, published ads and its website. These functions were performed for each of the six auction dates scheduled.[6] The auction of this Property had to be rescheduled five times. Each time Garrett had to promote, market and advertise the auction.

Garrett actually held two auctions. The first was on July 24, 2003 and the second on September 26, 2003. Garrett had to market and prepare for both dates. It was necessary to register buyers and prepare the site on both dates. In connection with July 24 auction, Garrett obtained a $2,000,000 bid, which SRC accepted. The July 24 deal subsequently fell through.

At SRC's direction, Garrett held another auction on September 26, 2003 at which the Property was sold for $1,200,000. **From the auction proceeds, SRC recovered the $932,630.87 owed to it. Doonan was paid its fees and expenses from the auction proceeds as well. SRC subsequently paid $210,096.33 to defendant Architectural Team, Inc., a creditor holding a secondary position to SRC. Garrett, however, has not been paid**.

SRC, the party with whom Mr. Healey and Garrett contracted, does not deem the 3.5% commission claim to be unreasonable. TAT, **not a party to the contract and having already**

---

[6] 5/20/03, 6/24/03, 7/24/03, 9/23/04, 9/26/03 at 11:30 a.m., and 9/26/03 at 1:15 p.m.

7

**received more than $200,000,** is the only party objecting to the $48,000 commission payment to Garrett. TAT alleges that SRC, Doonan and Garrett had a duty to inform it of Mr. Florence's interest and that they collectively decided to keep the inquiry a "secret" from TAT. **There is no evidence to support this allegation. Ex. 6 ¶ 11; Ex. 5 p. 366-367.**

SRC has a contractual right under its mortgage and note agreement with the debtor to pay all expenses of the auction, such as Garrett's fee, out of the funds received from the sale. Moreover, common sense and justice dictate that Garrett should be paid. Indeed, but for Garrett's efforts, neither SRC, nor Doonan, nor Architectural Team would have received any funds.

### III.     Garrett Had No Duty to TAT And TAT Has No Standing.

SRC had a duty to sell the Property at auction in compliance with M.G.L. ch. 183, § 21 and ch. 244, § 14. Neither SRC nor Doonan nor Garrett had the right to accept an offer made outside of the auction process. In fact, Attorney Doonan was concerned that Michael Capizzi would have sued SRC and/or him if he had sold the Property outside of the auction process. Ex. 6 ¶ 9.

Apparently, TAT is claiming that Garrett should not be paid because Garrett did not inform it of Mr. Florence's August 4 letter regarding his interest in buying the Property. However, Garrett had no duty to TAT, a junior creditor. Garrett had no relationship with TAT, contractual or otherwise. TAT simply lacks any standing to interfere with the contractual relationship that Garrett had with SRC.[7]

Instead, Garrett, as an agent of SRC and Doonan, owed them a fiduciary duty to act with the utmost loyalty and good faith. See United States v. Drumm, 329 F.2d 109 (1st Cir. 1964); Sabel v. Mead Johnson & Co., 737 F. Supp. 135 (D. Mass. 1990). As a principal, Doonan directed Garrett's conduct and Garrett, as an agent had a duty to obey those directions. See id.

---

[7]     TAT does not have any crossclaim against Garrett. It has moved to amend its counterclaim to include a M.G.L. ch. 93A claim against Garrett, a codefendant.

8

According to Attorney Doonan, Garrett would have been acting outside of the scope of its authority if it had taken action with respect to or accepted Mr. Florence's proposal. Ex. 6 ¶ 9, 12. Even assuming that SRC and Doonan had a duty to notify TAT of Mr. Leonard's inquiry and failed to do so (which is doubtful), Garrett cannot be held liable for the wrongful acts of its principal, as there is no evidence that Garrett believed or understood that any such duty existed. In re Lernout & Hauspie Securities Litigation, 236 F. Supp. 2d 161, 176 (D. Mass. 2003).

### IV. There Is No Evidence That Any Alleged Omission Caused TAT's Harm.

Assuming, *arguendo*, that SRC and Garrett had a duty to notify TAT of Mr. Florence's inquiry and failed to do so, there is no evidence that such alleged omission was the proximate cause of any harm claimed by TAT.

The evidence shows that TAT had notice of both auctions and was present at both of them, including the September 26, 2003 one at which the Property sold for $1.2 million. Ex. 11 Answers of The Architectural Team, Inc. To Interrogatories Propounded by Garrett, Inc. ¶¶ 1, 3. Although TAT now complains that this sale figure was insufficient to pay its second lien on the Property, it did nothing at the auction to protect its interest. Ex. 11, ¶ 2. Certainly it was within TAT's right to bid on the property with the goal of reselling it at a higher price. According to TAT, it was aware that the Property included six acres of land and it clearly believes that the Property is worth far more than the $1.2 million for which it sold. Ex. 11, ¶ 4. Notwithstanding this, TAT did nothing. Thus, it was TAT's own inaction that caused any harm that it may have suffered.

Moreover, there is no evidence that the situation would have turned out differently had TAT been informed of Mr. Leonard's inquiry. Any suggestion as what to the outcome might have been is purely speculative. **In fact, the undisputed evidence shows that Mr. Florence was no**

9

**longer interested in the Property as of the second auction on September 26, 2003**. Ex. 5 p. 370-371.

## Conclusion

Based on the foregoing, Garrett respectfully requests that this Court grant Garrett's Renewed Motion for Summary Judgment and enter an order allowing and requiring SRC to pay Garrett $48,459.20.

                                       Respectfully submitted,
                                       The Defendant,
                                       Garrett, Inc.,
                                       By Its Attorneys,

                                       /s/ Stephanie M. Williams_____
                                       CARMEN A. FRATTAROLI, BBO#: 177960
                                       STEPHANIE M. WILLIAMS, BBO#: 560149
                                       Law Office of Carmen A. Frattaroli
                                       76 Lafayette Street
                                       Salem, MA 01970
Date: October 4, 2004                  (978) 740-9501