Page 1

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MASSACHUSETTS
2
3

    STATES RESOURCES CORPORATION,        )
4         Plaintiff,                      )
                                          )   Civil Action
5   v.                                    )   No. 04 10095 DPW
                                          )
6   MICHAEL CAPIZZI, CATHERINE R.         )
    CAPIZZI, THE ARCHITECTURAL            )
7   TEAM, INC., JOHN CONNOLLY, JR.,       )
    GARRETT, INC. MASSACHUSETTS           )
8   DEPARTMENT OF REVENUE, JAMES          )
    GRUMBACK, KEVIN DUFFY,                )
9         Defendants.                     )
10
11
12    DEPOSITION OF GARRETT D. HEALEY, a deponent in the
13    above-entitled cause, taken before Susan Lozzi,
14    Shorthand Reporter and Notary Public in and for
15    Middlesex County, pursuant to the Federal Rules of
16    Civil Procedure, at the Offices of Eyal Court
17    Reporting, Inc., 4 Faneuil Hall Marketplace, 4th
18    Floor, Boston, Massachusetts, on Monday, August 2,
19    2004, commencing at 9:02 a.m.
20
21
              EYAL COURT REPORTING, INC.
22            4 FANEUIL HALL MARKETPLACE
          SOUTH MARKET BUILDING - 4TH FLOOR
23            BOSTON, MASSACHUSETTS 02109
                  (800) 322-3925
24

Exhibit 5

Page 346

1  lawyers have conventions. We talk. The standard
2  rate nationally is 2 to 5.5 percent. Our standard
3  rate is 3.5 percent for foreclosures, 5 to 6 percent
4  for conventional sales.
5       MS. WILLIAMS: When you say "our," you
6  mean Garrett, Inc.?
7       THE WITNESS: Garrett, Inc.
8       Q. Well, you say discuss this at
9  conventions. What conventions do you mean?
10      A. Well, I attend a lot of auction
11 conventions.
12      Q. Auctioneer conventions?
13      A. Right.
14      Q. Which you all discuss fees that you
15 charge?
16      MS. WILLIAMS: Objection.
17      A. (Witness nods.)
18      Q. Do you discuss fees that you charge at
19 auctioneer conventions?
20      A. Do we?
21      Q. Yes.
22      A. You mean, as open forum?
23      Q. Sure.
24      A. No. Well, yeah. It's probably

Page 347

1  brought up in certain parts of the forum, but I'm
2  just talking privately with other auctioneers. We
3  converse in private settings and what have you.
4       Q. So there's really no standard rate in
5  the industry. Only standard rate in your office?
6       A. No. There's standard rates in the
7  industry. I just told you from 2 to 5 percent 5.5
8  percent.
9       Q. Okay. And that the 5.5 percent is a
10 standard rate in the industry set by the industry?
11      MS. WILLIAMS: Objection. That's not
12 what he said.
13      A. If you have a formal education and
14 you're a certified auctioneer in this country, in
15 this United States of America, if you're a certified
16 auctioneer, okay? There is a standard rate of 3 to
17 5.5 percent.
18      If you're non-certified and you're
19 just an auctioneer, okay? Which a lot of people
20 here in this state are because we haven't cleaned it
21 all up yet, these people will work subordinately.
22 Okay? Also get you in trouble.
23      Q. Well, people who have auctioneer's
24 licenses charge between the figures you've just now

Page 348

1  told me about?
2       MS. WILLIAMS: Objection. If you
3  know.
4       A. I didn't say auctioneer's licenses. I
5  said are certified auctioneers.
6       Q. Certified?
7       A. With a formal education in the
8  industry.
9       Q. Okay. Could you tell me what you mean
10 by "certified"?
11      A. A certified auctioneer is an
12 auctioneer that has taken a four-year program, and
13 there's only two universities in the country that
14 offer it, one of which is the University of Indiana.
15 To be certified is a four-year program.
16      Q. The other?
17      A. The other?
18      Q. You said two.
19      A. The other university is in Texas.
20      Q. Now, the question is, there's a
21 standard among those types of persons who got that
22 certification to charge those percentages, --
23      MS. WILLIAMS: Objection.
24      Q. -- right?

Page 349

1       A. That's what they standardly charge,
2  yes.
3       Q. How do you know that?
4       A. Because I'm a member of the
5  association.
6       Q. And how do they tell you that?
7       A. Because we have, again, conventions.
8       Q. At these conventions, they tell you
9  the standard rates?
10      A. Well, we correspond otherwise.
11      MS. WILLIAMS: Objection.
12      Q. You also correspond --
13      MS. WILLIAMS: Let him ask the
14 question.
15      Q. So you correspond otherwise among
16 people similarly situated within the United States
17 as to what to charge for auctions?
18      MS. WILLIAMS: Objection. I think
19 you're mischaracterizing his testimony and you're
20 getting way off the track here.
21      MR. RING: I do not --
22      Q. Well, I'm going to withdraw the
23 question in deference to your lawyer's objection and
24 ask you whether or not there is a consensus of

Page 350

1  agreement between people similarly situated,
2  certificates, as you said, charge rates --
3          MS. WILLIAMS: Objection.
4      Q.  -- for foreclosure sales?
5          MS. WILLIAMS: Objection. Answer it
6  only if you know there's a consensus or an agreement
7  as to what rates to charge.
8      A.  I don't know.
9      Q.  Well, you just testified that you
10 discussed in these auction settings or these
11 certification settings 2.5 to 5 percent. And you
12 shake your head yes, and I apologize.
13         MS. WILLIAMS: He has testified to
14 that.
15     Q.  You have testified to that and you
16 just affirm by the shake of your head. When was the
17 last time this understanding was your understanding
18 of the standard rate? A year ago? Two years ago?
19 Five months ago?
20     A.  I work with it every day.
21     Q.  So it's currently your understanding?
22     A.  Right.
23     Q.  It's currently your understanding that
24 the industry of which you are a part of -- what do

Page 351

1  you call that industry? Auctioneer industry?
2      A.  Well, I belong to a few of them. I
3  belong to the Certified Auctioneers Institute, The
4  National Auctioneers Institute and the American
5  Marketing Institute.
6      Q.  Well, do each one agree to 2.5 or 5
7  percent or just one?
8          MS. WILLIAMS: Objection. He has not
9  stated there's been an agreement. I think that's
10 very clear.
11     Q.  Let me withdraw that in deference to
12 the keen observations of your attorney. Is there
13 any understanding that you understand there is among
14 any of these groups as to charge in a similar
15 foreclosure situation?
16         MS. WILLIAMS: Objection.
17     A.  I don't know that there's any -- any
18 rule, if that's what you're asking me. But I can
19 tell you that under the Certified Auctioneers
20 Institute certification and designation, that this
21 group of people, which is made up about 56,000
22 auctioneers worldwide, have a standard and that
23 standard is 2.5 to 5.5 percent for real estate
24 auctioneers.

Page 352

1      Q.  How do you know this?
2      A.  Because I'm a member.
3      Q.  And did you read this?
4      A.  I am a part of it.
5      Q.  You're a part of it?
6      A.  Correct.
7      Q.  And this takes place in the United
8  States or does it take place outside the United
9  States?
10     A.  What did I just say? Worldwide.
11 There are 56,000 of us.
12     Q.  So this happens in the United States,
13 too?
14     A.  Exactly.
15     Q.  Now, tell me, how you determine what
16 to charge?
17         MS. WILLIAMS: Objection.
18     A.  You know, in my --
19         MS. WILLIAMS: Just answer the
20 question.
21     A.  -- profession, Attorney Ring, --
22         MS. WILLIAMS: Garrett.
23     A.  -- I don't make my own rules as I go
24 along. I go along where what works and what has to

Page 353

1  be done to bring things to fruition, just like
2  there's no Chilton Manual for what you charge for
3  your fee, there's no Chilton Manual for what I
4  charge for my fee.
5      Q.  Do you base your fee in any part upon
6  this understanding of 2.5 to 5 percent worldwide?
7          MS. WILLIAMS: Objection. He's
8  testified regarding this very clearly. He didn't
9  say there was an understanding or an agreement.
10 Let's be clear about that.
11     Q.  The standards that you say are
12 published in the industry among 50,000-odd people
13 worldwide, are those standards carried out by you?
14     A.  Myself and many others.
15     Q.  And when you say "many others," you
16 mean people throughout the United States?
17     A.  Correct.
18     Q.  How long have you carried out that
19 kind of a policy?
20         MS. WILLIAMS: Objection.
21     Q.  A week old or two weeks old or a year
22 old?
23     A.  Since 1991 when I became a certified
24 auctioneer.

Page 366

1  Q. How about Attorney Alan Fitch? Is he
2  someone that's known to you?
3  A. No.
4  Q. Do you know Russ Bartlett?
5  A. No.
6  MR. CAPIZZI: I'm all set.
7  CROSS-EXAMINATION BY MR. DOONAN:
8  Q. Mr. Healey, I believe your testimony
9  earlier has been a trifle confusing. There was a
10 2-million-dollar offer that you received from
11 Leonard Florence on August 4th, the year 2003, is
12 that correct?
13 MR. RING: Motion to strike the
14 characterization of Mr. Healey's testimony by
15 counsel as inappropriate. Objection.
16 Q. Did you receive a correspondence from
17 Leonard Florence on August 4th, 2000, dated August
18 4th, 2003?
19 A. Thereabouts, yes.
20 Q. Did you discuss that offer with me?
21 A. Yes.
22 Q. Did I ever tell you not to tell anyone
23 about that offer?
24 MR. RING: Asked and answered.

Page 367

1  A. No.
2  MR. DOONAN: Thank you. No further
3  questions.
4  MS. WILLIAMS: If you're going to
5  redirect, let me just -- I just want to ask him a
6  couple of things.
7  MR. RING: I'm sorry.
8  CROSS-EXAMINATION BY MS. WILLIAMS:
9  Q. I just want to back up to a couple of
10 housekeeping things. I think that earlier your
11 testimony was that Garrett Auctioneers, Inc.,
12 dissolved in 1998, the corporation?
13 A. Right.
14 Q. Could you tell me the circumstances of
15 that dissolution, please? Or tell the stenographer.
16 A. Well, there was a couple of issues.
17 One issue was there was a conflict with another
18 corporation in Texas that had the same name and we
19 had a conflict especially with our web site, so we
20 changed the corporations name because of conflicts
21 like that and other types of conflicts.
22 Q. So you continued your auctioneer
23 business under the name Garrett, Inc.?
24 A. Correct.

Page 368

1  Q. And the license that you have is
2  issued to you, individually?
3  A. Correct.
4  Q. Do you have any understanding that
5  that should be done differently, that the licensing
6  should happen differently than as you've done it?
7  MR. RING: Objection, but you may
8  answer.
9  Q. You can answer.
10 A. No. No.
11 Q. Does Garrett, Inc., utilize bank
12 accounts at Danvers Savings Bank?
13 A. Yes.
14 Q. Is one of those an operating account?
15 A. Yes.
16 Q. And is one of those an escrow account?
17 A. Yes.
18 Q. And is "bulk account" also another
19 name for escrow account?
20 A. Right.
21 Q. And do you ever use funds out of the
22 escrow or bulk account to pay your operating
23 expenses?
24 A. No.

Page 369

1  Q. Do you have any understanding, I'm
2  going to show you Exhibit Three, as to why the check
3  that was made payable to Leonard Florence bears the
4  name Garrett Auctioneers, Inc., Bulk Auction as
5  opposed to Garrett, Inc.?
6  A. It's the bulk account.
7  MR. RING: Which exhibit are you
8  referring to?
9  MS. WILLIAMS: Sorry.
10 Q. Exhibit Three is a check that has the
11 name Garrett Auctioneers, Inc. I believe you
12 testified that that corporation dissolved in 1998.
13 And I'm wondering if you have any
14 explanation or understanding as to why that name may
15 still appear on a check that you're currently using?
16 A. We didn't -- we didn't change the
17 account because we had no reason to change the
18 account. It wasn't like Garrett Auctioneers, Inc.,
19 was in any trouble or anything.
20 So we left the bulk account like that
21 because our attorneys didn't think there would be a
22 problem with it. We don't write enough checks out
23 of the account. He said use up the checks and when
24 you reorder, put the right name on it.

Page 366

1  Q. How about Attorney Alan Fitch? Is he
2  someone that's known to you?
3  A. No.
4  Q. Do you know Russ Bartlett?
5  A. No.
6  MR. CAPIZZI: I'm all set.
7  CROSS-EXAMINATION BY MR. DOONAN:
8  Q. Mr. Healey, I believe your testimony
9  earlier has been a trifle confusing. There was a
10 2-million-dollar offer that you received from
11 Leonard Florence on August 4th, the year 2003, is
12 that correct?
13 MR. RING: Motion to strike the
14 characterization of Mr. Healey's testimony by
15 counsel as inappropriate. Objection.
16 Q. Did you receive a correspondence from
17 Leonard Florence on August 4th, 2000, dated August
18 4th, 2003?
19 A. Thereabouts, yes.
20 Q. Did you discuss that offer with me?
21 A. Yes.
22 Q. Did I ever tell you not to tell anyone
23 about that offer?
24 MR. RING: Asked and answered.

Page 367

1  A. No.
2  MR. DOONAN: Thank you. No further
3  questions.
4  MS. WILLIAMS: If you're going to
5  redirect, let me just -- I just want to ask him a
6  couple of things.
7  MR. RING: I'm sorry.
8  CROSS-EXAMINATION BY MS. WILLIAMS:
9  Q. I just want to back up to a couple of
10 housekeeping things. I think that earlier your
11 testimony was that Garrett Auctioneers, Inc.,
12 dissolved in 1998, the corporation?
13 A. Right.
14 Q. Could you tell me the circumstances of
15 that dissolution, please? Or tell the stenographer.
16 A. Well, there was a couple of issues.
17 One issue was there was a conflict with another
18 corporation in Texas that had the same name and we
19 had a conflict especially with our web site, so we
20 changed the corporations name because of conflicts
21 like that and other types of conflicts.
22 Q. So you continued your auctioneer
23 business under the name Garrett, Inc.?
24 A. Correct.

Page 368

1  Q. And the license that you have is
2  issued to you, individually?
3  A. Correct.
4  Q. Do you have any understanding that
5  that should be done differently, that the licensing
6  should happen differently than as you've done it?
7  MR. RING: Objection, but you may
8  answer.
9  Q. You can answer.
10 A. No. No.
11 Q. Does Garrett, Inc., utilize bank
12 accounts at Danvers Savings Bank?
13 A. Yes.
14 Q. Is one of those an operating account?
15 A. Yes.
16 Q. And is one of those an escrow account?
17 A. Yes.
18 Q. And is "bulk account" also another
19 name for escrow account?
20 A. Right.
21 Q. And do you ever use funds out of the
22 escrow or bulk account to pay your operating
23 expenses?
24 A. No.

Page 369

1  Q. Do you have any understanding, I'm
2  going to show you Exhibit Three, as to why the check
3  that was made payable to Leonard Florence bears the
4  name Garrett Auctioneers, Inc., Bulk Auction as
5  opposed to Garrett, Inc.?
6  A. It's the bulk account.
7  MR. RING: Which exhibit are you
8  referring to?
9  MS. WILLIAMS: Sorry.
10 Q. Exhibit Three is a check that has the
11 name Garrett Auctioneers, Inc. I believe you
12 testified that that corporation dissolved in 1998.
13 And I'm wondering if you have any
14 explanation or understanding as to why that name may
15 still appear on a check that you're currently using?
16 A. We didn't -- we didn't change the
17 account because we had no reason to change the
18 account. It wasn't like Garrett Auctioneers, Inc.,
19 was in any trouble or anything.
20 So we left the bulk account like that
21 because our attorneys didn't think there would be a
22 problem with it. We don't write enough checks out
23 of the account. He said use up the checks and when
24 you reorder, put the right name on it.

Page 370

1    Q.  So that account, though, is the escrow
2  account used by Garrett, Inc.?
3    A.  It's the escrow account, correct.
4    Q.  At the time -- I believe you testified
5  that you saw Mr. Ring with a leather jacket in a BMW
6  at some point during one of the early auctions, is
7  that correct?
8    A.  Correct.
9    Q.  And at that time, were you aware as to
10 who he represented?
11   A.  He made it perfectly clear.
12   Q.  He did identify who.  Who did he
13 identify?
14   A.  He made it clear that he represented a
15 significant subordinate.
16   Q.  Did he name The Architectural Team,
17 though?
18   A.  That, I don't know.
19   Q.  Okay.  Is it true that as of the
20 September 26th auction, Leonard Florence had told
21 you that he was no longer interested in the
22 property?
23       MR. RING:  Objection.  That's not what
24 he said.

Page 371

1    Q.  You can answer.
2    A.  He did.
3    Q.  Did you have any belief or
4  understanding that you had a duty to disclose the
5  2-million-dollar offer from Leonard Florence to
6  anybody other than John Doonan?
7    A.  No.
8    Q.  And would it be consistent with the
9  custom and practice in your industry to not make
10 such a disclosure to third parties?
11       MR. RING:  Objection to form and to
12 substance.
13   A.  We don't even usually know who they
14 are.  We always deal with the attorney.
15   Q.  So as far as you were concerned, --
16       MR. RING:  Motion to strike as
17 nonresponsive.
18   Q.  As far as you were concerned, you were
19 acting according to standard custom and practice
20 within your industry when you handled the
21 2-million-dollar offer from Leonard Florence, is
22 that correct?
23   A.  Yes.
24       MS. WILLIAMS:  I don't have anything

Page 372

1  else.
2        MR. RING:  Just a few questions in
3  relation to your counsel's examination.
4  REDIRECT EXAMINATION BY MR. RING:
5    Q.  When you discussed Exhibit No. 6 with
6  Mr. Doonan, that is, the August 4th, 2003, letter,
7  thereafter, after that conversation with Mr. Doonan,
8  you never revealed that document to anyone else,
9  true?
10   A.  I --
11       MS. WILLIAMS:  Objection.  He answered
12 that.
13   A.  Again, you asked me that four times
14 and, again, I don't recall ever discussing it with
15 anybody.
16   Q.  And, lastly, when you on September
17 26th, 2003, concluded the sale, had you sent the
18 $50,000 back to Leonard Florence?
19       MS. WILLIAMS:  Objection.  He answered
20 that.  You can answer it again.
21   A.  I sent it back to Mr. Florence.
22   Q.  Did you send it back before the sale?
23   A.  I don't remember.
24       MR. DOONAN:  Objection.

Page 373

1    Q.  And did you send it back the day of
2  the sale?
3        MR. DOONAN:  Objection.
4    A.  I don't know when I sent it back.
5    Q.  And did you send it back the day after
6  the sale?
7        MR. DOONAN:  Objection.
8    A.  I don't remember when I sent it back.
9    Q.  And did you send it back because you
10 had received a letter -- you testified that you had
11 conversations with Leonard Florence which Leonard
12 Florence said to you, well, keep it open until we
13 see what happens.  Do you recall those statements,
14 "see what happens"?  Do you recall that statement?
15   A.  I recall saying that I held onto the
16 deposit and said that I would keep it open and see
17 what happens; not that Leonard Florence would wait
18 and see what happens.
19   Q.  You would keep -- why were you keeping
20 it open?
21   A.  Because the property still wasn't
22 sold.
23       MR. RING:  Thank you.  No further
24 questions.

94 (Pages 370 to 373)

EYAL COURT REPORTING, INC.

– Exhibit 6

UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-10095DPW

| | |
|---|---|
| STATES RESOURCES CORPORATION<br>    Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>) |
| MICHAEL CAPIZZI, CATHERINE CAPIZZI,<br>THE ARCHITECTURAL TEAM, INC.,<br>GARRETT, INC., JOHN CONNOLLY, JR.,<br>MASSACHUSETTS DEPARTMENT OF<br>REVENUE, and JAMES GRUMBACH<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF JOHN A. DOONAN

I, John A. Doonan, on oath depose and state as follows:

1. I am an attorney admitted to practice in the Commonwealth of Massachusetts and am in good standing. I am admitted to practice in the United State District Court for the District of Massachusetts, the United State Bankruptcy Court for the District of Massachusetts and the states of New York and Maine.

2. I represent the Plaintiff, States Resources Corporation ("States"), in the above captioned matter.

3. I represented States Resources Corporation in connection with its foreclosure on a mortgage secured by property located at 236 Lincoln Road, Lincoln, Massachusetts.

4. In connection with my representation of States Resources Corporation with respect to the Lincoln foreclosure, I hired Garrett, Inc. to act as an agent for States and me for the purpose of conducting an auction of the real estate located at 236 Lincoln Road, Lincoln, Massachusetts.

5. In connection with the foreclosure, my office provided Garrett, Inc. with information regarding the property to be foreclosed upon, including information regarding what I believed to be the acreage involved and the details of the house located on the property. Because the debtor would not cooperate with us with respect to the foreclosure, I was not able to confirm all information.

6. With my approval, Garrett, Inc. placed paid advertisements in the Boston Globe announcing that an auction of the property at 236 Lincoln Road, Lincoln, Massachusetts would be held. Ads ran in the globe in February, May, July, and September 2003. My office approved of the publication of the information in the Boston Globe ads.

7. With respect to the auction of the Lincoln property, Garrett, Inc. at all material times, acted as my agent and the agent of State Resources Corporation. Garrett, Inc. was not endowed with any authority to independently attempt to sell or market the Lincoln property.

8. At some point in early August 2003, Garrett Healey, the President of Garrett, Inc., informed me that a gentlemen by the name of Mr. Leonard Florence had given Mr. Healey a $50,000.00 check and a letter indicating that he was interested in purchasing the Lincoln property for $2,000,000.00. In response, I advised Mr. Healey that I needed to think about what to do with the inquiry and told him that I would get back to him within 2 to 3 days. I looked into the situation and relevant law and concluded that neither I nor States Resources Corporation could accept the proposal made by Mr. Florence. I concluded that foreclosure law did not allow for the acceptance of an offer to purchase the property outside of the auction process itself. I informed Mr. Healey that States could not accept the offer.

9. Neither Mr. Healey nor Garrett, Inc. had the authority to accept Mr. Florence's proposal. Indeed, had I authorized Garrett, Inc. to do so I believe that it is highly likely that Michael Capizzi would have sued States Resources Corporation and/or me.

10. Neither Mr. Healey nor Garrett, Inc. had the authority to inform the Capizzis or The Architectural Team, Inc. of Mr. Florence's proposal.

11. At no time did I tell Mr. Healey or Garrett, Inc. to keep Mr. Florence's offer "secret" from anyone. However, I did not advise nor have Garrett, Inc. undertake to advise any third party, including The Architectural Team, Inc., of Mr. Leonard Florence's proposal and/or offer, as there was no duty to do so.

12. If Garrett, Inc. had accepted Mr. Florence's proposal, it would have been acting outside of the scope of its authority.

Signed under the pains and penalties of perjury this 28th day of September 2004.

_____
John A. Doonan

3

Dec 15 03 12:37p   RICHARD S. HACKEL, ESQ.   617-742-2171   p.2
Dec 03 03 09:48a   Garrett Healley   978-774-4947   p.2



# GARRETT, INC.

*Specializing in Selling Real Estate at Auction*

76 High Street, Danvers, Massachusetts 01923 • Tel: (978) 774-6008 • Fax: (978) 774-4947

License #: MA 197 • NH 2357 • ME 985 • VT 701

- Auctioneers
- Expert Witness
- Bankruptcy

- Liquidators
- Business Consultants
- Foreclosures

- Appraisers
- Environmental Experts
- NP Workouts

## CLOSING INVOICE

October 16, 2003

236 LINCOLN ROAD
LINCOLN, MA 01773

| DESCRIPTION | PRICE | TOTAL |
|---|---|---|
| Postponement 5/20 To 6/24 | $300.00 | $300.00 |
| Bosotn Globe Ad | $140.00 | $140.00 |
| Telemarketing 5/20 | $200.00 | $200.00 |
| Email Marketing | $60.00 | $60.00 |
| Mailer | $100.00 | $100.00 |
| Postponement 6/25 To 7/24 | $300.00 | $300.00 |
| Globe ad | $1,086.40 | $1,086.40 |
| AUCTION FEE FOR 7/24 | $1,500.00 | $1,500.00 |
| Postponement of 9/23/03 to 9/26/03 | $300.00 | $300.00 |
| BOSTON GLOBE AD 9/14/03 | $1,086.40 | $1,086.40 |
| BOSTON GLOBE AD 9/21/03 | $1,086.40 | $1,086.40 |
| COMMISSION 3.5% OF $1,200,000.00 | $42,000.00 | $42,000.00 |
| POSTPONMENT 9/26 FROM 11:30 TO 1:15 | $300.00 | $300.00 |
| **TOTAL DUE** | | **$48,459.20** |

BALANCE DUE AT TIME OF CLOSING

Exhibit 7









Exhibit 8