UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-10095DPW

| | |
|---|---|
| STATES RESOURCES CORPORATION<br>　　　Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>) |
| MICHAEL CAPIZZI, CATHERINE CAPIZZI,<br>THE ARCHITECTURAL TEAM, INC.,<br>GARRETT, INC., JOHN CONNOLLY, JR.,<br>MASSACHUSETTS DEPARTMENT OF<br>REVENUE, and JAMES GRUMBACH<br>　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) |

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF RENEWED
MOTION FOR SUMMARY JUDGMENT OF GARRETT, INC. PURSUANT TO
LOCAL RULE 56.1

1.　Garrett seeks payment in the amount of $48,459.20 from the plaintiff, States Resources Corporation ("SRC"), for auctioneer services provided pursuant to a contract entered into between Garrett and SRC.  Ex. 1, States Resources Response to Interrogatories Propounded By Garrett, Inc. ¶ ¶ 1, 2; Ex. 7.[1]

2.　None of the other parties to this case is a party to the contract, particularly The Architectural Team, Inc. ("TAT").  Id.

3.　The $48,459.20 represents 3.5% of the price for property sold at an auction marketed and "called" by Garrett on behalf of SRC in connection with its foreclosure on

---

[1] All exhibits referenced herein are attached to the Memorandum of Law filed in support of Garrett's Renewed Motion for Summary Judgment, except for Garrett's Verified Counterclaim which was docketed on April 7, 2004 as document no. 8.

        property located in Lincoln, Massachusetts.  See Verified Counterclaim ("VCC") ¶¶ 1-10.

4. SRC believes that a 3.5% commission is reasonable.  Ex. 1, States Resources Response to Interrogatories Propounded By Garrett, Inc. ¶ 1.

5. TAT is the only party in this case that objects to the payment.

6. Garrett is a Massachusetts corporation engaged in the business of, among other things, conducting real estate auctions. VCC ¶¶ 1, 3.

7. Garrett Healey is the president and sole stockholder of Garrett.  Id. ¶ 3.  Mr. Healey has been in the auction business for over thirty years.  Id.

8. Mr. Healey is a licensed and bonded auctioneer in several states, including Massachusetts, and "calls" the auctions for Garrett.  Id.; Ex. 2, Copies of Mr. Healey's Auctioneer's Licenses; Ex. 3, Garrett, Inc. Responses to Interrogatories Propounded by the Architectural Team, ¶ 1(a).

9. Mr. Healey also is a member the Certified Auctioneers Institute ("CAI").  Ex. 4, CAI Diploma.  Mr. Healy completed a four-year university program in order to become a CAI member.  Ex. 5, Deposition of Garrett Healey at p. 348.

10. Garrett regularly provides services to many local, state and federal agencies, major commercial lending institutions, and attorneys. VCC ¶ 3 and Ex. A thereto.

11. In 2002, the Law Office of Doonan, Graves & Longoria, LLC ("Doonan"), acting as an agent for SRC, contacted Mr. Healey for the purpose of hiring him and his company to conduct an auction in connection with SRC's foreclosure on property located at 236 Lincoln Road, Lincoln, Massachusetts ("the Property").  VCC ¶ 5; Ex. 6, Affidavit of John A. Doonan, ¶ 4.

12. The Property was owned by Michael Capizzi (the "Debtors"). VCC ¶ 5.

13. At all material times, Garrett was acting as SRC's agent and upon directions from SRC. Ex. 6 ¶¶ 4-12.

14. Garrett and SRC agreed that Garrett would conduct the auction in return for a 3.5% commission on any sale to a third party, plus reimbursement for expenses. VCC ¶ 6, and Ex. C thereto; Ex. 1 ¶ 2. It is SRC's position that before SRC would be required to pay Garrett, the Court would have to approve any such payment. Ex. 1 ¶ 2. It is Garrett's position that such approval is not a condition precedent to SRC's obligation. VCC ¶ 6. This disagreement, however, is not material because Garrett hereby seeks a Court order requiring SRC to pay Garrett in the amount of $48,459.20.

15. **This figure is arrived by adding: 1) $42,000 (3.5% of the auction price), 2) $2,700 for Auctioneer's Fees, and 3) $3,759.20 in advertising costs**. These charges and expenses are outlined in Garrett's invoice for the auction. Ex. 7, Garrett Invoice; see also VCC at Ex. F thereto.

16. It is customary and usual practice in the real estate auction business for an auctioneer to receive a commission on the sale price received at auction. VCC ¶ 7. Garrett's standard rate is 3.5% of the sale price for sales over $500,000, VCC ¶ 7, which is consistent with what Mr. Healey believes other auctioneers charge.[2] Ex. 5 at p. 344

---

[2] TAT has, in many e-mails to counsel, accused Garrett of price fixing. The record, however, is clear that **at no time has Mr. Healey or Garrett had knowledge of or been a party to any agreement among auctioneers to charge a certain price**. Ex. 5 at p. 350-351 ("**Q: (by Mr. Ring)** Well, do each one agree to 2.5 or 5 percent or just one? **OBJECTION (by Ms. Williams)**: **He has not stated there's been an agreement. I think that's very clear**. **Q: (By Mr. Ring) Let me withdraw that in deference to the keen observations of your attorney**. Is there any understanding that you understand there is among any of these groups as to charge in similar foreclosure situation [sic]? . . . **A: (By Mr. Healey)** I don't know that there's any – any rule, if that's what you're asking me."); see also p. 352-353 ("**A: (By Mr.**

("Our standard rate is 3.5[%]. . . . [T]he standard rate in the industry is from 2 to 5, 5.5 percent even.") It is also customary and usual practice for the auctioneer to paid all advertising and promotional costs and expenses. VCC ¶ 7.

17. Garrett engaged in all necessary promotions, marketing, and scheduling in order to successfully proceed with the auction. Ex. VCC ¶ 8; Ex. 3 ¶ 3(a). This included extensive telemarketing and mailings, as well as the use of published ads in the Boston Globe and its website, over an eight month period. Ex. 3 ¶ 3(a). The auction was scheduled and postponed on 5 occasions, apparently as a result of matters relating to Catherine Capizzi's filing of bankruptcy. VCC ¶ 9. Each time, Garrett undertook all necessary promotional, marketing and scheduling steps to accommodate the rescheduling. VCC ¶ 8. Doonan's office provided Garrett with all information concerning the Property, including that relating to acreage. Ex. 6 ¶ 5. Doonan's office approved all of the ads that Garrett placed on SRC's behalf.[3] Ex. 6 ¶ 6.

18. On July 24, 2003, Garrett held an auction for the Property on behalf of SRC. VCC ¶ 10. Garrett obtained a bid for the Property in the amount of $2,000,000 from a buyer by the name of Linda M. Micu. Id. SRC accepted the Micu offer and a $5,000

---

**Healey**) . . . just like there's no [manual] for what you charge for your fee, there's no [manual] for what I charge for my fee.")

[3]  A sample ad is attached hereto as Exhibit 8. The ad clearly identified the Auctioneer as Garrett D. Healey, as well as identifying his license number. Notwithstanding this, TAT claims that Mr. Healey was not licensed to conduct the auction of the Property. The ads indicated that the Property included "2 ½ acres", and gave the Book and Page Number of the Property at the Middlesex South Book Registry of Deeds. Although TAT received notice of all the auctions scheduled for the Property, it now complains that correct acreage is 6 acres and that it has been aware of this since 1989. Garrett obtained the information regarding acreage from Doonan and had no reason to believe it may have been inaccurate. Ex. 6 ¶ 5. In any event, the actual square footage of the property was announced at the Auction when the "Notice of Mortgage's Sale of Real Estate" was read and the Notice was published before the auction. Ex. 9.

deposit from her. Id. The Micu deal ultimately fell through. Id. ¶ 11. Consequently, SRC requested that Garrett hold another auction for the Property. Id.

19. Sometime in early August 2003, Garrett received a letter, dated August 4, and a $50,000 check, from a Leonard Florence in which Mr. Florence stated that "he would like to" make an offer of $2,000,000 on the Property. Ex. 3 ¶ 6(a); Ex. 6 ¶ 8. **This letter was not received in conjunction with any auction held by SRC.**

20. Mr. Healey informed Attorney Doonan of Mr. Florence's letter. Ex. 6 ¶ 8. Attorney Doonan later informed Mr. Healey that SRC could not accept any offer made outside of the auction process.[4] Ex. 6 ¶ 8.

21. On September 26, 2003 Garrett held another auction on behalf of SRC and Doonan. Id. ¶ 12. Garrett obtained a high bid of $1,200,000, which SRC and Doonan accepted. Id.

22. As a result of obtaining the $1,200,000 for SRC, SRC was able to satisfy the full amount owed to it by its Debtors at that time – $932,630.87. VCC ¶ 13. Doonan was paid for its fees and expenses from the auction proceeds as well. Id.

23. Additionally, Doonan paid $210,096.33 to defendant Architectural Team, Inc., a creditor holding a secondary position to SRC. Id. ¶ 13.

24. SRC has a contractual right under its mortgage and note agreement with the debtor to pay all expenses of the auction, such as Garrett's fee, out of the funds received from the sale. Id. ¶ 13; Ex. 1 ¶ 9. Specifically, the Mortgage granted to SRC states:

Statutory Power of Sale. This Mortgage is upon Statutory Condition, for any breach of which the Lender shall have the Statutory Power of Sale. **Lender shall be entitled to collect**

---

[4] In the meantime, Garrett deposited the check into its escrow account it at Danvers Savings Bank and later returned the $50,000 to Mr. Florence, who had informed Mr. Healey that he was no longer interested in the Property. Ex. 3 ¶ 5(c); Ex. 5 p. 369-371.

**all reasonable costs and expenses incurred inpursuing [sic] the remedies provided in the paragraph 19, <u>including but not limited to,</u> reasonable attorney's fees**. Ex. 10, Mortgage Modification Agreement; Ex. 1 ¶ 9.

25. Attorney Doonan was concerned that Michael Capizzi would have sued SRC and/or him if he had sold the Property outside of the auction process.  Ex. 6 ¶ 9.

26. According to Attorney Doonan, Garrett would have been acting outside of the scope of its authority if it had taken action with respect to or accepted Mr. Florence's proposal.  Ex. 6 ¶ 9, 12.

27. The evidence shows that TAT had notice of both auctions and was present at both of them, including the September 26, 2003 one at which the Property sold for $1.2 million.  Ex. 11 Answers of The Architectural Team, Inc. To Interrogatories Propounded by Garrett, Inc. ¶¶ 1, 3.  Although TAT now complains that this sale figure was insufficient to pay its second lien on the Property, it did nothing at the auction to protect its interest.  Ex. 11, ¶ 2.  Certainly it was within TAT's right to bid on the property with the goal of reselling it at a higher price.  According to TAT, it was aware that the Property included six acres of land and it clearly believes that the Property is worth far more than the $1.2 million for which it sold.  Ex. 11, ¶ 4.

28. Mr. Florence was no longer interested in the Property as of the second auction on September 26, 2003.  Ex. 5 p. 370-371.

                                        Respectfully submitted,
                                        The Defendant,
                                        Garrett, Inc.,
                                        By Its Attorneys,

                                        <u>/s/ Stephanie M. Williams</u>
                                        CARMEN A. FRATTAROLI,  BBO#:  177960
                                        STEPHANIE M. WILLIAMS, BBO#: 560149
                                        Law Office of Carmen A. Frattaroli
                                        76 Lafayette Street
                                        Salem, MA  01970
Date: October 6, 2004               (978) 740-9501