## UNITED STATES OF AMERICA
## DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| **STATES RESOURCES CORPORATION,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | **Civil Action No. 04 10095 DPW** |
| **v.** ) | |
| ) | |
| **MICHAEL CAPIZZI, ET AL.** ) | |
| ) | |
| **Defendants** ) | |
| ) | |
| ) | |

### MEMORANDUM IN SUPPORT OF STATES RESOURCES CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

In support of States Resources Corporation's, ("States"), Motion for Partial Summary Judgment, the Plaintiff, by and through its attorneys, Doonan, Graves & Longoria, LLC, hereby submits the following memorandum of law.

## I.  PROCEDURAL HISTORY

States commenced this Interpleader action on January 15, 2004.  On March 17, 2004, The Architectural Team, Inc., ("TAT"), filed an Answer with Counterclaims against States.  TAT filed an Amended Answer with Counterclaims against States on April 20, 2004.  On May 7, 2004, Michael and Catherine Capizzi, ("Capizzis"), filed an Answer, with Counterclaims against States. On July 1, 2004, the Capizzis filed a Motion to Amend Counterclaims, with Proposed Amended Counterclaims.  On July 8, 2004, TAT filed a Motion to Amend Answer, Counterclaims, Crossclaims, with the Proposed Amended Counterclaim Five.  To date, this Court has not ruled on the Capizzis' or TAT's Motion to Amend.  Discovery commenced between the parties pursuant to this Court's Scheduling Order, dated June 3, 2004, and ended on September 7, 2004.  States now

moves for Partial Summary Judgment on the basis that the Capizzis and TAT have been unable to present evidence that demonstrates a genuine issue of material fact with regard to the allegations put forth in their individual counterclaims.

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the nonmoving party's claims and/or defenses are deficient as a matter of law and that there is no genuine issue of material fact. Fed. R. Civ. P. 56 (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must show that documentary evidence presented does not support the nonmoving party's claims. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The nonmoving party cannot rely on his pleadings and allegations to defeat the summary judgment motion, but must allege specific facts establishing the existence of a material fact. Fed. R. Civ. P 56 (e). As held in *Celotex Corp.,* a nonmoving party must

> make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue at to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Since the claims and counterclaims advanced by TAT and the Capizzis do not meet this well-settled standard, they must be dismissed as a matter of law.

**III.  The claims and counterclaims advanced by the Capizzis and TAT do not meet the well-settled standard.  As a result, summary judgment against the Capizzis and TAT on their counterclaims is warranted.**

      **A.**        **The Capizzis request for declaratory judgment and accounting and claims of breach of contract, unlawful and fraudulent foreclosure and violation of Mass. Gen. Laws. c. 93A must be rejected as a matter of law.**

The Capizzis argue that a "justicable controversy exists" regarding how much they owe on the loan, States's obligation to pay real estate taxes from the escrow account and how much has been paid to date under the loan.  They further assert that States breached the terms of the loan documents, conducted an unlawful and fraudulent foreclosure and, subsequently violated Mass. Gen. Laws c. 93A.  The Capizzis are barred from raising the above allegations pursuant to the doctrine of res judicata and the Rooker-Feldman Doctrine, and, as a result, they must be rejected.

      **1.  _Res Judicata_ bars the Capizzis from asserting their counterclaims against States.**

The Capizzis' claims have been advanced and rejected in previous federal court litigation in this court.  In civil litigation (C.A. No. 02-12319-DPW), the Capizzis asserted claims of declaratory judgment, breach of contract, injunctive relief and violation of Mass. Gen. Laws c. 93A.  This Court rendered a valid, final judgment, on the merits in this case in favor of States in the amount of $875,203.38 on June 9, 2003.  No appeal was taken; however, the Capizzis filed a motion to set aside the default judgment on June 8, 2004, which was opposed by States.  _See_ Exhibit A (a true and correct copy of the Order is attached hereto.)

On March 17, 2004, the Capizzis filed a complaint in Middlesex Superior Court, (C.A. No. 04-1041), again alleging the same claims as in this prior federal litigation, C.A. No. 02-12319-DPW, and as those alleged in this case.   After hearing arguments on the Capizzis' Motion for _Ex-Parte_ Permission to Record Memorandum of Lis Pendes, Justice Burnes denied the motion and dismissed the case on April 13, 2004.  Judge Burnes held that "any interest the Capizzis had in [the Lincoln property] was foreclosed at the foreclosure sale and any and all of their claims have been

litigated numerous times and are barred by *res judicata*." *See* Exhibit B (a true and correct copy of the Clerk's Notice is attached hereto).

The Capizzis then filed a Motion for Reconsideration Pursuant to Mass. G.L. c. 84 § 15 on April 29, 2004. Said motion was denied on April 29, 2004. The Capizzis appealed the denial of the motion and dismissal to a single justice of the Court of Appeals, who also denied their request on May 5, 2004. The Capizzis filed a Notice of Appeal with the Massachusetts Appeals Court on May 12, 2004. The Capizzis requested that their time to file a brief be extended until October 15, 2004. This Court allowed their motion. However, after Kevin Duffy filed an opposition to the Capizzis' motion, the Court vacated its previous Order allowing the Capizzis' motion and ordered that the Capizzis' brief and appendix be filed by September 15, 2004.[1] *See* Exhibit C (a true and correct copy of the Order is attached hereto).

Under the doctrine of r*es judicata* (claim preclusion), once a final judgment on the merits has been rendered on a particular cause of action, the claimant is barred from further asserting the same cause of action in a later suit. *Federated Dept. Stores, Inc. v. Moite*, 452 U.S. 394, 398 (1981). In order for claim preclusion to apply, there must be a valid, final judgment on the merits; the cases must be brought by the same claimant against the same defendant; and the same cause of action must be involved in the later suit. *Kale v. Combined Ins. Co. of America*, 924 F.2d 1161, 1165 (1st Cir. 1991).

The Capizzis had opportunities to litigate the above claims in previous lawsuits filed in federal court. In their second federal suit on these issues, C.A. No. 02-12319-DPW, default judgment was entered in favor of States on its counterclaims in the amount of $875,203.38 and the Capizzis complaint was dismissed with prejudice. Specifically, the Court granted default judgment

---

[1] The court stated "they [the Capizzis] do not have a reasonable likelihood of prevailing on the merits of their present appeal, and that the market ability of the defendant's [Kevin Duffy] real property in Lincoln is negatively affected by the continuing litigation . . ."

on States' counterclaims and held that (1) the Capizzis are in default under the Note; (2) States is authorized to make an entry and to sell the Lincoln property under the Statutory Power of Sale; and (3) the Capizzis were unjustly enriched.

Whereas here, each element of the doctrine of claim preclusion is satisfied, summary judgment is proper. The parties involved in C.A. No. 02-123319-DPW are the same parties involved in this action. Further, the Capizzis' claims involved in C.A. No. 02-12319-DPW are identical to the claims being asserted by the Capizzis in this action. Lastly, a prior, valid, final judgment on the merits exists. Fed. R. Civ. P. 41(b), specifically states that "unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule . . . operates as an adjudication upon the merits." Furthermore, this Circuit has held that "a judgment by default is a 'final disposition of the case and an appealable order'[2] that has the same effect as a judgment rendered after a trial on the merits." *United States v. $23,000 in United States Currency*, 356 F.3d 157, 163 (1st Cir. 2004), *citing* 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Civil § 2684 (3d ed. 1998). The Supreme Court, in *Riehle v. Margolies*, specifically held that "[a] judgment of a court having jurisdiction of the parties and of the subject-matter operates as res judicata." 279 U.S. 218, 225 (1929). Based on all of the foregoing, the challenges to the foreclosure made by TAT and the Capizzis must be rejected since they are barred by the doctrine of *res judicata* and, therefore, summary judgment must be granted against the Capizzis and TAT.

## 2. The claims advanced by TAT and the Capizzis regarding the foreclosure must be rejected pursuant to the *Rooker-Feldman Doctrine*.

Even if not barred by *res judicata*, the Capizzis' claims must be rejected, since they require this Court to review previous Massachusetts State Court decisions relating to the foreclosure action, the summary process proceeding in Concord District Court, and the civil suit against States and

---

[2] No appeal was taken by the Capizzis in C.A. No. 02-12319-DPW.

Kevin Duffy in Middlesex Superior Court.  Identical claims were alleged by the Capizzis in the

Middlesex Superior Court action that was dismissed and is currently on appeal.[3]

Under the *Rooker-Feldman Doctrine*, lower federal courts do not have subject matter

jurisdiction to review Massachusetts state court decisions; this jurisdiction lies only with the

Massachusetts Appeals Court, the Massachusetts Supreme Judicial Court and the United States

Supreme Court.  *See Hill v. Town of Conway,* 193 F.3d 33, 39 (1st Cir. 1999*); see District of*

*Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983); *see Rooker v. Fidelity Trust*

*Co*., 263 U.S. 413, 416 (1923).  Through their counterclaims, the Capizzis are not only asking this

Court to reverse it prior decisions, they are also asking this Court to void the Massachusetts State

Court decisions regarding the foreclosure, the summary process action and the civil action in

Middlesex Superior Court.  Additionally, TAT's claims of unlawful foreclosure also require this

Court to review previous State Court decisions regarding the foreclosure.  The Capizzis' and TAT's

federal court claims are "inextricably intertwined" with issues previously addressed and adjudicated

in the state court actions.  *See Feldman*, 460 U.S. at 483; s*ee Hill*, 193 F.3d at 39.  As a result, this

Court does not have jurisdiction to hear the Capizzis' or TAT's counterclaims and they must be

dismissed pursuant to *the Rooker-Feldman Doctrine.*

**B.       The Capizzis and TAT's claims of unlawful foreclosure and violation of
          Mass. Gen. Laws c. 93A fail to establish a genuine issue of material fact and
          therefore must be rejected as a matter of law.**

The Capizzis and TAT contend that the property located at 236 Lincoln Rd., Lincoln, MA

("Lincoln property") was sold for an inadequate price and was inaccurately advertised by States and

its agents.  TAT further alleges that States conducted the foreclosure sale in bad faith, when it failed

to inform TAT and the Capizzis of an alleged communication from Leonard Florence ("Florence"),

and that States disregarded this alleged third party buyer.  The Capizzis and TAT's claims are based

---

[3] Said claims are 1) declaratory judgment; 2) breach of contract; 3) unlawful and fraudulent foreclosure; 4) violation of
Mass. Gen. Laws. c. 93A; and 5) wrongful eviction.

on an erroneous reading of both Massachusetts statutory and case law.   The Capizzis and TAT have

produced no admissible evidence to support their claims that the foreclosure sale was conducted in

an unlawful manner and in violation of Mass. Gen. Laws c. 93A.   They have failed to alleged

factual issues, which, even if true, could resist summary judgment.   States strictly complied with

Massachusetts statutory law and case law in conducting the foreclosure sale and as previously

determined by the State Courts, the foreclosure was properly conducted and not unlawful.

    **1.   States's foreclosure  was valid as a matter of law.**

    Under Massachusetts law, when exercising the power of sale in a mortgage, the mortgagee

must act in good faith and use reasonable diligence in protecting the interests of the mortgagor.   *See*

*Atlas Mortgage Co. v. Tebaldi*, 304 Mass. 554, 557, 24 N.E.2d 554, 555 (1940); *Chartrand v.*

*Newton Trust Co*., 296 Mass. 317, 320, 5 N.E.2d 421,423 (1936*); Sandler v. Silk*, 292 Mass. 493,

496, 198 N.E. 749, 751 (1935).   Furthermore, if the statutory requirements in Mass. Gen. Laws c.

244, § 11-14 are satisfied, "Massachusetts cases have generally regarded that as satisfying the

fiduciary duty of a mortgagee to deal fairly with the mortgaged property, unless the mortgagee's

conduct manifested fraud, bad faith, or absence of reasonable diligence in the foreclosure sale

process."   *Pemstein v. Stimpson*, 36 Mass. App. Ct. 283, 286-87, 630 N.E.2d 608, 610-11 (1994);

*see also BFP v. Resolution Trust Corp*., 511 U.S. 531 (1994).   Here, there is no evidence to indicate

that States conducted the foreclosure sale in bad faith or absent reasonable diligence.   In fact, the

evidence demonstrates that States not only complied the statutory requirements in Mass. Gen. Laws

c. 244, but also that it went above and beyond those requirements.

    **2.   TAT and the Capizzis' claims that notice was inadequate are unsupported**
       **and cannot resist summary judgment.**

    In conducting the foreclosure of the Lincoln property, States noticed all interested parties,

including the Capizzis and TAT, of the foreclosure sales taking place on July 24, 2003 and

September 26, 2003.   This notice is required under Massachusetts statutory law, in order to allow all

interested parties an opportunity to protect their interests by participating at the auction.   Mass.

Gen. Laws, c. 244, § 14.  In this case, the Notice of Mortgagee's Sale of Real Estate ("Notice") was

published in the Concord Journal on September 4, 2003, September 11, 2003, and September 18,

2003.   *See* Exhibit D (a true and correct copy of the Notice of Mortgagee's Sale is attached hereto).

States also sent, via certified mail, to all interested parties, including the Capizzis and TAT, a

Notice of Intent to Foreclose Mortgage and Intent to Pursue Deficiency after Foreclosure of

Mortgage.   *See* Exhibit E (true and correct copies of the notices are attached hereto).  The Capizzis

and TAT have presented no evidence that States did not provide the requisite statutory notice or that

the Capizzis and TAT did not have statutory notice.  The Capizzis decided not to attend the

foreclosure auctions and Robert Verrier, a representative of TAT, and counsel for TAT did attend.

### 3.   TAT and the Capizzis' challenge to the sale price must be rejected as a matter of law.

The Capizzis and TAT both allege that the Lincoln property sold for a lower price ($1.2

million dollars) than what could have been obtained.  However, they have failed to show any

evidence raising a genuine issue of material fact as to whether the actual price was inadequate.

Massachusetts law requires the mortgagor prove that the foreclosure sale was commercially

unreasonable and that the sales price was grossly inadequate.  *Resolution Trust Corp. v. Carr*, 13

F.3d 425, 429-30 (1st Cir. 1993).  Inadequacy of price will not automatically void a sale, "unless it is

so gross as to indicate bad faith or lack of reasonable diligence."  *Chartrand v. Newton Trust Co*.,

296 Mass. 317, 320, 5 N.E.2d 421, 423 (1936); *see also B.F.P. v. Resolution Trust Corp*., 511 U.S.

531, 538 (1994) ("In short, fair market value presumes market conditions that, by definition, simply

do not obtain in context of forced sale.").   "Auctions conducted with the utmost good faith and due

diligence in full compliance with statutory and mortgage requirements do not necessarily yield a

sale price commensurate with the full market value of the property." *Oyegbola v. DeSimone,* 1996

WL 210689, at 4 (Mass. App. Div. Apr. 12, 1996) *citing American Mech. Corp. v. Union Mac. Co.*, 21 Mass. App. Ct. 97, 101, 485 N.E.2d 680, 683 (1985).

The Capizzis specifically allege that a BPO by real estate broker Kathleen E. Cook "recommends a *marketing price* of $3,700,000.00 or $4,100,000.00 *if* [the Lincoln property] is *subdivided* to include a two acre buildable lot." (emphasis added). The marketing price recommendation is conditioned on the Lincoln property being subdivided. At Michael Capizzi's deposition, he testified that the Lincoln property was not automatically subdividable. He testified that he and his neighbor had met with an engineer to discuss combining both properties and "presenting a subdivision to the town." *See* Exhibit F (a true and correct copy of the Deposition of Michael Capizzi at page 22, lines 16-24 is attached hereto). He further testified that "neither party could do anything else other than have a single lot unless there was a swap of property and a change of some side yard easements and other things." *Id*. Michael Capizzi admitted that in order to subdivide the land, without combining the two lots together, one would have to go before the Town of Lincoln and get a special variance, which he did not do. *See* Exhibit G (a true and correct copy of the Deposition of Michael Capizzi at page 24, lines 7-10 is attached hereto).

The Capizzis have been unable to provide an accurate fair market value of the Lincoln property as it existed when it was sold in September 2003. Additionally, no evidence of an appraisal of the property, not subdivided, has been submitted. In fact, notwithstanding the fact that the Capizzis have advanced this claim in at least three legal forums, Mr. Capizzi admitted in his deposition that no market value appraisals of the property were ever done in 2003. *See* Exhibit H (a true and correct copy of the Deposition of Michael Capizzi at page 27, lines 16-24; and at page 28, lines1-5 is attached hereto). In sum, the Capizzis have presented no factual support for their allegation that the property was sold for a "grossly inadequate sale price" or for "less than one-third

(1/3) of then fair market value." *See Resolution Trust Corp. v. Carr*, 13 F.3d 425, 430 (1st Cir. 1993).

Moreover, even if the fair market value of the property in September 2003 could be shown, the First Circuit has held that even if a property is sold for 56% of its market value, the grossly inadequate standard would not be met. *Resolution Trust Corp,* 13 F.3d at 430 (1st Cir. 1993).  Even though there was the possibility that the property could have been purchased for more than the highest bid, States "was not required to postpone the sale . . . until such time, and on the basis of a remote chance, that another prospective purchaser might appear with a higher bid." *Oyegbola v. DeSimone,* 1996 WL 210689, at 4 (Mass. App. Div. Apr. 12, 1996).  Furthermore, as the First Circuit noted*,*

> it is common knowledge in the real world that the potential price to be realized from the sale of real estate . . . usually is considerably lower when sold 'under the hammer' than the price obtainable when it is sold by an owner not under distress and who is able to sell at his convenience and to wait until a purchaser reaches his price.

*Resolution Trust Corp. v. Carr,* 13 F.3d 425, 430 (1st. Cir. 1993).

TAT alleges that the sale price obtained by States at the September 26, 2003, foreclosure sale "was not the highest value sale price" for the Lincoln property.   Specifically, TAT argues that its interests were damaged, because States accepted the high bid of $1.2 million dollars from Kevin Duffy, even though, as TAT alleges, there was a willing and able buyer with a proposal to purchase the property for two million dollars.  TAT also contends that States should have informed the Capizzis and itself of any communication it had with potential purchasers.

TAT argues that its interests were damaged, because the high bid accepted at the September 26, 2003, auction was not high enough to pay in full the total amount of TAT's execution.  This argument is without merit, since the notice of the sale was provided to all interested parties, including TAT, and in fact, Robert Verrier, a representative of TAT, was present at both auctions

and declined to bid.  *See* Exhibit I (a true and correct copy of the Deposition of Garrett Healey, at page 331, lines 6-24; at page 332, lines 1-13 is attached hereto).  If it felt $1.2 million dollars was not a sufficient amount, TAT had every opportunity to bid in order to protect its interest.  TAT cannot shift the responsibility for its failure to protect its interest to States.  TAT is clearly estopped from challenging the sales price, since it failed to avail itself of its opportunity to bid at the foreclosure sale on September 26, 2003 (of which it now complains) and chose not to.

### 4.  States had no duty to inform TAT or the Capizzis of third party communications.

TAT erroneously contends that Florence made a valid offer to States for the purchase of the Lincoln property and that States had a duty to act on Florence's communications.  States could not sell the property in a private third party sale prior to the foreclosure, only the Capizzis had this right and they failed to exercise it.  Moreover, TAT fails to appreciate that if States had acted on the communications its agents had with Florence, made privately outside the public auction forum, States would have breached Massachusetts law and its fiduciary duty to the Capizzis, TAT and all junior lienholders to act in good faith and with reasonable diligence.[4]  Furthermore, States would have also breached its contract with the Capizzis under the mortgage.[5]  The mortgagee's power of sale specifically provides that the sale of the property must comply with Massachusetts statutory law.   A private sale to a third party would have been void and would not have satisfied the requirements under Mass. Gen. Laws c. 183, § 21.  Said statute specifically provides that "upon default in the performance or observation of the foregoing or other condition, the mortgagee . . . may sell the mortgaged premises or such portion thereof . . . by public auction on or near the premises then subject to the mortgage . . ."  (emphasis added).  If States would have entered into an

---

[4] "A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on the grounds of public policy."  Restatement (Second) of Contracts § 193.
[5] "A promise that tortiously interferes with performance of a contract with a third person or a tortiously induced promise to commit a breach of contract is unenforceable on grounds of public policy."  Restatement (Second) of Contracts § 194.

agreement with Florence regarding the Lincoln property, it would have been liable to the Capizzis and TAT for breach of its fiduciary duty and breach of contract. Furthermore, announcing the Florence communication at the auction would have chilled the sale by discouraging any other bids.

TAT further alleges that States had a duty to communicate to the Capizzis and TAT the substance of its dealings with third parties including an individual at one time interested in the property named Florence. For the purpose of this motion only, States acknowledges that it did not tell the Capizzis or TAT of its communication with any potential bidders at the two scheduled foreclosure sales, including Florence, since under Massachusetts law no such duty exists and, therefore, it was not required to do so.

Massachusetts law provides that there is no duty on the part of a foreclosing entity to disclose any communication it has with third parties. *See Manoog v. Miele*, 350 Mass. 204, 213 N.E.2d 917 (1966). The *Manoog* case dealt with a more stark fact pattern in which the Court refused to impose a duty on the foreclosing entity to disclose an accepted offer to resell the subject property after auction who had in fact agreed to sell the foreclosed property to a third party for more than the auction price. *Id.* The agreement had been made prior to the auction and the property was sold after it had been acquired by the mortgagee. *Id.* Like the communication in *Manoog,* States had no duty to disclose its communications with any third parties.

### 5. <u>TAT's reliance on Snowden is misplaced and cannot resist summary judgment.</u>

TAT's reliance *Snowden v. Chase Manhattan Mortgage Corp*., in previous pleadings in support of its argument that States did not act in good faith and with reasonable diligence is likewise misplaced. 2003 WL 22519518 (Mass. Super. Nov. 5, 2003). Not only is *Snowden* a Massachusetts Superior Court case, it is significantly distinguishable from the facts here. *Id.* at 1-2. In *Snowden*, the Plaintiffs, the mortgagors, alleged that the defendant, the mortgagee, violated Mass. Gen Laws c. 93A by refusing to postpone the auction of their home, even though the mortgagors

12

had produced evidence of a buyer ready and able to purchase the home for a price that would have completely paid off the defendant's loan. *Id.* Unlike *Snowden,* even after a year in foreclosure, Mr. Capizzi, the legal owner of the property and holder of the equity of redemption, never presented States with a prospective buyer qualified to purchase the property for an amount that would have paid in full States' loan.

Garrett Healey, the auctioneer in charge of conducting the auction of the Lincoln property, was in contact with the alleged <u>potential</u> bidder. Since neither States nor Garrett, Inc. could contract to sell the property or were the holders of the equity of redemption, States would have violated Massachusetts law in accepting Florence's communication and not executing a power of sale via a public auction, as clearly required under Mass. Gen. Laws c. 183, § 21. If States would have done what TAT claims they should have done, they would have directly violated Mass. Gen. Laws c. 183, § 21 and c. 244, § 14 and this argument cannot resist summary judgment.[6]

TAT's allegation that the Lincoln property could have been sold for $2,000,000.00 is conclusory and not supported by any factual evidence. On September 26, 2003, the day of the foreclosure sale, all ready, willing and able purchasers registered as bidders and submitted the requisite deposit of $50,000.00. TAT wrongly presumes that Florence was a ready and willing purchaser on that day. Despite being told of the sale date, Florence was not a registered bidder at the sale or even present at the sale.[7] Moreover, TAT cannot provide any factual support that any bid was made by Florence or anyone else at the public auction on September 26, 2003 in the amount

---

[6] TAT further alleges that John Doonan told Garrett Healey ("Healey") not to reveal the Florence communication to TAT or the Capizzis. This allegation is repudiated by Healey's testimony at his deposition, in which he states that John Doonan did not tell him to withhold any information regarding Florence to anyone or to deposit the $50,000.00 check from Florence. *See* Exhibit J (a true and correct copy of the Deposition of Healey at page 164, line 11; at page 186, lines 2-4 is attached hereto). Additionally, it is immaterial and irrelevant to this action where and for how long Healey deposited the Florence check, since Florence's letter was not an offer in compliance with Mass. Gen. Laws c.183, § 21.

[7] In fact, Healey testified at his deposition that in September 2003, prior to the auction, Florence stated that he did not want to bid at the September 26, 2003 auction and "wanted to withdraw his offer at this time." *See* Exhibit K (a true and correct copy of the Deposition of Healey, at page 131, lines 1-8 is attached hereto).

of $2,000,000.00, notwithstanding the fact that TAT's agent was present, registered to bid and free to bid two million or any amount thereof.

States clearly complied with the statutory prerequisites to a foreclosure sale under Mass. Gen. Laws c. 183, § 21 and exercised the foreclosure sale in good faith and used reasonable diligence in protecting Michael Capizzi's interest. *See Atlas Mortgage Co. v. Tebaldi*, 304 Mass. 554, 557, 24 N.E.2d 554, 555 (1940). Thus, even if the argument was not barred as a matter of law by *res judicata* and the *Rooker-Feldman Doctrine*, it must be rejected on its merits. As both the Capizzis and TAT have been unable to produce any evidence to support their allegations that the $1,200,000.00 sale price was unfair and inadequate and, therefore, no genuine issue of material facts exists as to whether the foreclosure of the mortgage was conducted in good faith and with reasonable diligence.

### 6.  **TAT and the Capizzis's claims that inaccurate advertising caused an unlawful foreclosure are without merit.**

The Capizzis and TAT allege that the advertisements published in the Boston Globe for the foreclosure auction on September 26, 2004, were "incorrect" in that they listed the property as having the wrong amount of bathrooms and bedrooms and being on two and one-half acres, instead of six acres, and that, as a result, the foreclosure was unlawful. Mass. Gen. Laws c. 244, § 14 provides that "no sale under such power [of sale] shall be effectual to foreclose a mortgage unless, previous to such sale, notice thereof has been published once in each of three successive weeks . . . in the town where the land lies . . ." Moreover, "in Pemstein , the Court confirmed that when weighing the reasonable diligence involved in a foreclosure sale under Massachusetts law, consideration of the marketing effort for a foreclosed property beyond what is mandated by statute does not come into the equation." *Federal Deposit Insurance Corporation v. Finn*, No. 94-11151-MLW (D. Mass. March 19, 1998) (attached hereto as Exhibit L).

States clearly carried out its duties pursuant to this statute in good faith and with reasonable diligence. *See Atlas Mortgage Co. v. Tebaldi*, 304 Mass. 554, 24 N.E.2d 554 (1940). Both the Capizzis and TAT challenge additional "display" advertisements that Garrett, Inc. ran in the Boston Globe, which were based in good faith upon the Town of Lincoln's records and specifically referenced the mortgage being foreclosed, which contained a legal description of the property. *See* Exhibit M (a true and correct copy of the display advertisement is attached hereto).   As a result, the display ads were diminimus and did not affect the sale.   These advertisements were not the Notice of Mortgagee's Sale of Real Estate ("Notice"), which was required by the Land Court to be advertised in the Concord Journal.   The Notice, which lists the correct legal description of the property and gives its exact square footage, ran in the Concord Journal on September 4, 2003, September 11, 2003, and September 18, 2003.   The Notice was also read at the September 26, 2003 auction. *See* Exhibit N (a true and correct copy of the Deposition of Healey at page 282, lines 16-22).  No further legal ads were required under Massachusetts law. *See West Roxbury Co-Op Bank v. Bowser*, 324 Mass. 489, 493, 87 N.E.2d 113, 115 (1949).   States's good faith and diligence is demonstrated by it going beyond the statutory advertisements required under Massachusetts law and advertising the sale in the Boston Globe, sending out fliers regarding the sale, and listing the sale on Garrett, Inc.'s website.

### 7.  Claims that States is not registered as a foreign corporation does not allow defendants to resist summary judgment.

Both TAT and the Capizzis assert that States is not registered to do business in Massachusetts as a foreign corporation and, therefore, did not have a right to seek relief in the Massachusetts State Court system.  States is a foreign corporation formed under the laws of Iowa. States has never filed a certificate with the Commonwealth of Massachusetts, since it is not required to under Massachusetts statutory law and case law.

Under Mass. Gen. Laws c 181, § § 3-4, any foreign corporation considered to be doing business in the Commonwealth of Massachusetts is required to register with the state and file a certificate if it is to seek recovery in State Court. Mass. Gen Laws c. 181, § 9, provides that if a foreign corporation fails to register with the Commonwealth, it may not maintain an action or seek recovery "in any of the courts of the Commonwealth." TAT and the Capizzis' argument is irrelevant where, as here, States is not seeking relief, but is turning the surplus proceeds from a foreclosure over to the court for distribution. It is the defendants who have sought to re-litigate legal issues in this context.

Moreover, while this statute governs foreign corporations doing business in Massachusetts, it is limited by the Constitution. If a foreign corporation is exclusively engaged in interstate business, a state cannot constitutionally require the foreign corporation to obtain a certificate to do business in the state or prohibit a foreign corporation from access to its courts. *Goodwin Bros. Leasing, Inc. v. Nousis*, 373 Mass. 169, 174, 366 N.E.2d 38, 42 (1977).

In order to determine if a foreign corporation is engaged in interstate commerce, one must look to the facts of each case and to the corporation's business activities in Massachusetts. *Id*. at 42. States is corporation organized under the laws of Iowa, with a principal place of business in Omaha, NE, which is also where all executive decisions are made. States does not have an office in Massachusetts or any employees located in Massachusetts. States does not solicit business, hold any meetings or have any assets located in Massachusetts. *See Goodwin Bros. Leasing, Inc. v. Nousis*, 373 Mass. 169, 175, 366 N.E.2d 38, 42 (1977); *see also Shulton, Inc. v. Consumer Value Stores, Inc.* 352 Mass. 605, 611, 227 N.E.2d 482, 485 (1967). Furthermore, States has only commenced one foreclosure proceeding in Massachusetts in the last two years. It is apparent, based on the above facts, that States is engaged exclusively in interstate commerce, with little, if any incidental activity in Massachusetts. As a result, even if this were not a surplus money proceeding,

Mass. Gen. Laws c. 181 is inapplicable in this case and States is entitled to summary judgment notwithstanding this argument.[8]

### 8. TAT's argument that Garrett, Inc. is unlicensed is without merit and cannot resist summary judgment.

TAT also argues that Garrett, Inc. does not hold an auctioneers license from the Commonwealth of Massachusetts, as required under Mass. Gen. Laws c. 100, § 2. This argument is irrelevant. Garrett Healey, the president of Garrett, Inc. and the person who conducted the foreclosure sale of the Lincoln property on September 26, 2003, does have a Massachusetts's auctioneers license. *See* Exhibit O (a true and correct copy of the Deposition of Healey, at page 18, lines 10-11 is attached hereto).

### 9. The Capizzis' argument that they were able to reinstate is not supported by the facts and cannot prevent summary judgment.

The Capizzis allege that the foreclosure was unlawful and in violation of Mass. Gen. Laws c. 93A, since they wanted to reinstate the mortgage, but their reinstatement requests were ignored by States. The Capizzis have failed to provide any evidence to support their allegations that States and its agents ignored their requests to reinstate. Furthermore, the Capizzis have failed to show that they could have reinstated. The Capizzis had reinstated on prior occasions. They knew well how to reinstate, were represented by counsel and yet made no effort to reinstate prior to the foreclosure. Rather they attempted to thwart the foreclosure in a myriad of ways, including filing bankruptcy and civil suits, all of which were unsuccessful.

In Catherine Capizzi's deposition, she testified that in September 2003, she and her husband would have had sufficient funds to reinstate once the property located at 350 North Street, Boston, MA ("Boston property") was sold. *See* Exhibit P (a true and correct copy of the Deposition of Catherine Capizzi, at page 43, lines 1-23 is attached hereto). However, Catherine Capizzi admitted

---

[8] See also discussion on the Rooker-Feldman doctrine at page 5.

that in September 2003 the Boston property had not been sold nor had a purchase and sale agreement been signed. *Id.* Catherine Capizzi further testified that other than selling part of the Lincoln property or selling the Boston property, they did not have any other assets that they could have used to reinstate the mortgage. *See* Exhibit Q (a true and correct copy of the Deposition of Catherine Capizzi at page 46, lines 20-24; at page 47, lines 1-4 is attached hereto). Further, at this time, Catherine Capizzi was in bankruptcy and the Boston property was part of her estate and could not be sold to pay obligations on the Lincoln property. Since the evidence demonstrates that in September 2003 the Capizzis did not have the ability to reinstate their loan, their allegation is factually deficient and must be rejected as a matter of law.

C.     **TAT's claim that States conducted a "questionable first sale" on July 24, 2003 that resulted in infecting future sales is unsupported by the documentary evidence and must be rejected as a matter of law.**

TAT asserts that States should not have accepted the deposit check of Linda Micu, the successful bidder at the July 24, 2003 auction, since the funds for the bank check made out to Linda Micu allegedly came from Catherine Capizzi. The foreclosure documents allow the mortgagee full discretion in deciding who is allowed to bid. Under the terms of the original Notice of Mortgagee's Sale of Real Estate, a person could qualify to bid at the foreclosure sale upon proof of a cashier's check or certified check in the amount of $5,000.00. To prohibit Linda Micu from bidding and purchasing the Lincoln property, after furnishing the requisite deposit, States would have "chilled" the sale. States had a fiduciary duty to allow all registered bidders to bid on the property. While Michael Capizzi and Catherine Capizzi admitted in their depositions that at the July 24, 2003, sale that Linda Micu was acting as an agent for them, at the time of said sale, neither States nor its agents had any knowledge of the Capizzis' agreement with Linda Micu. *See* Exhibit R (a true and correct copy of the Deposition of Catherine Capizzi, at page 20, lines 15-16 is attached hereto); *see also* Exhibit S (a true and correct copy of the Affidavit of Robin Oberg is attached hereto).

Catherine Capizzi further testified that she gave Linda Micu the $5,000.00 bank check, with money given to her by her brother, and that she gave Linda Micu no instructions regarding the amount to bid, other than to be the highest bidder. *See* Exhibit T (a true and correct copy of the Deposition of Catherine Capizzi at page 21, lines 12-20; at page 28, lines 2-6 is attached hereto). As the evidence shows, States fully complied with its duties under Massachusetts law in conducting the July 24, 2003 sale and, therefore, no genuine issue of material fact exists at to whether the July 24, 2003 sale was "questionable" and "[infected] all future sales." In fact, if what the Capizzis allege in their depositions is true, they had an extra thirty days to payoff the loan, but were unable to do so. In sum, the Micu bid only bought the Capizzis additional time, it did not invalidate the subsequent sale as a matter of law.

### D.    TAT's claims for an accounting and unjust enrichment are vague, unsubstantiated allegations that must be rejected as a matter of law.

TAT seeks a full accounting of the sale proceeds that resulted from the foreclosure sale of the property located at 236 Lincoln Rd., Lincoln, MA and all sale proceeds due it. TAT further claims that States was unjustly enriched by "sums added to the principle balance and interest" and "may have entered into an unreasonable fee arrangement with Garrett, Inc." TAT has failed to make a sufficient showing to support its claims. Said claims are only conclusory allegations and not supported by documentary evidence.

This interpleader action was commenced in order to enable this Court to determine which interested parties have rights to the surplus funds. Furthermore, although States and Garrett, Inc. agreed to a commission fee of three and one half percent (3 ½ %) of the third party sale price, said agreement was conditioned on the Court's approval. *See* Exhibit U (a true and correct copy of the email evidencing the agreement is attached hereto). TAT has failed to provide any evidence of an unreasonable fee arrangement or that States was unjustly enriched by the sale proceeds.

TAT is estopped from challenging the distribution of post foreclosure funds, since they accepted a disbursement of said funds. TAT has neglected to acknowledge the payment made by States to TAT in the amount of two hundred ten thousand ninety-six and 33/100 ($210,096.33) dollars, in consideration for TAT signing an Indemnification Agreement. Through email communications between November 7, 2003 and November 10, 2003, States and TAT negotiated an agreement in which the States would disburse said funds from the proceeds of the foreclosure sale to TAT in consideration for TAT indemnifying States and its agents. *See* Exhibit V (true and correct copies of the emails exchanged are attached hereto). Through its attorneys, States sent TAT a check in the amount of two hundred ten thousand ninety-six and 33/100 ($210,096.33) dollars. TAT negotiated the aforesaid check on or about November 13, 2003. As a matter of law, by accepting and negotiating the payment, TAT agreed to the terms of the contract and waived any challenge it may have to the distribution of the surplus funds.

## IV. CONCLUSION

The Plaintiff respectfully requests that this Court grant States Resources Corporation's Motion for Partial Summary Judgment and dismiss all counterclaims brought by Michael and Catherine Capizzi and The Architectural Team, Inc.

Respectfully Submitted,

Date:  October 6, 2004

/s/ John A. Doonan
John A. Doonan, Esq. (BBO# 547838)
Reneau J. Longoria, Esq. (BBO#635118)
Doonan, Graves & Longoria, L.L.C.
100 Cummings Center, Suite 213C
Beverly, MA  01915
(978) 921-2670

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL J. CAPIZZI, ET AL.,          )
      Plaintiffs                  )          CIVIL ACTION NO.
                             )          01-11298-DPW
        v.                      )
                             )
STATE RESOURCES, CORP.,              )
      Defendant.                  )

### ORDER ON MOTIONS

After a conference this date at which time the Plaintiff's failed to Appear, it is hereby

ORDERED:

1. The Defendant's Motion for Default Judgment on its counterclaim (#29) is ALLOWED as proposed;

2. The Defendant's Motion to Dismiss the Plaintiff's Complaint (#23) is allowed WITH PREJUDICE;

3. All other pending motions ([14] Motion for Miscellaneous Relief; Motion to Dismiss filed by State Resources Corp, [21]; Motion for Entry of Default filed by State Resources Corp, [2] Motion for Preliminary Injunction filed by Michael J. Capizzi, Catherine Capizzi; [23] Motion to Compel filed by State Resources Corp, [4] Motion for Miscellaneous Relief filed by Michael J. Capizzi, Catherine Capizzi; and [18] Motion to Withdraw as Attorney filed by Michael J. Capizzi, Catherine Capizzi, shall be terminated from the docket as moot in view of the dismissal of this action.

                                    /s Rebecca Greenberg
                                    Deputy Clerk

Dated: June 9, 2003



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL J. CAPIZZI, ET AL.,　　　　　)
　　　　　Plaintiffs　　　　　　　　　　)　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　　　　)　　01-11298-DPW
　　　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
STATE RESOURCES, CORP.,　　　　　　　)
　　　　　Defendant.　　　　　　　　　)

## DEFAULT JUDGMENT ON COUNTERCLAIMS
## AND ORDER OF DISMISSAL OF COMPLAINT

In accordance with 1) The Court's allowance of the Defendant's Motion for a Default

Judgment at a conference this date, at which time the Plaintiffs failed to Appear, 2) The Court's

allowance of the Defendant's Motion to Dismiss the Plaintiff's Complaint, 3) a Notice of default having

been entered on April 9, 2003 against each Plaintiff, and 4) the plaintiffs having failed to plead or

otherwise defend in this action against the Counterclaims of Defendant, State Resources Corp., and 5)

upon application of Defendant and Counterclaim Plaintiff State Resources Corp., and affidavits

demonstrating that Plaintiffs owe Defendant the sum of $816,983.37, and that Plaintiffs are not infants

or incompetent people or in the military service of the United States, and the Defendant has incurred

costs of $58,220.01, it is hereby ORDERED, ADJUDGED and DECREED:

　　**1.  Judgment for Defendant and Counterclaim Plaintiff State Resources
　　Corp. against the Plaintiffs Michael Capizzi and Catherine Capizzi, in
　　the sum of $875,203.38, with interest as provided by law;  and**

　　**2.  Dismissal of Plaintiff's Complaint, <u>With Prejudice</u>.**

　　　　　　　　　　　　　　　　　　/s Rebecca Greenberg
　　　　　　　　　　　　　　　　　　Deputy Clerk

Dated: June 9, 2003

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

Civil Docket **MICV2004-01041**

RE:    Capizzi v States Resources Corporation et al

TO:    John A Doonan, Esquire
Doonan Graves & Longoria LLC
100 Cummings Center
Suite 213C
Beverly, MA 01915

---

## **CLERK'S NOTICE**

This is to notify you that in the above referenced case the Court's action on **04/22/2004**:

*RE: Plaintiff Michael & Catherine R Capizzi's Ex Parte MOTION to record memorandum of Lis Pendens. The within matter is set down for hearing on April 5, 2004 in Courtroom 9B at 2:00 pm (Burnes, J.)*

**is as follows:**

**MOTION (P#3) After hearing this motion is DENIED and pusuant to c 184 sec 15 the case is dismissed. Any interest the Capizzis had in this property was forclosed at the forclosure sale and any and all of their claims have been litigated numorous times and are barred by res judicator. Dated: April 13, 2004 (Nonnie S. Burnes, Justice) Notices mailed April 22, 2004**

Dated at Cambridge, Massachusetts this 22nd day of April, 2004.

Edward J. Sullivan,
Clerk of the Courts

BY:

Michael H. Powers/James Lynch
Assistant Clerk

Telephone: 617-494-4010 EXT 4274

Copies mailed 04/22/2004



cvdresult_2.wpd 2549859 motden johnson

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

04-P-891

MICHAEL CAPIZZI & another[1]

<u>vs</u>.

STATE RESOURCES CORPORATION & another.[2]

<u>ORDER</u>

The defendant, Kevin P. Duffy, seeks reconsideration of an administrative order enlarging the time for filing of the plaintiffs' brief to October 15, 2004.  The plaintiffs' request was allowed on the basis of representations by them that they are pro se; need additional time to prepare; and are simultaneously representing themselves in the United States District Court (Mass.) in related litigation.

In making their request, the plaintiffs omitted considerable history, including an unfavorable decision in the Federal litigation on their motion for a temporary restraining order,[3] that indicates both that they do not have a reasonable likelihood of prevailing on the merits of their present appeal, and that the marketability of the defendant's real property in Lincoln is

---

[1] Catherine R. Capizzi.

[2] Kevin P. Duffy.

[3] See <u>Michael Capizzi, et al</u> v. <u>State Resources Corp., et al</u>, C.A. No. 04-10533-DPW.

negatively affected by the continuing litigation, the recording of certain notices in the Middlesex Registry of Deeds, and the delay in bringing the dispute to a conclusion.

The defendant's motion for reconsideration is allowed.  The administrative order dated August 9, 2004, is vacated.  The plaintiffs' brief and appendix shall be filed not later than September 15, 2004.

<u>So ordered</u>.

By the Court (Cowin, J.),

Assistant Clerk

Entered: August 16, 2004

2

# NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

By virtue and in execution of the Power of Sale contained in a certain mortgage given by Michael Capizzi and Catherine R. Capizzi to Winchendon Savings Bank dated 10/19/88, recorded with Middlesex County (Southern District) Registry of Deeds at Book 19420, Page 84 of which mortgage the undersigned is the present holder for breach of conditions of said mortgage and for the purpose of foreclosing the same will be sold at PUBLIC AUCTION at **11:30 a.m.** on **September 23, 2003**, on the mortgaged premises. The entire mortgaged premises, all and singular, the premises as described in said mortgage:

The following parcels of land situated in the Southerly part of Lincoln, Middlesex County, Commonwealth of Massachusetts:

1)  That parcels of land described as Lot 117-22-.01 on a plan entitled "Plan of Land in Lincoln, MA., owned by John L. Przybylski, scale 1 inch = 60 feet, Snelling, Hilton & Asso., Lincoln, MA., Civil Engineers & Land Surveyors, dated May 19. 1980" and recorded with Middlesex County South District Registry of Deeds in Book 14168, Page 381; bounded and described as follows:

SOUTHEASTERLY     by land now formerly of Gallitano, as shown on said plan, Two Hundred Fifty-Three and 71/100 (253.71) feet;

SOUTHWESTERLY     by lot 117-22.012, as shown on said plan, by two lines, Two Hundred Five and 71/100 (205.71) feet, and Two Hundred Fifty-Eight and 22/100 (258.22) feet;

NORTHWESTERLY     by Lot 117-22.02, as shown on said plan, Two Hundred Fifteen and 48/100 (215.48) feet;

NORTHERLY     by 117-22.02, by a curved line Sixty-Three and 68/100 (63.68) feet;

NORTHEASTERLY     by Lot 117-22.02, Two Hundred One and 89/100 (201.89) feet;

EASTERLY     by Lot 117-22.02, by a curved line, One Hundred Twenty-Three and 66/100 (123.66) feet, to the point of beginning.

e:\Massachusetts Foreclosures\Generated_Forms\NMS_Foreclosure_Capizzi_4505.87F



Said Lot containing 111,494 square feet, more or less according to said plan.

2) That parcel of land described as Lot 117-21.012 on the aforementioned plan, bounded and described as follows:

SOUTHEASTERLY      by land now or formerly of Gallitano, as shown on said plan, One Hundred Twenty-Eight and 48/100 (128.48) feet;

SOUTHWESTERLY      by land now or formerly of Coffin and the Lincoln Land Conservation Trust and Burt, by four lines, Fifty-Three (53.00) feet, Three Hundred Forty and 95/100 (340.95) feet, Seventy-Nine (79.00) feet, and Sixty-Four and 88/100 (64.88) feet;

WESTERLY      by land, now or formerly of Burt, Eighty-Four and 31/100 (84.31) feet;

NORTHWESTERLY      by Lots 117-21.07 and 117-22.02 by two lines, One Hundred Fifteen and 29/100 (115.29) feet, and by a curved line Sixty-Four and 15/100 (64.15) feet;

NORTHEASTERLY      by Lot 117-22.01, by two lines, Two Hundred Fifty-Eight and 22/100 (258.22) feet, and Two Hundred Five and 71/100 (205.71) feet to the point of beginning.

Said Lot containing 85,737 square feet, more or less, according to said plan.

3) That parcel of land described as Lot 117-22.03, on "Plan Showing Subdivision of Land in Lincoln, MA, owned by Alphonse L. and Eleanor M. Gallitano and John L. and Jean M. Przybylski (scale 1 inch = 60 feet) July 1975, Snelling, Hilton & Assoc., Lincoln, MA, Civil Engineers and Land Surveyors", and recorded with Middlesex South District Registry of Deeds in Book 12893, Page 712, bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY | by Lot 117-22.02 as described on said plan, One Hundred Eighty-Three and 51/100 (183.51) feet; |
| NORTHWESTERLY | by land now or formerly of John A. and Marion M. MacDearmid, Two Hundred Twenty-Eight and 43/100 (228.43) feet; |
| NORTHEASTERLY | by Lot 117-22.04 as described on said plan, Two Hundred Twenty-Eight and 32/100 (228.32) feet, to point of beginning. |

Containing 19, 190 square feet more or less according to said plan.

4) That parcel of land described as Lot 117-22.02 (a minor street) on the above mentioned plan. Containing 33,310 square feet more or less. Subject to a right of way granted to Alphonse L. and Eleanor M. Gallitano, husband and wife, and their heirs and assigns, dated November 12, 1975, and recorded in Book 12893, Page 718. For a more definite description refer to said plan in Book 12893, Page 712.

5) That parcel of land described as Lot 117-21.07 on a "Plan Showing an Exchange of Land in Lincoln, MA., Snelling, Hilton & Assoc.-Lincoln, Mass., Civil Engineers & Land Surveyors, June 1976" recorded with Middlesex South District Registry of Deeds in Book 13332, Page 155, more particularly described as follows:

| | |
|---|---|
| NORTHEASTERLY | by Lot 117-21.06, Eighty-Eight and 56/100 (88.56) feet; |
| SOUTHEASTERLY | by Lot 117-22.01, One Hundred Fifteen and 29/100 (115.29) feet; and |
| WESTERLY | by Lot 117-21, One Hundred Fourteen and 44/100 (114.44) feet to the point of beginning. |

Containing according to said plan 4,694 square feet, more or less.

6) A right of way for all usual purposes that streets and ways are now or have been used in the Town of Lincoln over that parcel of land described in a Plan of Land entitled "Plan Showing Subdivision of Land in Lincoln, MA. , owned by Alphonse L. And Eleanor M. Gallitano and John L. And Jean M. Przybylski", scale 1 inch = 60 feet, July 1975, Snelling, Hilton & Assoc., Lincoln, MA., Civil

e:\Massachusetts Foreclosures\Generated_Forms\NMS_Foreclosure_Capizzi_4505.87F

Engineers & Land Surveyors, being Lot 117-22.04 as described on said plan and having a width of 33 feet and an area of 39, 958 square feet more or less. For a more definite description see plan recorded in Book 12893, Page 712, said deeds.

7) All right, title and interest in an undivided one-half interest in and to certain easements which the grantor owns and has the benefit of by virtue of reservation of said easements in deed from concord Countyside Realty, Inc. To William F. Burt and Donna G. Burt , of Lots 1, situated Longmeadow Road in the Town of Lincoln, Middlesex County, Comonwealth of Massachusetts, as shown on a plan entitled "Plan of land in Lincoln, Mass., dated October 28, 1971, Albert A. Miller and Wilbur C. Nylander, Civil Engineers and Surveyors, recorded with Middlesex County South District Registry of Deeds as Plan No. 143 (A of 3) of 1972 and recorded Book 12158, Page 071, said deed being dated September 1, 1972, recorded with Middlesex South District Registry of Deeds in Record Book 12281, Page 98, said reserved easements being described in said deed as follows:

"The within conveyancing is made subject to reservation of right of a right of way and easement 50' in width extending from Longmeadow Road to the land of Dorothy G. Gray as shown on the aforementioned plan along the Northeasterly boundary being a distance of 198.91 feet according to said plan; said right of way and easement being for all purposes for which streets and ways are commonly used in the Town of Lincoln and including without limiting the foregoing the right to install electric, telephone, water, sewer, gas, facilities, equipment and services to and from Longmeadow Road to the Land of said Dorothy G. Gray, including the right to operate, maintain and repair the same."

Said premises are further conveyed subject to and with the benefit of easements, rights restriction and agreements of record, if any there be, insofar as the same are now in force and applicable.

For title, see deed to the mortgagor recorded with said Deeds in Book 17611, Page 334.

Subject to and with the benefit of easements, reservation, restrictions, and taking of record, if any, insofar as the same are now in force and applicable.

In the event of any typographical error set forth herein in the legal description of the premises, the description as set forth and contained in the mortgage shall control by reference.

This property has the address of **236 Lincoln Road, Lincoln, MA 01773.**

e:\Massachusetts Foreclosures\Generated_Forms\NMS_Foreclosure_Capizzi_4505.87F

Together with all the improvements now or hereafter erected on the property and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this sale.

**Terms of Sale:**

Said premises will be sold subject to any and all unpaid taxes and assessments, tax sales, tax titles and other municipal liens and water or sewer liens and State or County transfer fees, if any there are, and FIFTY THOUSAND DOLLARS ($50,000.00) in cashier's or certified check will be required to be paid by the purchaser at the time and place of the sale as a deposit and the balance in cashier's or certified check will be due in thirty (30) days, at the offices of DOONAN, GRAVES, & LONGORIA L.L.C, 16 Front Street, Salem, Massachusetts, time being of the essence.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale-date by public proclamation at the time and date appointed for the adjourned sale date.

The premises is to be sold subject to and with the benefit of all easements, restrictions, leases, tenancies, and rights of possession, building and zoning laws, encumbrances and all other claim in the nature of liens, if any there be.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or the terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder, providing that said second highest bidder shall deposit with the Mortgagee's attorneys, DOONAN, GRAVES, & LONGORIA L.L.C., 16 Front Street, Salem, Massachusetts, 01970, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous highest bidder and title shall be conveyed to the said second highest bidder within twenty (20) days of said written notice.

If the second highest bidder declines to purchase the within described property, the Mortgagee reserves the right to purchase the within described property at the amount bid by the second highest bidder.

The foreclosure deed and the consideration paid by the successful bidder shall be held in escrow by DOONAN, GRAVES, & LONGORIA L.L.C., (hereinafter called the "Escrow Agent") until the deed shall be released from escrow to the successful bidder at the same time as the consideration is released to the Mortgagee, thirty (30) days after the date of sale, whereupon all obligations of the Escrow Agent shall be deemed to have been properly fulfilled and the Escrow Agent shall be discharged.

e:\Massachusetts Foreclosures\Generated_Forms\NMS_Foreclosure_Capizzi_4505.87F

Other terms to be announced at the sale.

Dated: August 26, 2003

States Resources Corp.

By: John A. Doonan. Esq.,
DOONAN, GRAVES, & LONGORIA L.L.C.
16 Front Street Salem, MA 01970
(978) 741-2680

e:\Massachusetts Foreclosures\Generated_Forms\NMS_Foreclosure_Capizzi_4505.87F

# DOONAN, GRAVES & LONGORIA, LLC
## ATTORNEYS AT LAW

*Serving Massachusetts, Maine,*
*New York & Washington*

**Certified Article Number**

7160 3901 9844 4857 4983

**SENDERS RECORD**

*www.doonanandgraves.com*

*16 Front Street*
*Salem, Massachusetts 01970*
*TEL: (978) 741-2680*
*FAX: (978) 744-8780*

---

## NOTICE OF INTENT TO FORECLOSE MORTGAGE AND INTENT TO PURSUE DEFICIENCY AFTER FORECLOSURE OF MORTGAGE

---

September 3, 2003

Catherine R. Capizzi
236 Lincoln Road
Lincoln, MA  01773

**VIA CERTIFIED MAIL**

RE: 236 Lincoln Road, Lincoln, MA  01773

Dear Sir or Madam:

You are hereby notified, pursuant to Massachusetts General Laws, Chapter 244, §14, of the intention of States Resources Corp., on or after September 23, 2003 at 11:30 a.m to foreclose by sale, under the power of sale for breach of conditions, the mortgage given by Michael Capizzi and Catherine R.  Capizzi to Winchendon Savings Bank dated 10/19/88 and recorded at the Middlesex County (Southern District) Registry of Deeds Registry of Deeds at Book 19420, Page 84, which mortgage was to secure a note of the same date given by you, for the whole or part, of which you may be liable to the aforesaid Lender in case of a deficiency in the proceeds of the foreclosure sale.

Very truly yours,
States Resources Corp.
by its attorneys
DOONAN, GRAVES, & LONGORIA L.L.C.,

by
John A. Doonan, Esq.

kp/JD

**EXHIBIT**

E

2. Article Number

7160 3901 9844 4857 4983

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery

C. Signature

X _____    ☐ Agent ☐ Addressee

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

LINCOLN, MA 01773 SEP 8 2003 USPS

3. Service Type    **CERTIFIED MAIL**

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

Catherine R. Capizzi
236 Lincoln Road
Lincoln, MA 01773

KP/NMS 9/3/03    Doonan, Graves & Lon

PS Form 3811, July 2001    Domestic Return Receipt

---

7160 3901 9844 4857 4983

**TO:**  Catherine R. Capizzi
236 Lincoln Road
Lincoln, MA 01773

**SENDER:**  Doonan, Graves & Lon

KP/NMS 9/3/03

**REFERENCE:**

PS Form 3800, June 2000

| RETURN RECEIPT SERVICE | Postage | .33 |
|---|---|---|
| | Certified Fee | 1.40 |
| | Return Receipt Fee | 1.25 |
| | Restricted Delivery | 0.00 |
| | Total Postage & Fees | 2.98 |

US Postal Service    POSTMARK OR DATE

**Receipt for Certified Mail**

No Insurance Coverage Provided
Do Not Use for International Mail

# DOONAN, GRAVES & LONGORIA, LLC
## ATTORNEYS AT LAW

*Serving Massachusetts, Maine,*
*New York & Washington*

*www.doonanandgraves.com*

**Certified Article Number**

**7160 3901 9844 4857 4990**

**SENDERS RECORD**

*16 Front Street*
*Salem, Massachusetts 01970*
*TEL: (978) 741-2680*
*FAX: (978) 744-8780*

---

### NOTICE OF INTENT TO FORECLOSE MORTGAGE AND INTENT TO PURSUE DEFICIENCY AFTER FORECLOSURE OF MORTGAGE

---

September 3, 2003

Michael Capizzi
236 Lincoln Road
Lincoln, MA 01773

**VIA CERTIFIED MAIL**

RE: 236 Lincoln Road, Lincoln, MA 01773

Dear Sir or Madam::

You are hereby notified, pursuant to Massachusetts General Laws, Chapter 244, §14, of the intention of States Resources Corp., on or after September 23, 2003 at 11:30 a.m to foreclose by sale, under the power of sale for breach of conditions, the mortgage given by Michael Capizzi and Catherine R. Capizzi to Winchendon Savings Bank dated 10/19/88 and recorded at the Middlesex County (Southern District) Registry of Deeds Registry of Deeds at Book 19420, Page 84, which mortgage was to secure a note of the same date given by you, for the whole or part, of which you may be liable to the aforesaid Lender in case of a deficiency in the proceeds of the foreclosure sale.

Very truly yours,
States Resources Corp.
by its attorneys
DOONAN, GRAVES, & LONGORIA L.L.C.,

by:
John A. Doonan, Esq.

kp/JD

e:\Massachusetts Foreclosures\Generated_Forms\Notice of Deficiency_Foreclosure_Capizzi_4505.87F

2. Article Number

7160 3901 9844 4857 4990

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery

Michael Capizzi

C. Signature

X _M.C._    ☐ Agent
            ☑ Addressee

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:           ☐ No

LINCOLN MA 01773
SEP 8 2003
USPS

3. Service Type   CERTIFIED MAIL

4. Restricted Delivery? (Extra Fee)    ☐ Yes

1. Article Addressed to:

Michael Capizzi
236 Lincoln Road
Lincoln, MA  01773

KP/NMS 9/3/03                Doonan, Graves & Lon

PS Form 3811, July 2001          Domestic Return Receipt

---

7160 3901 9844 4857 4990

TO:    Michael Capizzi
       236 Lincoln Road
       Lincoln, MA  01773

SENDER:    Doonan, Graves & Lon

           KP/NMS 9/3/03

REFERENCE:

PS Form 3800, June 2000                    .33

| RETURN RECEIPT SERVICE | Postage | 1.40 |
|---|---|---|
| | Certified Fee | 1.25 |
| | Return Receipt Fee | 0.00 |
| | Restricted Delivery | |
| | Total Postage & Fees | 2.98 |

US Postal Service          POSTMARK OR DATE

**Receipt for
Certified Mail**

No Insurance Coverage Provided
Do Not Use for International Mail

# DOONAN, GRAVES & LONGORIA, LLC
## ATTORNEYS AT LAW

*Serving Massachusetts, Maine,*
*New York & Washington*

*www.doonanandgraves.com*

*16 Front Street*
*Salem, Massachusetts 01970*
*TEL: (978) 741-2680*
*FAX: (978) 744-8780*

Certified Article Number

7160 3901 9844 4857 5010

SENDERS RECORD

## NOTICE OF INTENT TO FORECLOSE MORTGAGE

September 3, 2003

Jordan Lewis Ring & Associates
4 Longfellow Place, 37th Floor
Boston, MA 02114

**VIA CERTIFIED MAIL**

Re:     236 Lincoln Road, Lincoln, MA 01773
        Case No. 284167

To Whom It May Concern:

You are hereby notified, pursuant to Massachusetts General Laws, Chapter 244, §14, of the intention States Resources Corp., on or after September 23, 2003 at 11:30 a.m, to foreclose by sale, under the power of sale for breach of conditions, the mortgage given by Michael Capizzi and Catherine R. Capizzi to Winchendon Savings Bank dated 10/19/88 and recorded at the Middlesex County (Southern District) Registry of Deeds at Book 19420, Page 84, which mortgage was to secure a note of the same date.

Very truly yours,

States Resources Corp.
by its attorneys
DOONAN, GRAVES, & LONGORIA L.L.C.,

by
John A. Doonan, Esq.

kp/JD

e:\Massachusetts Foreclosures\Generated_Forms\Notice to Jr. Lien Holders_Foreclosure_Capizzi_4505.87F

**2. Article Number**

||||| barcode |||||

7160 3901 9844 4857 5010

**3. Service Type  CERTIFIED MAIL**

**4. Restricted Delivery?** *(Extra Fee)*  ☐ Yes

**1. Article Addressed to:**

Jordan Lewis Ring & Associates
4 Longfellow Place, 37th Floor
Boston, MA  02114

KP/NMS 9/3/03 Capizzi

Doonan, Graves & Lon

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)     B. Date of Delivery

9/5/03

C. Signature

X _____     ☐ Agent
                    ☐ Addressee

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

PS Form 3811, July 2001          Domestic Return Receipt

---

7160 3901 9844 4857 5010

**TO:**  Jordan Lewis Ring & Associates
        4 Longfellow Place, 37th Floor
        Boston, MA  02114

**SENDER:**  Doonan, Graves & Lon

        KP/NMS 9/3/03 Capizzi

**REFERENCE:**

| PS Form 3800, June 2000 | | .33 |
|---|---|---|
| RETURN RECEIPT SERVICE | Postage | 1.40 |
| | Certified Fee | 1.25 |
| | Return Receipt Fee | 0.00 |
| | Restricted Delivery | 2.98 |
| | Total Postage & Fees | |

US Postal Service          POSTMARK OR DATE

**Receipt for Certified Mail**

No Insurance Coverage Provided
Do Not Use for International Mail

22

1    A    No, I did not.

2    Q    Did you ever attempt to list with a real estate

3         broker any portion of the property at 236 Lincoln

4         Road in Lincoln?

5    A    So my neighbor, Doctor Gallitano, who owns 6 acres,

6         and I -- not only do we own the parcels, but we own

7         the right-of-way coming in, and he owns a certain

8         portion, and I have an easement, and conversely I own

9         the fee in a certain portion and he has an easement.

10        We met with the Town Engineer, as well with a local

11        engineer in Town who handles subdivisions, and we

12        retained his --

13   Q    Who was that?

14   A    Who was it?  I'll have to get you his name.  I'll get

15        you his name.

16             So we met with a local engineer to discuss

17        taking the 12 acres, combining them and presenting a

18        subdivision to the Town.  Because the way the

19        original subdivision took place is that it was

20        gerrymandered so neither party could do anything else

21        other than have a single lot unless there was a swap

22        of property and a change of some side yard easements

23        and other things.  So it guaranteed that if neither

24        party wanted to subdivide, they didn't have to.  And

EXHIBIT

F

24

1    regulations and with the conservation land, something

2    has to be done with the conservation land.  So you go

3    back to the Town, revise the conservation

4    restrictions so that the two acres shifts over to

5    another side, and you can get two houses, plus they

6    still have two acres of --

7  Q  But it's your understanding that in order to do that

8    for 236 Lincoln Road, you'd have to go before the

9    Town and get a special permit or a variance?

10 A  Unless you combine the two lots together.

11 Q  Did you ever make an application to the Town of

12   Lincoln for a special permit or variance for

13   236 Lincoln Road?

14 A  I did not.

15       MR. DOONAN:  Why don't we mark this as 3

16   for Michael's also, and this as 4 for Michael's also.

17       THE STENOGRAPHER:  Okay.

18

19                (Exhibit Number 3, marked;

20                 Official check from Fleet Bank to

21                 Linda Micu in the amount of

22                 $5,000, check #220350844, dated

23                 7/24/03)

24



27

1  building where my mother lives in the North End.  And

2  so I called -- well, for different reasons.  I called

3  for different reasons.  One was to get a value of the

4  land in Lincoln.  One was to get a value of the

5  condominium at North Street.  One was to find -- I

6  gave them the marketing of 350 North Street to find a

7  viable buyer and would they be interested in the

8  developable lots in Lincoln Road, assuming we moved

9  ahead on that subdivision and if they had a buyer for

10  any of those lots, and could this be a quick

11  acquisition.  And that's really, you know, the tenor

12  of a dialogue you'd have with any broker.

13  Q  And they provided these broker's opinions of market

14     value to you?

15  A  Right.

16  Q  And you understood that these were broker opinions of

17     market value not appraisals?

18  A  Correct.

19  Q  Are you aware of any other appraisals of the property

20     on Lincoln Road in Lincoln in 2003?

21  A  2003.  I'm aware that the insurance company came

22     through the house in 2003 and photographed every room

23     for our, you know, for our policy, and did some kind

24     of evaluation of the replacement value of the house.

**EXHIBIT**

H

28

1    I don't believe they did a value of the land and the

2    value of a lot and whatever else.  It was just the

3    replacement value.

4  Q  So it was replacement not market value?

5  A  Right.

6  Q  And who would those people have been?

7  A  That was Chris Piccone, Winchester Benefits Group,

8    and I guess it was Chubb that came and did it.

9  Q  And where is Winchester Benefits Group out of?

10  A  Yes, they're in Stoneham on Montvale Ave.

11  Q  Okay, I'd like you to take a look at the document

12    that has been marked as Exhibit 2 for this

13    deposition.

14  A  Okay.

15  Q  And I would refer you to paragraph 30, which is on

16    page 5.

17  A  Page 5, okay.

18  Q  Before we get to that, are you aware that Linda Micu

19    made a bid of $2 million and then a bid of

20    $2.1 million on the property in Lincoln?

21  A  I'm not.

22  Q  Okay.  The last sentence of paragraph 30, "Upon

23    advice of Counsel, the Capizzis asked a neighbor to

24    bid at the foreclosure sale."

Page 331

1              MS. WILLIAMS:  Objection.

2         A.   I followed the direction of the

3    attorney.

4         Q.   Okay.  And that attorney was?

5         A.   John Doonan.

6         Q.   And you didn't tell me, who you knew,

7    you said you had me at the foreclosure sale, true?

8         A.   I knew you were there.

9         Q.   You knew --

10         A.   I didn't know who you represented.

11         Q.   I didn't introduce myself as the

12    counsel for The Architectural Team?

13         A.   Not to my knowledge.

14         Q.   I didn't give you a card?

15         A.   You gave me a card and you told me

16    that you represent one of the subordinate mortgages.

17         Q.   And I used the word "mortgages"?

18         A.   I'm not sure what you used, but I

19    don't think you specifically told me who your client

20    was.

21         Q.   And you saw -- did you see Robert

22    Berrier at the sale on that date?

23         A.   Who is he?

24         Q.   You don't know Robert Berrier?

EXHIBIT
1

1      A.   Robert?

2      Q.   B-E-R-R-I-E-R?

3      A.   No, I don't.

4      Q.   The Architectural Team.

5      A.   Is that the gentleman that was with

6  you?

7      Q.   That's right.

8      A.   Okay.  I don't know him, but I know he

9  was with you.

10     Q.   Did you ever talk to him?

11     A.   I talked to him when you were there

12 that you and he represented a subordinate lien,

13 loan, mortgage, whatever you had.

14     Q.   Did you ever call his office and tell

15 him about the offer?

16     A.   I didn't know him.  No, I didn't call

17 his office.

18     Q.   Did you ever call his office at all,

19 The Architectural Team's office?

20     A.   Never.

21     Q.   You're absolutely certain about that?

22     A.   Did I call his office?

23     Q.   Yes.

24     A.   I don't even know where his office is.

him.

Q. So you had this letter. You may have sent it to him; you may not have sent it to him?

A. Correct.

Q. Did Mr. Doonan ever say to you please send me a copy of that letter or words to that effect?

A. I don't recall.

Q. Did Mr. Doonan ever tell you not to tell anyone that you had received such a letter?

A. No.

Q. So the decision not to tell or announce the letter to anyone was yours alone and not Mr. Doonan's?

MS. WILLIAMS: Objection.

A. Not to tell?

Q. Yes.

A. A decision not to tell anyone?

Q. Yes.

A. I don't think that was a decision. Why would I even think of telling anyone?

Q. So it never came to your thought that you should tell Mr. Capizzi or any one of the attorneys involved with the property about th

1 withdraw it.

A.   Well, Mr. Doonan didn't tell me to put

in my client fund account or in any account.  He

st, basically, said to me just hold on.

I'll have to get back to you to

ether or not we're going to accept this offer or

o back to auction.

Q.   Did you ever tell your boss or

r. Doonan, I'm sorry, whether -- that you, in fact,

ashed the check --

MR. DOONAN:  Objection.

Q.   -- or did you do it on your own?

MR. DOONAN:  Objection.

A.   I never cashed the check.  I deposited

the check.

Q.   I apologize to you.  I'll use that.

Did you keep it a secret from Mr. Doonan that you

deposited it?

A.   That I deposited it?

Q.   Yes.  And that you didn't tell

Mr. Doonan about it?

MS. WILLIAMS:  Objection.

A.   It was no secret.

Q.   You did tell Mr. Doonan, in fact, that

the first auction, I told him that the second

auction was going to take place. And I think it was

a day or two before that auction he said to me -- I

said, do you want me to place your bid at the

auction with your 50,000-dollar deposit on your

behalf for the 2 million?

And he said no. I want to withdraw my

offer at this time. I'm busy in a very large

project in Chicago and I'm not going to be able to

put the time into this and you can just return my

check to me. That would be fine. And that was our

conversation.

Q.   And when did that conversation take

place?

A.   It may have been a day or two before

the second auction.

Q.   Did you confirm it in writing?

A.   Did I confirm it in writing? No. I

don't think there was any writing going back and

forth on it.

Q.   Now, that was the 24th of September,

the?

A.   It may have been, yeah.

Q.   Did you send a check back the 24th

EXHIBIT

05-021-98

# United States District Court
## District Of Massachusetts

FEDERAL DEPOSIT INSURANCE CORPORATION,
     as Liquidating Agent of
     CAPITOL BANK and TRUST COMPANY,
         Plaintiff,

     v.                         CIVIL ACTION NO. 94-11151-MLW
                                    (COLLINGS, U.S.M.J.)

JOHN P. FINN, Individually;
JOHN P. FINN, as Trustee and
     Beneficiary of the
     AISLING REALTY TRUST;
JOHN P. FINN, as Trustee and Beneficiary
     of the BANBA REALTY TRUST;
MARY B. FINN, Individually;
MARY B. FINN, as Trustee and Beneficiary
     of the BANBA REALTY TRUST; and
MARY B. FINN, as Beneficiary of the
     AISLING REALTY TRUST,
         Defendants,

     v.

BANK OF BOSTON,
STATE STREET BANK AND TRUST,
NEEDHAM COOPERATIVE BANK, and
AMERICAN AIRLINES FEDERAL CREDIT UNION,
         Trustee Process Defendants,

     v.

NORWOOD FIRE PROTECTION, INC.,
         Reach and Apply Defendant.   **43**


EXHIBIT
L

# MEMORANDUM AND ORDER ON FDIC'S MOTION FOR SUMMARY JUDGMENT (#66)

COLLINGS, U.S.M.J.

## I. Introduction

This action was instituted with the filing of a complaint by the plaintiff, the Federal Deposit Insurance Corporation (hereinafter "the FDIC") as liquidating agent of Capitol Bank and Trust (hereinafter "the Bank"), to collect sums allegedly due and owing to the Bank on certain notes executed by the defendants John P. Finn, individually (hereinafter "J. Finn"), John P. Finn as trustee and beneficiary of Aisling Realty Trust (hereinafter "Aisling Trust"), John P. Finn as trustee and beneficiary of Banba Realty Trust (hereinafter "Banba Trust"), Mary B. Finn, individually (hereinafter "M. Finn"), Mary B. Finn as trustee and beneficiary of Banba Trust, and Mary B. Finn as beneficiary of the Aisling Trust. The defendants have filed an answer to the plaintiff's complaint together with a two count counterclaim.

Counts I and II of the Complaint seek payment on commercial real estate promissory notes in the amount of $1,199,963.00 (Count I) and $120,000.00

**44**

(Count II).[1]  Count III seeks injunction relief.

In Count I of the counterclaim, the defendants allege that the FDIC conducted certain foreclosure sales in a commercially unreasonable manner, thereby causing them monetary damages.  It is alleged in Count II that the actions undertaken by the FDIC constituted breaches of the implied covenant of good faith and fair dealing which again purportedly caused damage to the defendants.  The FDIC seeks the entry of summary judgment in its favor on both counts of the counterclaim; the defendants oppose the dispositive motion.

Subsequent to the filing of the FDIC's motion, M. Finn sought relief in the bankruptcy court.  (#70)  All parties agree that as a result of the bankruptcy proceedings, the FDIC's claims against M. Finn are subject to the permanent injunction of 11 U.S.C. §§ 524(a)(2) and 727(b).  (##84 & 87)  As the FDIC puts it, its claim against M. Finn "...has been discharged in her bankruptcy proceedings."  (#87 at pp. 1-2)  While M. Finn's counterclaims against the FDIC are property of her bankruptcy estate and have not been abandoned by her trustee, the trustee has not filed an opposition to the FDIC's motion for summary judgment on M. Finn's counterclaims despite being

---

[1]

The FDIC does not seek summary judgment on Count III, a claim for injunctive relief against J. Finn and Norwood Fire Protection, Inc.  *See* #66, p. 2.

invited to do so.  (#76)  Accordingly, the Court will treat the FDIC's motion

for summary judgment on M. Finn's counterclaims as being unopposed.

## II. The Facts

A comparison of the parties' Local Rule 56.1 statements of fact reveals

that there are few disputes with respect to the background facts underlying

this controversy.    (*Compare* Statement of Undisputed Facts #67 with

Defendant/Counterclaim Plaintiff's Opposition #79 at 2-7)  To the extent that

disputes do exist, they shall be duly noted within this recitation.

On or about December 29, 1990, when the Bank was declared insolvent

by the Commissioner of Banks of the Commonwealth of Massachusetts, the

plaintiff FDIC was appointed as the liquidating agent for the Bank.  (#67 ¶ 3;

Affidavit of Mary B. Finn #80 ¶ 8; Affidavit of John P. Finn #81 ¶ 8)

Defendants J. Finn and M. Finn, husband and wife, reside at 16 Whiting Road,

Dover, Massachusetts. (#67 ¶ 4; Counterclaim #59 ¶ 1)  The Aisling Trust was

established under a Declaration of Trust dated December 30, 1992; J. Finn and

M. Finn are both trustees and beneficiaries of this trust. (#67 ¶ 5; #59 ¶ 2;

#80 ¶ 3; #81 ¶ 3)  So, too, in April, 1980, the Banba Trust was established

under a Declaration of Trust; both J. Finn and M. Finn are trustees of this

trust, while J. Finn, M. Finn, Sean Finn and Brian Finn are the beneficiaries. (#67 ¶ 6; #59 ¶ 3; #80 ¶ 4; #81 ¶ 4)

On or about September 12, 1989, J. Finn and M. Finn, individually and in their capacities as trustees of the Aisling Trust and the Banba Trust (collectively "the defendants"), executed and delivered a secured commercial real estate promissory note in the original principal amount of $1,199,963.00 to the Bank.  (#67  ¶ 7; #79 at 2)  The security for this promissory note consisted of a first mortgage and security agreement on the real estate, improvements, and personalty situated at 534-536 Columbus Avenue, Boston, Massachusetts ("the Columbus premises"), a first mortgage and security agreement on the real estate, improvements, and personalty located at 170 Botolph Street, Boston, Massachusetts ("the Botolph premises")[2], and a collateral assignment of leases and rents of the Columbus and Botolph premises.  (#67 ¶ 8; #79 at 2-3)

On or about August 31, 1990, the defendants executed a secured commercial real estate promissory note in the original principal amount of

---

[2]

In all the papers preceding the PDIC's Reply Memorandum (#83), this property is denoted 170 Botolph Street, Boston, Massachusetts. For the first time in the Reply Memorandum, the premises are denominated 170 St. Botolph Street, Boston, Massachusetts.

M. Finn, Brian Finn, offered the highest amount, approximately $600,000.00, to purchase the property; Brian Finn's bid was accepted. (#79 at 4) The defendants assert that one of the terms and conditions of the sale of both the Columbus premises and the Botolph premises was that the sales had to close within 30 days of the auction, i.e., on or about January 14, 1994. (Id.) Both Brian Finn and the high bidder for the Botolph premises requested extensions of the 30-day period due, at least in part, to the press of the holiday season and year end. In Brian Finn's case, the mortgage company processing his mortgage application as well as his attorney requested an extension on his behalf. (Id.)

According to the defendants, Brian Finn's mortgage broker was snubbed by the FDIC loan officer handling the foreclosure sales; this loan officer also purportedly made very disparaging remarks about the Finns. (#79 at 5) In his affidavit, Robert C. Muller, the FDIC account officer responsible for the foreclosures on the Columbus premises, the Botolph premises, and the Worcester Square premises, denied every having spoken with Brian Finn or any person representing him about Brian Finn's application for funds to purchase the Columbus premises. (Reply Memorandum #83, Second Affidavit

In Support Of FDIC's Motion For Summary Judgment, Exh. A ¶¶ 1,2 7)  Mr. Muller stated that "[a]ll communications with the FDIC regarding Brian Finn's efforts to purchase the Columbus Avenue property went through Mr. Moriarity", the attorney who represented the FDIC in all three foreclosure proceedings.  (#83, Exh. A ¶¶ 4, 8)  Mr. Muller was advised by Attorney Moriarity that Brian Finn had requested a 30-day extension to close.  (#83, Exh. A ¶ 9)  The FDIC denied Brian Finn's request for an extension and, because he was unable to close within the 30-day period, he forfeited his $10,000.00 cash deposit in accordance with the terms of the auction of the Columbus premises.[6]  (#79 at 5)  Mr. Muller asserted that "Brian Finn never presented a firm financing commitment to the FDIC."  (#83, Exh. A ¶ 9)

As related by the defendants, following Brian Finn's inability to close within 30 days, the FDIC then approached the next highest bidder at the December 15, 1993 auction of the Columbus premises, but that bidder refused to buy the property.  (#79 at 5)  Thereafter, the failure to close upon the

---

[6]

The defendants contend they were advised by the FDIC that the request for an extension by the high bidder for the Botolph premises was also rejected when, in fact, an extension was granted by the FDIC thereby allowing the high bidder to close on the sale of the Botolph premises on January 31, 1994. (#79 at 5)  The defendants have not disputed the assertion by the FDIC that the extension was granted because the high bidder for the Botolph premises paid the FDIC an additional nonrefundable $20,000.00 deposit on January 12, 1994. (#83, Exh. A, Second Affidavit of Robert C. Muller)

December 15, 1993 auction resulted in the Columbus premises becoming subject to applicable rent control provisions. (#79 at 6) The FDIC contends, however, that the Columbus premises were "subject to the City of Boston rent control requirements during the entire time the Finns' (sic) owned the property", a fact of which the Finns were aware at least since 1990 when they were sued by one of their tenants for rent control violations. (#83, Exh. A ¶¶ 12, 13)

After a second scheduled foreclosure sale was once postponed, an auction of the Columbus premises was held on June 8, 1994. (#79 at 6) The highest bid at the June 1994 auction was $295,000.00, approximately $300,000.00 less than the amount bid by Brian Finn six months before. (Id.)

Prior to the foreclosure sales of the Columbus and Botolph premises, the FDIC scheduled and noticed a foreclosure sale by public auction of the Worcester Square premises for July 16, 1992. (Id.) The defendants assert that the FDIC's notice of this sale only met the bare minimum statutory requirements, and again, that no prominent display advertisements were used. (Id.)

The FDIC commenced the instant litigation to recover from the

defendants the deficiencies outstanding on the notes following the three referenced foreclosure sales.

### III.  THE SUMMARY JUDGMENT STANDARD

The summary judgment standard in this Circuit is familiar.  When considering the propriety of the entry of summary judgment, the court must determine whether:

> ...the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the court is to examine the materials presented "in the light most favorable to the nonmoving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether a factual dispute is "genuine" the

court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.; see also National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff,* 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *National Amusements,* 43 F.3d at 735; *Vasapolli,* 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry
> of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the existence
> of an element essential to the party's case, and on
> which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also National Amusements,* 43 F.3d at 735.

## IV. DISCUSSION

### A. Counts I and II of the FDIC's Complaint

J. Finn  bases his opposition to the FDIC's Motion for Summary Judgment solely on the merits of his counterclaims which have also been interposed as affirmative defenses against the FDIC's claims. (Answer, Etc., # 59 at ¶¶ 44 and 46)  Since no other basis for opposing the FDIC's motion is stated, the Court will turn to the merits of the Finns' counterclaims.

### B. Count I of the Finns' Counterclaim

To recap, in the first count of the counterclaim, the defendants allege that the foreclosure sales of the Columbus premises, the Botolph premises and the Worcester Square premises were held in a commercially unreasonable manner and, consequently, that the proceeds realized from those sales were significantly less than they otherwise would have been.  The defendants rely in large measure upon the purportedly inadequate sales prices to support their contention.

The parties agree that resolution of the issues raised in the counterclaim is controlled by Massachusetts law.  As reiterated by the Supreme Judicial Court of the Commonwealth:

not argue otherwise. "The standard applied...is whether the purchase price at foreclosure as compared with the market value was so grossly inadequate as to invalidate the sale." *Fairhaven Savings Bank v. Callahan*, 391 Mass. 1011, 1012, 462 N.E.2d 112, 114 (1984).

The defendants have proffered an appraisal of the Columbus premises stating that the market value of that property as of June 11, 1993 was $750,000.00. (#80, Exh. B; #81, Exh. B)[7]   Given that their son bid $600,000.00 for the property on December 15, 1993, and that the price ultimately obtained for the premises on June 8, 1994 was $295,000.00, the defendants assert that the sale price was obviously inadequate.  It cannot be said, however, that the evidence leads inexorable to that conclusion.  If the son's bid of $600,000.00 was a true indication of the fair market value in December, 1993, as defendants seem to suggest, and the fair market value was $750,000.00 in June, 1993, as the appraiser concluded, it appears that the value of the Columbus property decreased within a six-month period from June, 1993 to December, 1993 approximately $150,000.00.  If the value of the

---

[7]

The defendants have submitted no evidence at all with respect to the market value of the Botolph premises and the Worcester Square premises at any time.  In these circumstances, they have no basis upon which to argue that the prices received at foreclosure were somehow inadequate.

property had diminished by the same amount in the next six months, the market value at the time of the ultimate sale was $450,00.00, making a sale price of $295,000.00 far from inadequate. In other words, an appraisal of the Columbus premises a full year prior to the foreclosure is little aid in establishing the market value of the property at the time of the sale. But even if it is assumed that the fair market value was $600,000.00 in June, 1994, merely showing that the property sold at $295,000.00, or 49% of value, is not sufficient evidence to raise a genuine of issue of material fact under Massachusetts law. As the First Circuit noted, "[i]n canvassing Massachusetts case law, we find ample suggestion that a price deficiency of as much as 39 percent of fair market value can support the granting of a dispositive motion." *Carr*, 13 F.3d at 430 (citations omitted). Thus, even if it is assumed that $600,000.00 was the fair market value in June, 1994, that fact alone would not be sufficient evidence to raise a genuine issue of material fact with regard to the adequacy of the sale price.

In the instant case, the defendants do not contend that the FDIC engaged in any fraudulent activity. Rather, the allegations seem to imply either a lack of diligence or bad faith in conducting the foreclosure sales. Under

the liability of a guarantor on a note and mortgage after a foreclosure.

However, the *Pemstein* court specifically stated that the guarantor's

"unconditional guarantee is subject to the rules and standards which we have

described as generally applicable to real estate mortgage foreclosures."

*Pemstein*, 36 Mass. App. Ct. at 291, 630 N.E.2d at 613-14. The court's

subsequent discussion bears repeating, at length:

> The difference between the State standard of
> reasonable diligence, discussed above, and the
> commercially reasonable standard, as developed, for
> example, in the instant case, is that the State
> "reasonable diligence" standard inquires whether the
> sale has been advertised at least as required by
> statute, whether the proceeding have been open, and
> whether notice of foreclosure sale has been given to
> obviously interested parties, especially those who have
> manifested interest. The "commercially reasonable"
> standard, as we have seen in this case, produces
> inquiry into the competence and aggressiveness of the
> marketing effort. As the bankruptcy judge expressed
> it in a memorandum and order issued in connection
> with this case on February 2, 1990, "[S]tate law
> [relating to real estate foreclosure] requires only
> minimal advertising and sales efforts." Adherence to
> established standards of reasonable diligence in
> connection with real estate foreclosures commends
> itself, as well, as a matter of policy. It would not fulfil
> the reasonable expectations of lenders or borrowers to
> have, after every real estate foreclosure sale, a
> postlude of litigation about whether the presale

> marketing effort had been sufficiently astute and aggressive.

*Pemstein*, 36 Mass. App. Ct. at 291-2, 630 N.E.2d at 614 (footnote omitted.) In short, the Massachusetts Appeals Court specifically confirmed that when weighing the reasonable diligence involved in a foreclosure sale under Massachusetts law, consideration of the marketing effort for a foreclosed property beyond what is mandated by statute does not come into the equation.

Finally, the bad faith element of the reasonable diligence standard has, in the reported cases, related to issues of notification. *See Pemstein,* 36 Mass. App. Ct. at 286, 630 N.E.2d at 611-12 (collecting cases). There have been no allegations of bad faith "of an active and conspicuous character" as to this aspect.

The defendants contend that Brian Finn's bid on the Columbus premises was treated differently than the high bidder on the Botolph premises in that the former was denied an extension of time within which to close and the latter was granted one. It is suggested that this evidences the FDIC's bad faith. However, the FDIC has presented evidence as to why that distinction was made, to wit, that Brian Finn never presented a firm financing commitment and that the higher bidder on the Botolph premises paid an additional

63

nonrefundable deposit of $20,000.00 in consideration for the extension. The defendants have not disputed these statements, or otherwise demonstrated that Brian Finn was similarly situated. In addition, although the defendants suggest that the account officer at the FDIC rebuffed Brain Finn's mortgage broker when a request for an extension was made and further made derogatory statements about the Finns, the defendants have simply proffered no admissible evidence to support these contentions, as, for example, an affidavit from the mortgage broker. The statements in the affidavits of J. Finn and M. Finn are plainly hearsay and cannot be considered as evidence which would raise a genuine issue of material fact. *See* Rule 56(e), Fed. R. Civ. P.

To summarize, the defendants have failed to present evidence to raise a genuine issue of material fact as to whether the foreclosure sales of the Columbus premises, the Botolph premises, and the Worcester Square premises were conducted in a commercially reasonable manner under Massachusetts law.

### B. Count II of the Finns' Counterclaims

In the second count in the counterclaim, the defendants allege that the FDIC breached the implied covenant of good faith and fair dealing in the

manner in which it dealt with the subject premises. This is a contract claim, and the FDIC argues that it had no contract with the defendants. Be that as it may, even assuming that the defendants have a claim, it is no more than was alleged in Count I. No new or different evidence has been added to support the contentions. Thus, for all the reasons previously stated, this claim too must fail.

### V. CONCLUSION AND ORDER

Based on the reasoning set forth herein, it is ORDERED that the FDIC's Motion For Summary Judgment (#66), to the extent that it seeks the entry of judgment as a matter of law against J. Finn on Counts I and II of its Complaint and in its favor on all counts of the defendant J. Finn's counterclaim and the defendant M. Finn's counterclaim, be, and the same hereby is, ALLOWED. It is FURTHER ORDERED that the FDIC's Motion For Summary Judgment (#66), to the extent that it seeks the entry of judgment as a matter of law against M. Finn on Counts I and II of its Complaint, be, and the same hereby is, DENIED.

### VI. PROCEDURAL ORDER RE:
### COUNT III OF COMPLAINT AND FORM OF JUDGMENT

Counsel for the FDIC is directed to file and serve, *IN HAND on or before 2:00 P.M. on Wednesday, March 25, 1998,* a form of judgment to be entered

by the Court and a statement respecting its position as to Count III of its Complaint.

Counsel for J. Finn and the Trustee for M. Finn shall file and serve any objections to the form of judgment or the FDIC's suggested disposition of Count III *IN HAND on or before 2:00 P.M. on Monday, March 30, 1998* .

If any objections are filed, counsel for the FDIC and counsel for any party who has filed an objection shall report for a conference before the Court on *Tuesday, March 31, 1998 at 2:30 P.M.* at Conference Room #920 (9th floor), John W. McCormack Post Office and Court House, Boston, Massachusetts. Claims for attorney's fees shall be filed within fourteen days after entry of judgment as provided in Rule 54(d)(2)(b), Fed. R. Civ. P.


**ROBERT B. COLLINGS**
United States Magistrate Judge

March 19, 1998.

# AUCTIONS

## PAUL E. SAPERSTEIN CO., INC.
Auctioneers · Appraisers
144 Centre Street, Holbrook, MA 02343
Tel. 617-227-6553 · Fax 781-986-4397
MA Lic. #295 · RI Lic. #1395 · NH Lic. #2508
Visit our website at www.pesco.com

Site @ Public Auction, Combined Owners Retiring & Secured Party Sales
CONTRACTOR & WOODWORKING EQUIPMENT · WELDERS
POWER & HAND TOOLS · GARAGE EQUIPMENT · 300+ ITEMS

### Mortgagee's Sale of Real Estate at Public Auction
## SAUGUS · 17+ ACRES OF LAND
### 12 RES'D LOTS OFF ROUTE 1 NORTHBOUND

### Trustee Sale @ Public Auction
## CADILLAC · MAXIMA · CHRYSLER · CHEVY

---

### RESIDENTIAL COLONIAL STYLE HOME,
## LINCOLN, MA
Public Auction/Mortgage Foreclosure
236 Lincoln Road, Lincoln
September 23, 2008 at 11:30 A.M.

Auctioneer: Garrett R. Healey
Lic # MA: 167 · NH: 2367 · VT: 701 · ME: 985

GARRETT, INC.
78 High Street
Denver, Massachusetts 01923
Tel. 978-774-6006
www.garrettauctioneers.com

The Experience That Guarantees Success



---

## FORECLOSURE SALE AT
### PUBLIC AUCTION
ALPINE FOREST MOTEL ON ROUTE 2
### Exceptional Views of
Mt. Washington
MONDAY, SEPTEMBER 29 AT 11:00 AM
ROUTE 2, PRESIDENTIAL HIGHWAY
JEFFERSON, NH

ID #3-145

---

## CHARLESTON · HARBOR
9 Oceanfront Condos
## 16 SHARES TO BE
### SOLD ABSOLUTE

44 Eighth Salem Avenue
MOUNT PLEASANT, SC

Sun., Oct. 5th, at 1:00

---

ABSOLUTE AUCTION
Oct. 5, 2008 @ 1 pm

Saturday, September 20, 2008 at 11:00 AM
HAVERHILL, MA
Antiques & Contents (Sold separately)
Known as 60 Marsh Avenue

## NEW ENGLAND'S WEATHER

EXHIBIT
m

Page 282

Q.   Of course.

A.   Now we're up to 2.5 acres.  Do you want me to go another page?

(Reviewing document.)

(Discussion off the record.)

A.   I don't know what you're looking for, if you want to highlight it and show it to me.  I don't know what you're looking for.  What are you looking for?

Q.   Did you read what is contained in Exhibit 12 prior to the sale of September 26th?

A.   Did I read it prior?

Q.   To the sale on September 26th.

MS. WILLIAMS:  Objection.

A.   No.

Q.   What did you read on September 26th?  Do you have a copy from which you read?

A.   Prior to.  I read it at the sale.

Q.   You read what is on Exhibit No. 12?

A.   Notice of sale.

Q.   You read that to the audience?

A.   Right.

Q.   And in that you did not see the difference between number of acreage that was on

EXHIBIT
N

Page 18

Counsel and client are back.

Q.   Sir?

MS. WILLIAMS:  Do you want to restate the question?

MR. RING:  Yes, I certainly will.

Q.   Garrett, Inc., a Massachusetts business corporation of which you are president, treasurer, clerk, does it have a license in its name of Garrett, Inc., as an auctioneer?

A.   It has a license auctioneer of Garrett D. Healey, who is the president of the corporation.

Q.   Thank you very much for your answer. Does Garrett, Inc., a Massachusetts business corporation, possess a license from the Commonwealth of Massachusetts as an auctioneer?

MS. WILLIAMS:  Objection.

Q.   You may answer, sir.

MS. WILLIAMS:  You can answer the question.

Q.   Your attorney can make objections and she is reserving your rights, but would you please answer my question?

MS. WILLIAMS:  Unless I instruct you not to answer, you should go ahead and answer the

EXHIBIT
O

43

| | | |
|---|---|---|
| 1 | Q | Had you actually sold that property? |
| 2 | A | Well, we were selling it and we had a good figure for |
| 3 | | it, and then one of our darling lawyers from that |
| 4 | | office said, "Oh, you can't do that," because of |
| 5 | | whatever numbers were thrown my way. |
| 6 | Q | Did you have a signed Purchase and Sale Agreement? |
| 7 | A | I don't think it came to that, but we had somebody |
| 8 | | who wanted to buy it, and they had stopped us. |
| 9 | Q | And what was the property address that you were going |
| 10 | | to sell? |
| 11 | A | 350 North Street in Boston. |
| 12 | Q | That's a condominium? |
| 13 | A | Mm-hmm. |
| 14 | Q | What was the purchase price? |
| 15 | A | Okay...I don't know 525. |
| 16 | Q | But you weren't -- |
| 17 | A | I'm guessing now.  I don't remember. |
| 18 | Q | Okay. |
| 19 | A | Since and before we had a lot of offers, but that was |
| 20 | | what we had planned to do.  And it seemed rather |
| 21 | | simple.  I don't know how things got so darn |
| 22 | | complicated.  I think I do know how they got |
| 23 | | complicated. |
| 24 | Q | But you decided not to go through with that |



EXHIBIT

P

46

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Or a portion of the property in Lincoln? |
| 3 | A | No. |
| 4 | Q | Other than selling a portion of the property in |
| 5 | | Lincoln or selling -- it's a condominium in Boston? |
| 6 | A | Mm-hmm. |
| 7 | Q | -- or selling the condominium in Boston, did you have |
| 8 | | any other resources that you could access to |
| 9 | | reinstate or pay off the mortgage that had been held |
| 10 | | by States Resources and was being foreclosed on |
| 11 | | September 26th, the year 2003? |
| 12 | A | No.  To pay off the mortgage? |
| 13 | Q | Correct or reinstate it? |
| 14 | A | Well, I don't know what the bill was, so it's kind of |
| 15 | | hard for me to say, but I -- if you're talking about |
| 16 | | cash -- |
| 17 | Q | Yes. |
| 18 | A | And, again, I don't know what that was.  Our plan was |
| 19 | | to sell the land and to sell the condominium. |
| 20 | Q | I understand that, but that's not my question.  The |
| 21 | | question that I'm attempting to ask is other than |
| 22 | | those two assets, a portion of the property in |
| 23 | | Lincoln or the condominium in Boston, did you have |
| 24 | | any other assets that you could have used to either |

1    sell or cash that you had to reinstate the mortg

2    that was being foreclosed on on September 26th,

3    year 2003 on the Lincoln Road property in Lincol

4    A    I would say not.

5         (Brief pause.)

6    Q    Refer you to page 12, paragraph 16, which is a

7    portion of Exhibit 2 that is entitled "Verified

8    Counterclaim."  You'll see the title on page 10,

9    then it runs through to page 12.

10        MICHAEL CAPIZZI:  We're going back; ri

11   No.  On page 10.

12        MR. DOONAN:  Page 10 is the heading,

13   "Verified Counterclaim."

14        MICHAEL CAPIZZI:  Right.

15        MR. DOONAN:  And I'm asking about

16   paragraph 16 on page 12.

17        MICHAEL CAPIZZI:  Sixteen.  All right.

18        THE WITNESS:  Okay.

19   Q    You've read that?

20   A    Mm-hmm.

21   Q    Is that true and accurate, as far as you know?

22   A    I really don't know.  I don't know.

23   Q    This is part of the document --

24   A    That I signed.

20

In the back of my mind I didn't say Linda or Michael

or Mauser or anybody, I was thinking, "Well, if it

doesn't work out, maybe Linda will let me rent it

from her or something," because I knew she liked it.

It was all part of the things that were in my mind

that day in the rectory, everything that -- it may be

dreaming on my part, I don't know, but I'm just

trying to tell you how I was thinking.

Q   But it was your intent in your discussions with Linda

    Micu that you would ultimately own the property on

    Lincoln Road in Lincoln?

A   Mm-hmm.

Q   You need to say "yes" or "no"?

A   Yes.

Q   So in other words Ms. Micu was acting as your agent?

A   Yes.

Q   And she was going to follow your instructions?

A   Well, she was doing that, but I thought she was the

    one that knew how to do these things.

Q   But ultimately as to the disposition --

A   She did it because when she had said to me, "What can

    we do to help you?"

Q   But my point is ultimately as to the disposition or

    who was going to own the property on Lincoln Road, it

EXHIBIT

R

**UNITED STATES OF AMERICA**
**DISTRICT COURT OF MASSACHUSETTS**

| | |
|---|---|
| **STATES RESOURCES CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **Civil Action No. 04 10095 DPW** |
| ) | |
| **v.** ) | |
| ) | |
| **MICHAEL CAPIZZI, ET AL.** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**AFFIDAVIT OF ROBIN OBERG IN SUPPORT OF STATES RESOURCES CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. I, Robin Oberg, am the Special Assets Manager for States Resources Corp., ("States"), the Plaintiff in the above captioned interpleader matter.

2. I am the individual at States who is most aware of the matters set forth in the above action and, therefore, will be States' representative for the deposition.

3. States is organized under the laws of the State of Iowa.

4. States principal place of business is its offices in Omaha, NE.

5. States does not have a usual place of business in Massachusetts.

6. States does not own any property in Massachusetts, solicit business in Massachusetts or have any employees in Massachusetts.

7. Over the past two years, States has commenced only one foreclosure action, which is the subject of this litigation, within the Commonwealth of Massachusetts.

8. In September 2002, States began foreclosure proceedings against the Capizzis, pursuant to the power of sale contained in the mortgage.

EXHIBIT

S

9. At the July 24, 2003 foreclosure sale, Linda Micu was the high bidder for the property located at 236 Lincoln Rd., Lincoln, MA. ("Lincoln property").

10. At the time of the July 24, 2003 sale, States had no knowledge that Linda Micu was acting as an agent for the Capizzis.

11. No employee of States has ever had any direct contact with Garrett, Inc. or Leonard Florence and any knowledge of either entities' involvement with the other is based upon information from States' counsel.

12. States has had no direct contact with the foreclosure vendors other than its counsel in this action.

Sworn to under the pains of penalty and perjury,

Dated:

Robin Oberg
Special Assets Manager
States Resources Corp.

Notary: Donna Butler

GENERAL NOTARY - State of Nebraska
DONNA BUTLER
My Comm. Exp. Sept. 24, 2008

9-24-2008

2

21

1   was your view that you were going to be in charge of

2   who made that decision?

3   A   Mm-hmm.

4   Q   Is that a "yes"?

5   A   Yes.

6   Q   Who provided the funding to Linda Micu for her

7       deposit on July 24th, 2003 for the foreclosure

8       office?

9   A   I gave it to her.

10  Q   You gave it to her.

11  A   Yes.

12  Q   And where did you obtain that financing or that

13      money?

14  A   Where did I get the money?

15  Q   Yes.

16  A   From my brother.

17  Q   And your brother's name is?

18  A   Timmo (phonetic) -- Timothy Rowley, but to this day

19      he doesn't know what it was for.

20  Q   That's okay.  It is not my intention to bring your

21      brother in for a deposition.

22          And there came a time after July 24th, 2003

23      -- or what happened after July 24th, 2003 concerning

24      your purchase or Linda Micu's purchase of the

28

I don't know how to do it.  I thought she did.

Q    But you gave her no instructions --

A    No.

Q    -- other than to bid and you wanted her to end up to be the high bidder?

A    Yes.

Q    So she could have bid $10 million?

A    Well, I would hope she'd use her common sense.

Q    So you wanted her to use her common sense, but you wanted her to be the high bidder?

A    Yes.

Q    Okay.

A    The odd part about it, now that I'm sitting here in a different frame of mind, to think that this transpired and I gave her no instruction whatsoever. Nothing.  I mean, to say -- one would think that I would have said, "Don't go over such-and-such an amount."  None of that happened.  I was just putting everything into everybody else's hands.

Q    But you did give her the $5,000?

A    Yes.

Q    And she was bidding on your behalf on July 24th, 2003 at the foreclosure auction on Lincoln Road in Lincoln?

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat

*msn*    Your Breast Cancer Treatment OPTIONS?

**Hotmail**    Home    Inbox    Compose    Contacts    Options    Help

susan_auctions@msn.com    Free Newsletters | MSN Featured Offers | Find Message

Save Address(es) | Block    Previous **Next | Close**

From : "Kerry A. Pass" <kap@doonanandgraves.com>
To : "Susan Kagdis" <susan_auctions@msn.com>
Subject : RE: Capizzi/Lincoln
Date : Thu, 29 May 2003 15:45:57 -0400

Reply | Reply All | Forward | Delete | Put in Folder...    **Printer Friendly Version**

In response to the below:

1) No advertising at this time.
2) Commission to auctioneer is 3.5% if sold to a third party – only if our
client is made whole and this is subject to court approval. Yes, $600.00 if
bought back by the bank. Thanks.

Kerry A. Pass
Paralegal
Doonan, Graves & Longoria, LLC
16 Front Street
Salem, MA 01970
Tel. (978) 741-2680 ext. 14
Fax (978) 744-8780
kap@doonanandgraves.com


-----Original Message-----
From: Susan Kagdis [mailto:susan_auctions@msn.com]
Sent: Tuesday, May 27, 2003 2:43 PM
To: kap@doonanandgraves.com
Subject: Capizzi/Lincoln


Two Things:

1. Marketing expenses for the 6/24 auction are estimated to be $500.00. Do
we have approval to do additional marketing?

2. Can you confirm with John that this is our commission for the auction:
Commission to auctioneer is 3.5% if sold to a 3rd party or $600 if brought
back by Attorney/Client (Doonan, Graves, Longoria)

Susan
Garrett, Inc
978-774-6008

_____

The new MSN 8: smart spam protection and 2 months FREE*
http://join.msn.com/?page=features/junkmail

**EXHIBIT**
_____

http://by4fd.bay4.hotmail.msn.com/cgi-bin/getmsg?curmbox=F000000001&msg=

## John A. Doonan

**From:** MASSLAWYERUSA/jordan lewis ring/ma [jordanlewisring@masslawyer.us]
**Sent:** Friday, November 07, 2003 1:56 PM
**To:** John A. Doonan
**Subject:** Re: tat execution/levy

```
have great weekend      sounds okay    will confirm with tat


RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor
Boston, MA 02114 USA

Suburban Office:

"The Towers"
250 Hammond Pond Parkway
Penthouse 1701 North Tower
Chestnut Hill, MA  02467.1529 USA

American Affiliated Caribbean Offices
P. O. Box 7, 15 Wellington  Road, Cole Bay
St. Maarten, NA
011 5995 5 77777
On SXM   5 444444


jordanlewisring@masslawyer.us
masslawyer@comcast.net

www.masslawyer.us

boston usa   617 558 9800
boston fax.  617 558 9801
usa cell       617 680 4422

This message and any attached document(s) contain
information which may be confidential, subject to
privilege or exempt from disclosure under applicable
```

12/2/2003

EXHIBIT

tabbies

V

Federal, State, International Law, United Nations
UNCITRAL MODEL LAW ON ELECTRONIC SIGNATURES 2001*. This
e-mail message (including attachments) is covered by the
Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-
2521, and is intended only for the person or entity to
which it is addressed and may contain confidential and/or
privileged material.  Further, this e-mail may be
protected by attorney-client privilege and/or work-
product doctrine.  Any unauthorized review, use,
disclosure, dissemination, copying, forwarding or
distribution is strictly prohibited.  If you are not the
intended recipient, or received this e-mail in error,
please contact the sender by reply e-mail and destroy all
copies of the original message. These materials are
intended only for the use of the intended recipient and
are for discussion purposes only, unless stated expressly
otherwise. If you are not the intended recipient of this
transmission, you are hereby notified that any
distribution, disclosure, printing,
copying,storage,modification or the taking of any action
in reliance upon this transmission is strictly
prohibited. Delivery of this message to any person other
than the intended recipient shall not compromise or waive
such confidentiality, privilege or exemption from
disclosure as to this communication. If you have received
this communication in error, please immediately notify
the sender and delete the message from your system.

+This footnote also confirms that this email message and
any
attachments have been swept by Commercial Systems for
content and the presence of known computer infections.

Disclaimer Regarding Electronic Transactions*:
If this communication concerns negotiation of a contract
or agreement,
any electronic transaction or electronic signature act
does not apply to
this communication: contract formation in this matter
shall occur only
with manually-affixed original signatures on original

12/2/2003

**documents**
**unless expressly and specifically stated/waived in a**
**dated witnessed writing and the written waiver is**
**affirmed in writing and executed in a witnessed and dated**
**writing by each party/witness thereto.**

**This message is digitally signed and verified.**
**Y6jjjjX77j782950S₿₮S????S€???-¦j49933j9595j5b000**
**399448856h568868992043232385859385944hfj6ye   tj**

**Jordan Lewis Ring**

----- Original Message -----
From: John A. Doonan
To: MASSLAWYERUSA/jordan lewis ring/ma
Cc: TAT robert verrier ; RICHARD L. BLUMENTHAL
Sent: Friday, November 07, 2003 12:32 PM
Subject: RE: tat execution/levy

**I'm about to leave office, if what you are suggesting is**
**that we agree to escrow a certain amount and then send you**
**the remainder, I can do that Monday. How does 50K sound as**
**hopefully temporary continuing escrow? I'll call you on**
**Monday Aft. when I return and if above is ok I can**
**overnight check to your office. Could you share memo with**
**me so I can share with Garrett and move process from that**
**side?**
**Thanks**
**John**

**John A. Doonan**

| | |
|---|---|
| **From:** | MASSLAWYERUSA [jordanlewisring@masslawyer.us] |
| **Sent:** | Wednesday, October 22, 2003 9:26 AM |
| **To:** | TAT robert verrier; REISER; RBLUMENTHAL@SILVERMANKUDISCH.COM; murray reiser; John A. Doonan |
| **Subject:** | Re: capizzi fyi |
| **Importance:** | High |



Thank you for your response.  We would appreciate docs requested.

Of course as matter of law it is improper for a lawyer to act as surety for a client.

our client after review will of course discuss hold harmless

please forward via e mail or fax the docs   today if possible...  thanks again

RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor
Boston, MA 02114 USA

Suburban Office:

"The Towers"
250 Hammond Pond Parkway
Penthouse 1701 North Tower
Chestnut Hill, MA  02467.1529 USA

12/2/2003

**American Affiliated Caribbean Offices**
**P. O. Box 7, 15 Wellington  Road, Cole Bay**
**St. Maarten, NA**
**011 5995 5 77777**
**On SXM   5 444444**

**jordanlewisring@masslawyer.us**
**masslawyer@comcast.net**

**www.masslawyer.us**

**boston usa   617 558 9800**
**boston fax.  617 558 9801**
**usa cell       617 680 4422**

**This message and any attached document(s) contain
information which may be confidential, subject to
privilege or exempt from disclosure under applicable
Federal, State, International Law, United Nations
UNCITRAL MODEL LAW ON ELECTRONIC SIGNATURES 2001\*. This
e-mail message (including attachments) is covered by
the Electronic Communications Privacy Act, 18 U.S.C. §§
2510-2521, and is intended only for the person or
entity to which it is addressed and may contain
confidential and/or privileged material.  Further, this
e-mail may be protected by attorney-client privilege
and/or work-product doctrine.  Any unauthorized review,
use, disclosure, dissemination, copying, forwarding or
distribution is strictly prohibited.  If you are not
the intended recipient, or received this e-mail in
error, please contact the sender by reply e-mail and
destroy all copies of the original message. These
materials are intended only for the use of the intended
recipient and are for discussion purposes only, unless
stated expressly otherwise. If you are not the intended
recipient of this transmission, you are hereby notified
that any distribution, disclosure, printing,
copying,storage,modification or the taking of any
action in reliance upon this transmission is strictly
prohibited. Delivery of this message to any person**

12/2/2003

other than the intended recipient shall not compromise
or waive such confidentiality, privilege or exemption
from disclosure as to this communication. If you have
received this communication in error, please
immediately notify the sender and delete the message
from your system.

+This footnote also confirms that this email message
and any
attachments have been swept by Commercial Systems for
content and the presence of known computer infections.

Disclaimer Regarding Electronic Transactions*:
If this communication concerns negotiation of a
contract or agreement,
any electronic transaction or electronic signature act
does not apply to
this communication: contract formation in this matter
shall occur only
with manually-affixed original signatures on original
documents
unless expressly and specifically stated/waived in a
dated witnessed writing and the written waiver is
affirmed in writing and executed in a witnessed and
dated writing by each party/witness thereto.

This message is digitally signed and verified.
Y6jjjjX77j782950S฿¥S????S€???-¦j49933j9595j5b000
399448856h56886899204323238585944hfj6ye  tj

Jordan Lewis Ring

----- Original Message -----
From: John A. Doonan
To: MASSLAWYERUSA
Sent: Wednesday, October 22, 2003 8:39 AM
Subject: RE: capizzi fyi

wE ARE, OF COURSE, HAPPY TO COOPERATE BUT ARE TREADING
VERY CAREFULLY IN THIS MATTER. tHE CLOSING HAS NOT

12/2/2003

OCCURRED YET. wE WILL BE WILLING TO DISCUSS AN IMMEDIATE
DISBURSEMENT TO YOUR CLIENT (ASSUMING OUR CLIENT AGREES)
IF WE RECEIVE AN INDEMNIFICATION FROM YOUR OFFICE AND
YOUR CLIENT TO US AND OUR CLIENT.
THANKS
JOHN DOONAN

-----Original Message-----
From: MASSLAWYERUSA [mailto:jordanlewisring@masslawyer.us]
Sent: Sunday, October 19, 2003 10:54 AM
To: attorneydoonan
Subject: capizzi fyi
Importance: High



RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor
Boston, MA 02114 USA

Suburban Office:

"The Towers"
250 Hammond Pond Parkway
Penthouse 1701 North Tower
Chestnut Hill, MA  02467.1529 USA

American Affiliated Caribbean Offices
P. O. Box 7, 15 Wellington  Road, Cole Bay
St. Maarten, NA
011 5995 5 77777
On SXM   5 444444

12/2/2003

## John A. Doonan

**From:** John A. Doonan [jad@dgandl.com]
**Sent:** Friday, November 14, 2003 11:29 AM
**To:** MASSLAWYERUSA/jordan lewis ring/ma
**Subject:** RE: TAT urgent response

```
Any progress on resolution of $50,000?
Thanks
John
```

> -----Original Message-----
> **From:** MASSLAWYERUSA/jordan lewis ring/ma [mailto:jordanlewisring@masslawyer.us]
> **Sent:** Monday, November 10, 2003 8:12 PM
> **To:** John A. Doonan
> **Subject:** Re: TAT urgent response

```
thanks john    will try to settle auctioneer   sorrie re
conn   my son   summa cum harvard   us atty hartford
just convicted state treasuer and head of naacp of
fraud  us dist court    reading hartford courant    good
good luck conn    night


RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor
Boston, MA 02114 USA


Suburban Office:

"The Towers"
250 Hammond Pond Parkway
Penthouse 1701 North Tower
Chestnut Hill, MA  02467.1529 USA

American Affiliated Caribbean Offices
P. O. Box 7, 15 Wellington  Road, Cole Bay
St. Maarten, NA
011 5995 5 77777
On SXM   5 444444
```

12/2/2003

**jordanlewisring@masslawyer.us**
**masslawyer@comcast.net**

**www.masslawyer.us**

**boston usa   617 558 9800**
**boston fax.  617 558 9801**
**usa cell      617 680 4422**

This message and any attached document(s) contain
information which may be confidential, subject to
privilege or exempt from disclosure under applicable
Federal, State, International Law, United Nations
UNCITRAL MODEL LAW ON ELECTRONIC SIGNATURES 2001*.
This e-mail message (including attachments) is covered
by the Electronic Communications Privacy Act, 18
U.S.C. §§ 2510-2521, and is intended only for the
person or entity to which it is addressed and may
contain confidential and/or privileged material.
Further, this e-mail may be protected by attorney-
client privilege and/or work-product doctrine.  Any
unauthorized review, use, disclosure, dissemination,
copying, forwarding or distribution is strictly
prohibited.  If you are not the intended recipient, or
received this e-mail in error, please contact the
sender by reply e-mail and destroy all copies of the
original message. These materials are intended only
for the use of the intended recipient and are for
discussion purposes only, unless stated expressly
otherwise. If you are not the intended recipient of
this transmission, you are hereby notified that any
distribution, disclosure, printing,
copying,storage,modification or the taking of any
action in reliance upon this transmission is strictly
prohibited. Delivery of this message to any person
other than the intended recipient shall not compromise
or waive such confidentiality, privilege or exemption
from disclosure as to this communication. If you have
received this communication in error, please
immediately notify the sender and delete the message

12/2/2003

from your system.

+This footnote also confirms that this email message and any
attachments have been swept by Commercial Systems for
content and the presence of known computer infections.

Disclaimer Regarding Electronic Transactions*:
If this communication concerns negotiation of a
contract or agreement,
any electronic transaction or electronic signature act
does not apply to
this communication: contract formation in this matter
shall occur only
with manually-affixed original signatures on original
documents
unless expressly and specifically stated/waived in a
dated witnessed writing and the written waiver is
affirmed in writing and executed in a witnessed and
dated writing by each party/witness thereto.

This message is digitally signed and verified.
Y6jjjjX77j782950SẞⱯS????S₵???-¦j49933j9595j5b000
399448856h568868992043232385859385944hfj6ye   tj

Jordan Lewis Ring


----- Original Message -----
From: John A. Doonan
To: MASSLAWYERUSA/jordan lewis ring/ma
Cc: TAT robert verrier ; REISER ; RBLUMENTHAL@SILVERMANKUDISCH.COM ; murray reiser
Sent: Monday, November 10, 2003 7:10 PM
Subject: RE: TAT urgent response

In the interest of time have cut check, total proceeds
$1,205,000.00; Check cut to The Architectural Team
Inc. in the amount of $210,096.33. Kerry Pass at ext.
14 has check and will overnight it or your client can
pick up. Please have someone contact Kerry and let her
know your preference. Full accounting to, of course,
follow but wanted to get this money out. My apologies
for travel delay. Thurs & fri pretty open for me, I

12/2/2003

think Atty. Hackel will represent Garrett. Can be
reached on cell tom'w at number I left on your
voicemail at about one this Aft.
Regards
John Doonan

-----Original Message-----
From: MASSLAWYERUSA/jordan lewis ring/ma
[mailto:jordanlewisring@masslawyer.us]
Sent: Monday, November 10, 2003 1:48 PM
To: John A. Doonan
Cc: TAT robert verrier; REISER; RBLUMENTHAL@SILVERMANKUDISCH.COM;
murray reiser
Subject: Re: TAT urgent response
Importance: High



Appreciate    reply

in todays world conn is but a click away

we are much concerned with the next delay

again we appreciate the money today

we have waited long enough

i trust that my client has had enough re delays
while states disbused.

please understand the simple concept of
frustration and fainess...

RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor

12/2/2003

## John A. Doonan

**From:** Jordan Lewis Ring/ masslawyer/ma [masslawyer@comcast.net]
**Sent:** Friday, November 21, 2003 2:12 PM
**To:** John A. Doonan
**Subject:** Re: autioneer csts



afternoon John      reply from remote location thanks to wi
fi from verizon

did you forward the auctioneer doc i.e. agreement of
engagement re commission?

our colleagues in Boston are interested in the number of
these type of percentage agreements since they are
fearful such would be challenged based upon good faith
doc implied   just other day by judge Agnes.... and dare
93a he applied...   anyway have great weekend

will communicate overweek or next week     holiday week
but will try    happly holiday to all up there

RING LAW FIRMS
Admissions:  MA/DC/NY

Boston, USA
4 Longfellow Place,
37th Floor
Boston, MA 02114 USA

Suburban Office:

"The Towers"

12/2/2003

250 Hammond Pond Parkway
Penthouse 1701 North Tower
Chestnut Hill, MA  02467.1529 USA

American Affiliated Caribbean Offices
P. O. Box 7, 15 Wellington  Road, Cole Bay
St. Maarten, NA
011 5995 5 77777
On SXM   5 444444

jordanlewisring@masslawyer.us
masslawyer@comcast.net

www.masslawyer.us

boston usa   617 558 9800
boston fax.  617 558 9801
usa cell        617 680 4422

This message and any attached document(s) contain
information which may be confidential, subject to
privilege or exempt from disclosure under applicable
Federal, State, International Law, United Nations
UNCITRAL MODEL LAW ON ELECTRONIC SIGNATURES 2001*. This
e-mail message (including attachments) is covered by
the Electronic Communications Privacy Act, 18 U.S.C. §§
2510-2521, and is intended only for the person or
entity to which it is addressed and may contain
confidential and/or privileged material.  Further, this
e-mail may be protected by attorney-client privilege
and/or work-product doctrine.  Any unauthorized review,
use, disclosure, dissemination, copying, forwarding or
distribution is strictly prohibited.  If you are not
the intended recipient, or received this e-mail in
error, please contact the sender by reply e-mail and
destroy all copies of the original message. These
materials are intended only for the use of the intended
recipient and are for discussion purposes only, unless
stated expressly otherwise. If you are not the intended

12/2/2003

recipient of this transmission, you are hereby notified that any distribution, disclosure, printing, copying,storage,modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system.

+This footnote also confirms that this email message and any
attachments have been swept by Commercial Systems for content and the presence of known computer infections.

Disclaimer Regarding Electronic Transactions*:
If this communication concerns negotiation of a contract or agreement,
any electronic transaction or electronic signature act does not apply to
this communication: contract formation in this matter shall occur only
with manually-affixed original signatures on original documents
unless expressly and specifically stated/waived in a dated witnessed writing and the written waiver is affirmed in writing and executed in a witnessed and dated writing by each party/witness thereto.

This message is digitally signed and verified.
Y6jjjjX77j782950SߥS????S€???-¦j49933j9595j5b000
399448856h56886899204323238585938594 4hfj6ye   tj

Jordan Lewis Ring

12/2/2003

----- Original Message -----
**From:** John A. Doonan
**To:** Jordan Lewis Ring/ masslawyer/ma ; TAT robert verrier ; REISER ; RBLUMENTHAL@SILVERMANKUDISCH.COM
**Sent:** Friday, November 21, 2003 9:13 AM
**Subject:** RE: autioneer csts

**Good morning, attached please find the previously discussed indemnification agreement. Please have your client execute and return to me.**
**Thank You**
**John D.**

> **-----Original Message-----**
> **From:** Jordan Lewis Ring/ masslawyer/ma [mailto:masslawyer@comcast.net]
> **Sent:** Wednesday, November 19, 2003 6:19 PM
> **To:** TAT robert verrier; REISER; RBLUMENTHAL@SILVERMANKUDISCH.COM; attorneydoonan
> **Subject:** autioneer csts
> **Importance:** High

> **good evening john**

> **after spending this day is session 7 Suffolk superior i witnessed judge burns review foreclosure costs.  of this i am certain...she would never have allowed a 50k auctioneer fee....the auctioneer was not a broker  he was not the effective cause of the sale...e was a bear bones auctioner only....the funds held by you less costs and 5k should be forwarded to the client TAT    the 50 k is beyond the pale for auction fees    best to all**


> **RING LAW FIRMS**
> **Admissions:  MA/DC/NY**

> **Boston, USA**
> **4 Longfellow Place,**
> **37th Floor**
> **Boston, MA 02114 USA**

12/2/2003