UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No.
04 10095-DPW

| | |
|---|---|
| STATES RESOURCES CORPORATION, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| MICHAEL CAPIZZI, | ) |
| CATHERINE R. CAPIZZI, | ) |
| THE ARCHITECTURAL TEAM, INC., | ) |
| GARRETT, INC., | ) |
| JOHN CONNOLLY, JR., | ) |
| MASSACHUSETTS DEPARTMENT OF REVENUE, | ) |
| JAMES GRUMBACH, and KEVIN DUFFY, | ) |
| | ) |
| Defendants | ) |

**CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED-REVISED WITH EXHIBITS**

Defendants and Plaintiffs-in-Counterclaim Michael Capizzi and Catherine R. Capizzi (sometimes jointly referred to as the "Capizzis") hereby submit pursuant to LR 56.1 this joint concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried. For convenience and in the interest of judicial economy this statement is submitted in response to the Capizzis' oppositions to the motions for summary judgment of Plaintiff and Defendant-in-Counterclaim States Resources Corporation ("States"), Defendant-in-Counterclaim Kevin Duffy ("Duffy") and Defendant Garrett, Inc. ("Garrett"), all of which deal with related factual circumstances.

1. States, an Iowa Corporation, has not filed with the Commonwealth of Massachusetts a certificate required by G.L. c. 181, sec. 4 of every foreign corporation "doing

business" in the Commonwealth. (See States Memo in Support of Summary Judgment- pp. 15-16.) *(Ex. 1- G.L. c.181, sec.3-4.)*

2.  The Capizzis are the former owners and currently rightful owners of property located at 236 Lincoln Road, Lincoln, Massachusetts (the "Property") which they occupied as their personal residence.

3.  In connection with the development of the Property on October 19, 1988, the Capizzis gave Winchendon Savings Bank (the "Bank") an adjustable rate note (the "Note") *(Ex. 2-Adjustable Rate Note)* in the principal amount of $750,000.00. The Note was secured by a mortgage (the "Mortgage") on the Property (Ex. 3-*Mortgage dated 10/19/88)*. The Capizzis had acquired the land in 1985, and the loan from the Bank paid off the original loan and provided funds for construction of their home. (See Duffy Statement #5).

4.  Under the terms of the loan documentation, the Bank was responsible for escrowing fees from the borrower to pay the real estate taxes on the Property. (See Mortgage-Uniform Covenants-item 2.)

5.  The interest rate on the Note was 9.25% for three years, after which it reverted to prime plus 3%. (See Note and Adjustable Rate Rider.)

6.  On April 22, 1992, the president of the Bank sent a letter to the Capizzis stating that the interest rate on the Note had been "fixed at an annual amortization rate of 6%." *(Ex. 4-letter dated 4/22/92 from Charles Steele to Capizzis.)*

7.  As of April 22, 1992, the Capizzis' monthly payment to the Bank for principal and interest on the loan was $4,668.64, plus escrow payments for real estate taxes of an additional $936.64, for a total monthly payment of $5,605.46 (the "Amended Note") (See Ex. 4 letter from Steele).

8. The Capizzis confirmed their agreement with the Bank in writing and paid the Bank $5,605.46 in May, June, July and August of 1992. (*Ex. 5- Capizzi letter to Bank; Bank loan Statements.*)

9. On August 14, 1992, the Federal Deposit Insurance Corporation ("FDIC") took over the Bank.

10. In March, 1993, the FDIC confirmed the monthly payments, including the real estate tax escrow, were $5,605.46. (*Ex. 6-letter dated 3/10/93 from FDIC to Michael Capizzi.*)

11. The FDIC reconfirmed through correspondence dated October 18, 1993, March 23, 1994 and July 21, 1994, that $5,605.46 was the correct amount to be paid monthly on the loan. (*Ex. 7-FDIC letters to M. Capizzi dated 10/18/93, 3/23/94 and 7/21/94.*)

12. In November, 1994, the FDIC sold the Amended Note to First Essex Bank, FSB. (*Ex. 8-letter dated 10/20/94 from First Essex to M. Capizzi.*)

13. First Essex Bank, FSB notified the Capizzis that their monthly payments were $5,605.46, including $4,668.64 for principal and interest and $936.64 for tax escrow. (*Ex. 9-letter dated 11/03/94 from First Essex to M. Capizzi.*)

14. On September 30, 1998, States acquired the rights to the Amended Note. (*Ex. 10-letter dated 9/15/98 from Star Bank Mortgage to M. Capizzi.*)

15. States continuously refused to abide by the terms of the Amended Note and instead sought to collect from the Capizzis the amounts due if the adjustable Note were to be in effect.

16. In January, 1999, States declared the Capizzis to be in default under the Note and initiated foreclosure proceedings. (*Ex. 11-letter Doonan & Graves to M. Capizzi dated 1/7/99.*)

17. Notice of a foreclosure sale scheduled for March 23, 1999 was advertised in the

newspaper. *(Ex. 12- Notice of Intention to Foreclose dated 2/23/99.)*

18. The Capizzis notified States that they were not in default under the Amended Note.

19. Faced with the prospects of losing their home, the Capizzis paid States $62,581.79 on March 1, 1999. *(Ex. 13- Cashiers check to Doonan & Graves dated 3/1/99.)*

20. On July 26, 1999, States again commenced foreclosure proceedings based upon the adjustable Note. *(Ex. 14- letter dated 7/26/99 from Atty Doonan to Capizzis.)*

21. The Capizzis notified States that they were not in default of the operative Amended Note. *(Ex. 15 – letter dated 9/23/99 from Atty David Klebanoff to John Doonan, Esquire.)*

22. Again, faced with the prospect of losing their home, the Capizzis paid States $43,776.23 on September 23, 1999. *(Ex. 16 - Cashier's check receipt to Doonan & Graves dated 9/23/99.)*

23. On January 7, 2000, States yet again commenced foreclosure proceedings based upon the adjustable Note. *(Ex. 17–letter from Doonan & Graves to Capizzis dated 1/11/00*

24. The Capizzis again notified States that they were not in default under the operative Amended Note. *(Ex. 18 – letter dated 2/11/00 from M. Capizzi to John Doonan, Esquire.)*

25. Yet again faced with the prospect of losing their home, the Capizzis paid States $24,141.53 on February 11, 2000. *(Ex. 19 – Cashier's check receipt to Doonan & Graves dated 2/10/00.)*

26. In May, 2000, States commenced foreclosure proceedings based on the adjustable Note. *(Ex. 20- letter dated 5/18/00 from Doonan & Graves to M. Capizzi.)*

4

27. The Capizzis again notified States that they were not in default under the operative Amended Note. *(Ex. 21- letter dated 6/15/00 from M. Capizzi to Atty Doonan.)*

28. On June 15, 2000, the Capizzis paid States $24,418.61 to avoid foreclosure. *(Ex. 22-Bank check to Doonan & Graves dated 6/15/00.)*

29. On July 27, 2000, States commenced foreclosure proceedings based upon the adjustable Note. States claimed that the Capizzis were in default of their tax obligations, even though States had not paid any amounts from the tax escrow account to the taxing authorities. *(Ex. 23-letter dated 7/27/00 from Doonan & Graves to M. Capizzi.)*

30. The Capizzis notified States that they were not in default under the operative Amended Note. *(Ex. 24- letter dated 8/29/00 from M. Capizzi to Atty Doonan.)*

31. On August 29, 2000, the Capizzis paid States $18,161.88. *(Ex. 25- copy bank check to Doonan & Graves dated 8/29/00 and receipt from Town of Lincoln for taxes.)*

32. On October 26, 2000, States sent yet another notice to the Capizzis threatening to commence foreclosure proceedings. *(Ex. 26- letter dated 10/26/00 from Doonan & Graves to M. Capizzi.)*

33. On January 31, 2001, the Capizzis sent a demand letter under M.G.L. c. 93A. sec. 9, via certified mail to States. *(Ex. 27-Demand letter to Doonan & Graves from Atty Joseph Davis dated 2/1/01.)*

34. States refused to tender a settlement offer.

35. On May 4, 2001, the Capizzis sent another demand letter under M.G.L. c. 93A, sec. 9, via certified mail to States, demanding that States pay their current real estate tax bill. *(Ex. 28- Second demand letter dated 5/4/01 from Atty Philip Brown to Atty Doonan.)*

36. States never responded to the May 4, 2001 demand letter.

37. On or about June 20, 2001, the Capizzis filed suit against States in Middlesex Superior Court, C.A. No. 01-2618, seeking a declaratory judgment and damages for breach of contract and violation of Massachusetts General Laws chapter 93A. *(Ex. 29- Middlesex Sup. Ct. No. 01-2618-cover sheet & Complaint.)* States removed the suit to U.S. District Court for the District of Massachusetts, case number 01-CV-11298-DPW ("1st Federal Suit"). *(Ex. 30- Notice of Removal.) (Ex. 31- U.S. Dist. Ct. No. 01-CV-11298-DPW- Docket.)* In its Statement of Undisputed Facts #3, States inaccurately stated that the Capizzis filed the suit in the United States District Court. They filed in the Middlesex Superior Court and States removed the case to this court.

38. States is somewhat misleading when it states in its Statement #4 that in or about September 2002 it commenced foreclosure proceedings under the Capizzi mortgage. It commenced foreclosure proceedings against the Capizzis as early as January, 1999 and repeatedly commenced foreclosure proceedings at least six times prior to the commencement of suit by the Capizzis in June 2001. In each instance the mortgage was current but the Capizzis paid very large amounts to States to avoid the threatened foreclosure. (See paragraphs 16-32 supra.)

39. On November 22, 2002, within days of the dismissal without prejudice of the 1st Federal Suit for failure to prosecute, States sent to the Capizzis a certified letter informing them that it had scheduled a foreclosure sale upon foreclosure of the adjustable Note for December 16, 2002 at 11:30 a.m.

40. On or about December 2, 2002, the Capizzis filed a second complaint in the U.S. District Court for the District of Massachusetts, case number 02-12319-DPW ( 2nd Federal Suit") seeking a declaratory judgment, damages for breach of contract, violation of M.G.L. c. 93A and

injunctive relief. *(Ex. 32- US Dist. Ct. No. 02-12319-DPW-Docket.)*

41. Since the FDIC took over the Bank in 1992, the Capizzis have made principal and interest payments to note holders in the amount of $675,218.52. Of that amount, $173,180.04 has been paid to States. *(Ex. 33- Copies of checks.)*

42. Since August, 1992, when the FDIC took over the Bank, the Capizzis have overpaid all note holders in the amount of $181,134.50. Moreover, there has been no adjustment for overpayments since 1992, and the note has never been properly amortized.

43. Since States took over the loan, the Capizzis have overpaid by $83,630.70.

44. Since the FDIC took over the Bank in 1992, no note holder, including States, has paid any real estate taxes from the escrow account as they were obligated to do. Indeed, States requested information on several occasions, which the Capizzis provided, showing that they had paid the taxes. To date, States has failed to provide an accounting of the escrow account that States was obligated to maintain, the amounts contained in the escrow account or the amounts, if any, paid from the escrow account. (See #45 below.)

45. As a result, the Capizzis have personally paid over $155,000.00 in real estate taxes directly to the Town of Lincoln, Massachusetts. *(Ex. 34- tax payments.)*

46. Plaintiff Michael Capizzi filed a voluntary petition for Bankruptcy under Chapter 13 of the United States Bankruptcy Code on February 28, 2003. The Bankruptcy filing was not Pro Se as States asserted in its Statement # 9. Michael Capizzi was represented by Bankruptcy attorneys throughout this proceeding, although he received bad advice from them in several instances. Defendant States Resources filed a motion to dismiss the Chapter 13 on the grounds that Michael Capizzi was not an eligible Chapter 13 debtor, although his Bankruptcy attorneys had led him to believe that Chapter 13 was appropriate for him. States alleged that his secured

7

debts exceeded $871,550.00 at the time of filing. (See States' Statement #10.) This claim was totally false and consisted primarily of the amount States falsely claimed was due on the note under its counterclaim. Michael Capizzi's attorneys did not apprise him of this action or take proper steps to contest it. *(Ex. 35- Bankruptcy Docket-#03-11621.)*

47.   On March 5, 2003, in response to the motion to dismiss, the Bankruptcy Court granted relief from the stay in order to allow States to proceed on the 2nd Federal Suit. The Capizzis were not aware of this action and assumed that they were still protected by the automatic stay. Their attorney did not take adequate steps to oppose this action or to keep the Capizzis advised. (See Docket-Ex. 35)

48.   On May 1, 2003, the Bankruptcy Court granted debtor Michael Capizzi's motion to dismiss the Chapter 13, which action he took on advice of counsel who recommended that Catherine Capizzi file a Chapter 11 in place of his Chapter 13 filing because certain of his listed claims would cause problems because some of the Bankruptcy judges and clerks had close personal relationships with lawyers and law firms against whom he asserted claims. His attorneys never informed him that States had brought a motion to dismiss the Chapter 13 because his secured indebtedness exceeded the limit or that the Bankruptcy Court had granted relief from stay in response to States motion to dismiss. (See Docket-Ex. 35)

49.   On May 20, 2003, Defendant Catherine Capizzi filed a voluntary petition for Bankruptcy under Chapter 11 of the Bankruptcy Code. This was not a Pro Se filing, as stated in States Statement #13, in that Catherine Capizzi was represented by the same Bankruptcy attorneys who represented Michael Capizzi. This action is still pending. However Catherine Capizzi's name was not on the title to the Property and it was determined that her bankruptcy would not affect a foreclosure. For this reason, States was granted relief from stay and allowed

8

to proceed in the United States District Court. Again, the Capizzis were completely uninformed of the action taken in the Bankruptcy Court and assumed that they were protected by the Bankruptcy stay. *(Ex. 36- Bankruptcy Docke-#03-14266.)*

50. On June 9, 2003, the Federal District Court dismissed with prejudice Plaintiffs' 2nd Federal suit because Plaintiffs failed to meet the requirements of a Stipulated Order requiring, among other things, that they deposit in escrow the amount of $219,771.95 on or before February 3, 2003, and because they failed to meet certain discovery deadlines and other requirements. (See Ex. 32-Docket). The Plaintiffs did not have the available funds at that time to make such a large escrow deposit by February 3, 2003. Furthermore, although the Capizzis owned other real estate which would have yielded $500,000.00 if sold, the sale could not be consummated prior to February 3, 2003. Such deposit was not necessary to secure States since the Property was assessed for over $2,000,000.00 by the Town of Lincoln, Massachusetts.

51. The Court further granted judgment for States against the Capizzis on its counterclaim in the amount of $875,203.38, being the amount falsely alleged to be due under the Note. The dismissal of the Capizzis' claims and the granting so States counterclaim were judgments by default due to procedural failures. *(Ex. 37- Default Judgment)*. Neither the Capizzis' claims nor States' counterclaim were tried on the merits. There was no proof of the amount due. States merely relied on false affidavits and allegations. The Capizzis had been led to believe that they were still protected by the automatic stay in bankruptcy and thus failed to take further action to protect their interests in the U.S. District Court. (See States Statement #18 and Duffy Statement #14.)

52. Although the Capizzis did not file an appeal of the default judgment, they did file a motion to set aside the judgment pursuant to Fed. R. Civ. P. 60(b) and this motion is currently

9

pending in this court. *(Ex. 38- Rule 60(b) Motion.)* If granted, the Capizzis would move to consolidate the prior action with their counterclaim in this action. (See Duffy Statement # 13.)

53. A foreclosure auction on the Capizzis' property was held by States on July 24, 2003. The high bidder, Linda Micu, was bidding on behalf of the Capizzis upon the recommendation of their attorney. She did not consummate the sale because the proposed lenders backed out of the transaction at the last minute. (See States Statements #20 and #21.)

54. States admits that its auctioneer, Garrett Healey, President of Garrett, Inc., informed States attorney that he had received a letter of interest from Leonard Florence and a $50,000.00 check as a deposit on the Capizzis' property. (See States' Statement #22.) The letter of interest was an offer to purchase the Capizzis' property for $2,000,000.00 *(Ex. 39-Florence offer & deposit)*(See Garrett Statement #19 & #20), the same amount as Linda Micu had previously bid on July 24, 2004. Healy deposited this check in his company account, but there are questions whether it was deposited in escrow or even placed in the proper corporation's account. It is also questionable why the check was deposited at all if States could not accept any offer made outside the auction process. (See TAT Statement #7-16.)

55. States admits that its attorney, John Doonan, informed Garrett Healey that under Massachusetts law, States could not accept Florence's proposal. (See States' Statement #23.) This might be the case if the Capizzis did not consent to the acceptance of the offer outside of the foreclosure procedure, but States did not even inform the Capizzis of Mr. Florence's offer which was considerably higher than the bid ultimately accepted at the September 26 auction. See States' Statement #24. How can Attorney Doonan have been concerned that Michael Capizzi would have sued States if he never even informed him of the Florence offer? (See Garrett Statement #25 & #26.) Furthermore, States never informed the Bankruptcy court of Mr.

Florence's offer although it had moved in both bankruptcy cases for relief from the stay and was the principal creditor of Mr. Capizzi.

56.  Defendant Michael Capizzi filed a pro se voluntary petition for Bankruptcy under Chapter 11 of the U.S. Bankruptcy Code on September 25, 2003, upon advice of counsel, one day before the scheduled foreclosure sale, but the Bankruptcy Court dismissed the petition on September 26, 2003, without notice to Michael Capizzi or opportunity for a hearing, holding that Michael Capizzi was barred from filing another bankruptcy petition until November 1, 2003. The Court held that Michael Capizzi was barred from filing a new claim for 180 days after voluntary dismissal of his prior Chapter 13 after a motion for relief from the stay had been filed. *(Ex. 40-Bankruptcy Docket-03-18040.)*

57.  States intentionally ignored Plaintiffs' requests to reinstate the Mortgage prior to the foreclosure as provided in the Mortgage. (See Ex. 3- Mortgage, Uniform Covenants, paragraph 18.)

58.  States advertised the foreclosure citing substantially less land than was included in the Property conveyed to Defendant Duffy at the foreclosure sale. The Notice of Foreclosure Sale published in the Boston Globe, September 14, 2003 and September 21, 2003, *(Ex. 41- Notices of foreclosure sale)* describes the property as consisting of 2 ½ acres, whereas the 2004 real estate tax bills from the Town of Lincoln, Massachusetts *(Ex. 42- Town of Lincoln tax bills)* show that the premises consist of 5 parcels totaling 5.84 acres. A similar advertisement was used for the prior foreclosure sale. Garrett states in Garrett Statement #17 that all information concerning the Property, including that relating to acreage, was provided by Attorney Doonan's office which approve all ads that Garrett placed on behalf of States. In spite of States' allegation that these were display advertisements that were published above and beyond the legally

11

required advertising (see States' Statement #28) the advertisement was inaccurate and misleading to prospective bidders. The advertisement also describes the house as containing 5 bedrooms, 3 fireplaces and 3 full baths, whereas the house actually contains 6 bedrooms, 4 fireplaces and 2 half bathes in addition to the 3 full bathes. This is substantiated by a letter dated March 3, 2003 to Michael Capizzi from Kathleen E. Cook, a real estate broker from Atlantic Associates Real Estate, which accurately describes the premises and recommends a marketing list price of $3,700,000.00 or $4,100,000.00 if subdivided to include a two acre buildable lot. *(Ex. 43-letters from Kathleen E. Cook.)*

59. States held a foreclosure auction on the Property on September 26, 2003. The Property was sold to Duffy for $1,200,000.00, being less than one third of its fair market and $1,000,000.00 less than its assessed value. (See Ex. 42-Town of Lincoln assessment. See also Ex. 43- letters from Kathleen Cook.)

60. The Capizzis object to the amount of $932,630.87 alleged to be due to States from the Capizzis and paid out of the proceeds form the foreclosure sale as well as Doonan's fees and expenses. See Garrett Statement #22. The Capizzis also object to the $210,096.33 paid to defendant Architectural Team, Inc. See Garrett Statement #23. The Capizzis maintain that none of the foregoing amounts were owing. States did not have a contractual right under the Capizzi mortgage and note to pay any of the expenses of the auction, such as Garretts fee, out of funds received from the sale because the Capizzis were not in default under their note and mortgage. (See Garrett Statement #24.)

61. Although the Capizzis did not file a formal objection in this proceeding to Garrett's auctioneer fee, they believe that it is grossly excessive. A 3.5% fee is totally unreasonable. The fee should be based on the amount of work performed and not a percentage

of the amount received. (See Garrett Statement #15-16.)

62. States purchased and maintained the Capizzis' note in Massachusetts secured by a mortgage on Massachusetts property and foreclosed on the mortgage in Massachusetts, even though States had not obtained a certificate to do business in Massachusetts pursuant to G.L. c. 181, section 4. (See #1 supra.)

63. Garrett, Inc., the auctioneer, was not licensed to act as an auctioneer on real estate mortgages in Massachusetts. Although Garrett Healey, its President, had an auctioneer's license, the auction was conducted by Garrett, Inc which did not have a license. (See Garrett Statement #8.)

64. Michael Capizzi notified Duffy's attorney prior to the auction and Duffy prior to the closing on the foreclosure sale that the Capizzis were not in default under their Mortgage and Note which was current at the time of the foreclosure and that the foreclosure was fraudulent and illegal. Duffy and his attorney both stated that Duffy was buying the Property at 20% of its true value and that it was worth the risk.

65. Duffy has recently placed an ad for sale of the Property at $2,590.000.00, more than twice what he paid for the property at the foreclosure sale. *(Ex. 44-Deposition of Duffy, p. 51, l. 6-12; copy of Duffy's ad.)*

66. Duffy has admitted that he put up the entire $1,200,000.00 for purchase of the Property at the foreclosure sale and gave a false mortgage for $1,200,000.00 to his mother, Joan Duffy. *(Ex. 45 -Deposition of Duffy, p.34, l. 4-p.36, l. 2; p.38, l. 1-p.39, l. 21.)*

67. The foreclosure by States on the mortgage secured by the Property was fraudulent and invalid because the Capizzis were never in default to States under their Mortgage and Note and the Note was fully paid and even overpaid at the time of the foreclosure. *(Ex. 46- Accountant*

*statement.)*

68. The foreclosure and subsequent foreclosure sale to Duffy were predicated on false and fraudulent affidavits filed by States in the Federal District Court, the U.S. Bankruptcy Court, the foreclosure sale and the Concord District Court through Duffy. *(Ex. 47-Affidavits of States.)* (See Ex. 37- Default Judgment.)

69. In view of the fraud committed by States in the foreclosure on the Property and the subsequent sale to Duffy and in view of Duffy's full knowledge that the foreclosure was fraudulent and illegal and that he was paying less than 30% of its fair market value, the foreclosure sale should be declared void and set aside.

70. Duffy commenced a summary process action in the Concord District Court. On December 18, 2003, after trial, the Court entered a judgment for possession and damages in favor of Duffy. The Court refused to allow Michael Capizzi to submit evidence of fraudulent foreclosure. *(Ex. 48- Summary Process finding & Judgment-Concord Dist. Ct.)*

71. In the summary process proceeding, Duffy testified that he borrowed the entire $1,200,000.00 purchase price and that his monthly interest payments were approximately $6,000.00. In a deposition, Duffy testified that he used his own money and gave a false mortgage to his mother. He further testified that he paid no principal or interest to any lender for any loan on the purchase of the Property. (See Ex. 45- Duffy deposition.)

72. The Capizzis filed a notice of appeal on December 29, 2003, and an appeal bond in the amount of $19,007 was set along with a monthly use and occupancy charge of $6,788.00. *(Ex. 49- Appeal bond Order.)*

73. The Capizzis sought review of the amount of the appeal bond, and on March 3, 2004, the Appellate Division determined that the amount of the bond should be $28,058.72 along

with a use and occupancy charge of $6,788.00. *(Ex. 50- Appellate Division Decision & Order.)*

74. The amount of the appeal bond and the monthly use and occupancy charge were based on the fraudulent testimony of Duffy as to his interest payments which were non existent. A fair rental value for use and occupancy would undoubtedly have been much less than the $6,788.00 figure which was based entirely on Duffy's false statement of interest on the purchase price which was not paid. (See Ex. 45- Duffy deposition.)

75. The Capizzis were unable at that time to post a bond of this size, and the execution on the eviction was issued to Duffy by the Concord District Court. Catherine Capizzi was still in Bankruptcy and could not obtain access to certain real estate that would have provided funds for posting the bond.

76. Duffy proceeded to evict the Capizzis and remove them from their home on March 17, 2004, even though he and his attorney were fully aware that the foreclosure was fraudulent and illegal and that the foreclosure sale was a nullity.

77. Most of the Capizzis' personal property was either damaged or destroyed when removed from the Capizzis' home by the constable's movers.

78. The separate action filed in the Federal District Court on March 16, 2004 was brought solely for the purpose of staying the eviction which was scheduled to occur on the following day. The Court denied the Capizzis' request for a temporary restraining order without a hearing and relying primarily on the Rooker-Feldman Doctrine. The issues involving the validity of the foreclosure were not addressed or tried on the merits and the Capizzis voluntarily dismissed the case. *(Ex. 51- US Dist. Ct. No. 04-CV-10533-DPW-Complaint and ex parte motion for stay of eviction; Docket.)*

79. The civil action filed in the Middlesex Superior Court, C.A. No. MICV2004-

01041, on March 17, 2004, was also brought for the purpose of staying the eviction scheduled to occur on that day. The Court denied the stay stating that it was not an appellate court for the district court which granted the eviction. The merits of the case were not heard. *(Ex. 52-Middlesex Superior Court, C.A. No. MICV2004-01041-Docket.)*

80.     The Capizzis then moved ex parte for the Middlesex Superior Court to sign a memorandum of lis pendens. The Court requested that States and Duffy be given notice to appear and received their opposition memorandum on the day of the hearing which was the first day the Capizzis received the memorandum. The memorandum not only requested denial of the lis pendens but requested a special motion to dismiss the underlying action. The Court granted the dismissal of the action on the following day without giving the Capizzis any opportunity to respond to the opposition memorandums, either at a hearing or in writing. The Capizzis have appealed the Court's dismissal of the lis pendens and of the underlying case and the appeal is presently pending in the Massachusetts Court of Appeals. Clearly the allegations in this case were not tried on the merits.

Dated: November 15, 2004

*(signature)*
Michael Capizzi, pro se
1725 Wedgewood Common
Concord, Massachusett 01742
(978) 369-4894

*(signature)*
Catherine R. Capizzi, pro se
1725 Wedgewood Common
Concord, Massachusett 01742
(978) 369-4894

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of above document was served upon the attorney of record for each of the parties hereto by mail on the date set forth below.

Date: November 15, 2004

Michael Capizzi