

# DOONAN, GRAVES & LONGORIA, LLC
### ATTORNEYS AT LAW

*Serving Massachusetts, Maine,*
*New York & Washington*

*www.dgandl.com*

*100 Cummings Center*
*Suite 213C*
*Beverly, Massachusetts 01915*
*TEL: (978) 921-2670*
*FAX: (978) 921-4870*

January 13, 2005

Clerk's Office
USDC for the District of Massachusetts
U.S. Courthouse
One Courthouse Way
Boston, MA 02110

RE:    **State Resources Corp. v. Michael Capizzi, et al.**
       *Civil Action No. 04 10095 DPW*

Dear Clerk:

Enclosed, please find a complete copy of Exhibit L from States Resources Corporation's Memorandum in Support of its Motion for Summary Judgment (Document #90). The current Exhibit L in States Resources Corporation's Memorandum in Support of its Motion for Summary Judgment, filed with the Court on October 6, 2004, appears to be missing pages.

Thank you for your assistance. If you have any questions or need further information, I may be reached at 978-921-2670, ext. 12.

Very Truly Yours,

John A. Doonan, Esq.

Encl.

05-021-98

# United States District Court
## District Of Massachusetts

FEDERAL DEPOSIT INSURANCE CORPORATION,
    as Liquidating Agent of
    CAPITOL BANK and TRUST COMPANY,
        Plaintiff,

    v.                         CIVIL ACTION NO. 94-11151-MLW
                                  (COLLINGS, U.S.M.J.)

JOHN P. FINN, Individually;
JOHN P. FINN, as Trustee and
    Beneficiary of the
    AISLING REALTY TRUST;
JOHN P. FINN, as Trustee and Beneficiary
    of the BANBA REALTY TRUST;
MARY B. FINN, Individually;
MARY B. FINN, as Trustee and Beneficiary
    of the BANBA REALTY TRUST; and
MARY B. FINN, as Beneficiary of the
    AISLING REALTY TRUST,
        Defendants,

    v.

BANK OF BOSTON,
STATE STREET BANK AND TRUST,
NEEDHAM COOPERATIVE BANK, and
AMERICAN AIRLINES FEDERAL CREDIT UNION,
        Trustee Process Defendants,

    v.

NORWOOD FIRE PROTECTION, INC.,
        Reach and Apply Defendant.



# MEMORANDUM AND ORDER ON FDIC'S MOTION FOR SUMMARY JUDGMENT (#66)

COLLINGS, U.S.M.J.

## I. Introduction

This action was instituted with the filing of a complaint by the plaintiff, the Federal Deposit Insurance Corporation (hereinafter "the FDIC") as liquidating agent of Capitol Bank and Trust (hereinafter "the Bank"), to collect sums allegedly due and owing to the Bank on certain notes executed by the defendants John P. Finn, individually (hereinafter "J. Finn"), John P. Finn as trustee and beneficiary of Aisling Realty Trust (hereinafter "Aisling Trust"), John P. Finn as trustee and beneficiary of Banba Realty Trust (hereinafter "Banba Trust"), Mary B. Finn, individually (hereinafter "M. Finn"), Mary B. Finn as trustee and beneficiary of Banba Trust, and Mary B. Finn as beneficiary of the Aisling Trust. The defendants have filed an answer to the plaintiff's complaint together with a two count counterclaim.

Counts I and II of the Complaint seek payment on commercial real estate promissory notes in the amount of $1,199,963.00 (Count I) and $120,000.00

2

(Count II).[1]  Count III seeks injunction relief.

In Count I of the counterclaim, the defendants allege that the FDIC conducted certain foreclosure sales in a commercially unreasonable manner, thereby causing them monetary damages.  It is alleged in Count II that the actions undertaken by the FDIC constituted breaches of the implied covenant of good faith and fair dealing which again purportedly caused damage to the defendants.  The FDIC seeks the entry of summary judgment in its favor on both counts of the counterclaim; the defendants oppose the dispositive motion.

Subsequent to the filing of the FDIC's motion, M. Finn sought relief in the bankruptcy court.  (#70)  All parties agree that as a result of the bankruptcy proceedings, the FDIC's claims against M. Finn are subject to the permanent injunction of 11 U.S.C. §§ 524(a)(2) and 727(b).  (##84 & 87) As the FDIC puts it, its claim against M. Finn "...has been discharged in her bankruptcy proceedings."  (#87 at pp. 1-2)  While M. Finn's counterclaims against the FDIC are property of her bankruptcy estate and have not been abandoned by her trustee, the trustee has not filed an opposition to the FDIC's motion for summary judgment on M. Finn's counterclaims despite being

---

[1]

The FDIC does not seek summary judgment on Count III, a claim for injunctive relief against J. Finn and Norwood Fire Protection, Inc. *See* #66, p. 2.

3

invited to do so. (#76) Accordingly, the Court will treat the FDIC's motion

for summary judgment on M. Finn's counterclaims as being unopposed.

## II. The Facts

A comparison of the parties' Local Rule 56.1 statements of fact reveals

that there are few disputes with respect to the background facts underlying

this controversy. (*Compare* Statement of Undisputed Facts #67 with

Defendant/Counterclaim Plaintiff's Opposition #79 at 2-7) To the extent that

disputes do exist, they shall be duly noted within this recitation.

On or about December 29, 1990, when the Bank was declared insolvent

by the Commissioner of Banks of the Commonwealth of Massachusetts, the

plaintiff FDIC was appointed as the liquidating agent for the Bank. (#67 ¶ 3;

Affidavit of Mary B. Finn #80 ¶ 8; Affidavit of John P. Finn #81 ¶ 8)

Defendants J. Finn and M. Finn, husband and wife, reside at 16 Whiting Road,

Dover, Massachusetts. (#67 ¶ 4; Counterclaim #59 ¶ 1) The Aisling Trust was

established under a Declaration of Trust dated December 30, 1992; J. Finn and

M. Finn are both trustees and beneficiaries of this trust. (#67 ¶ 5; #59 ¶ 2;

#80 ¶ 3; #81 ¶ 3) So, too, in April, 1980, the Banba Trust was established

under a Declaration of Trust; both J. Finn and M. Finn are trustees of this

4

trust, while J. Finn, M. Finn, Sean Finn and Brian Finn are the beneficiaries. (#67 ¶ 6; #59 ¶ 3; #80 ¶ 4; #81 ¶ 4)

On or about September 12, 1989, J. Finn and M. Finn, individually and in their capacities as trustees of the Aisling Trust and the Banba Trust (collectively "the defendants"), executed and delivered a secured commercial real estate promissory note in the original principal amount of $1,199,963.00 to the Bank. (#67 ¶ 7; #79 at 2) The security for this promissory note consisted of a first mortgage and security agreement on the real estate, improvements, and personalty situated at 534-536 Columbus Avenue, Boston, Massachusetts ("the Columbus premises"), a first mortgage and security agreement on the real estate, improvements, and personalty located at 170 Botolph Street, Boston, Massachusetts ("the Botolph premises")[2], and a collateral assignment of leases and rents of the Columbus and Botolph premises. (#67 ¶ 8; #79 at 2-3)

On or about August 31, 1990, the defendants executed a secured commercial real estate promissory note in the original principal amount of

---

[2]

In all the papers preceding the FDIC's Reply Memorandum (#83), this property is denoted 170 Botolph Street, Boston, Massachusetts. For the first time in the Reply Memorandum, the premises are denominated 170 St. Botolph Street, Boston, Massachusetts.

$120,000.00 in favor of the Bank.  (#67 ¶ 13; #79 at 3)  This note was secured by a mortgage on the real estate and improvements located at Unit No. 1, 10 Worcester Square, Boston, Massachusetts ("the Worcester Square premises") together with an assignment of leases and rents of the Worcester Square premises.  (#67 ¶ 14; #79 at 3)

On or about May 12, 1991, the defendants defaulted in making their regularly scheduled payments pursuant to the $1,199,963.00 note and the $120,000.00 note.  (#67 ¶¶ 9, 15; #79 at 3)  Approximately three months thereafter, on or about August 2, 1991, the FDIC, by this time having been appointed as the liquidating agent for the defunct Bank[3], made demand upon the defendants by sending them a notice of intention to foreclose and of deficiency after foreclosure.  (#67 ¶¶ 10, 16; #79 at 3)  Subsequent to demand, the defendants failed to make any further payments on either of the subject notes.  (#67 ¶¶ 11, 17)

The FDIC noticed its intent to foreclose, and scheduled public auctions of the Columbus and Botolph premises for December 15, 1993.  (#67 ¶ 12; #79 at 3)  As later detailed, both properties were ultimately sold, the

---

[3]

As liquidating agent, the FDIC succeeded to all the rights and obligations of the Bank as mortgagor of the Columbus, Botolph, and Worcester Square premises. (*See* #79 at 3)

6

Columbus premises for $295,000.00.[4]  (#67 ¶ 12; #79 at 6)  A foreclosure sale by public auction was scheduled by the FDIC for the Worcester Square premises for July 16, 1992, and the property sold for $77,200.00.  (#67 ¶ 18; #79 at 6)

The remainder of the historical background to be recounted is premised upon the defendants' submissions and the FDIC's response thereto in its reply memorandum.

With respect to the foreclosures of the Columbus premises and the Botolph premises, the defendants aver that the auctions were scheduled for the same day, only about 45 minutes apart.  (#79 at 4)  In accordance with Massachusetts General Laws chapter 244, § 14, the FDIC published once a week for three successive weeks a small notice about the auctions in the legal pages of the local newspaper.  (#79 at 3-4)[5]  No prominent display advertisements were employed for the auctions. (#79 at 4)

Turning to the auction of the Columbus premises, the son of J. Finn and

---

[4]

The defendants state that the highest bid, $320,000.00, was accepted for the Botolph premises, but it is unclear if this was the amount actually realized for the property. (#79 at 4)  The plaintiff does not address the issue.

[5]

The FDIC has proffered nothing to rebut this statement.

7

M. Finn, Brian Finn, offered the highest amount, approximately $600,000.00, to purchase the property; Brian Finn's bid was accepted.  (#79 at 4)  The defendants assert that one of the terms and conditions of the sale of both the Columbus premises and the Botolph premises was that the sales had to close within 30 days of the auction, i.e., on or about January 14, 1994.  (Id.)  Both Brian Finn and the high bidder for the Botolph premises requested extensions of the 30-day period due, at least in part, to the press of the holiday season and year end.  In Brian Finn's case, the mortgage company processing his mortgage application as well as his attorney requested an extension on his behalf.  (Id.)

According to the defendants, Brian Finn's mortgage broker was snubbed by the FDIC loan officer handling the foreclosure sales; this loan officer also purportedly made very disparaging remarks about the Finns.  (#79 at 5)  In his affidavit, Robert C. Muller, the FDIC account officer responsible for the foreclosures on the Columbus premises, the Botolph premises, and the Worcester Square premises, denied every having spoken with Brian Finn or any person representing him about Brian Finn's application for funds to purchase the Columbus premises. (Reply Memorandum #83, Second Affidavit

In Support Of FDIC's Motion For Summary Judgment, Exh. A ¶¶ 1,2 7)  Mr. Muller stated that "[a]ll communications with the FDIC regarding Brian Finn's efforts to purchase the Columbus Avenue property went through Mr. Moriarity", the attorney who represented the FDIC in all three foreclosure proceedings.  (#83, Exh. A ¶¶ 4, 8)   Mr. Muller was advised by Attorney Moriarity that Brian Finn had requested a 30-day extension to close.  (#83, Exh. A ¶ 9)  The FDIC denied Brian Finn's request for an extension and, because he was unable to close within the 30-day period, he forfeited his $10,000.00 cash deposit in accordance with the terms of the auction of the Columbus premises.[6]  (#79 at 5)  Mr. Muller asserted that "Brian Finn never presented a firm financing commitment to the FDIC."  (#83, Exh. A ¶ 9)

As related by the defendants, following Brian Finn's inability to close within 30 days, the FDIC then approached the next highest bidder at the December 15, 1993 auction of the Columbus premises, but that bidder refused to buy the property.  (#79 at 5)  Thereafter, the failure to close upon the

---

[6]

The defendants contend they were advised by the FDIC that the request for an extension by the high bidder for the Botolph premises was also rejected when, in fact, an extension was granted by the FDIC thereby allowing the high bidder to close on the sale of the Botolph premises on January 31, 1994. (#79 at 5)  The defendants have not disputed the assertion by the FDIC that the extension was granted because the high bidder for the Botolph premises paid the FDIC an additional nonrefundable $20,000.00 deposit on January 12, 1994. (#83, Exh. A, Second Affidavit of Robert G. Muller)

December 15, 1993 auction resulted in the Columbus premises becoming subject to applicable rent control provisions. (#79 at 6) The FDIC contends, however, that the Columbus premises were "subject to the City of Boston rent control requirements during the entire time the Finns' (sic) owned the property", a fact of which the Finns were aware at least since 1990 when they were sued by one of their tenants for rent control violations. (#83, Exh. A ¶¶ 12, 13)

After a second scheduled foreclosure sale was once postponed, an auction of the Columbus premises was held on June 8, 1994. (#79 at 6) The highest bid at the June 1994 auction was $295,000.00, approximately $300,000.00 less than the amount bid by Brian Finn six months before. (*Id.*)

Prior to the foreclosure sales of the Columbus and Botolph premises, the FDIC scheduled and noticed a foreclosure sale by public auction of the Worcester Square premises for July 16, 1992. (*Id.*) The defendants assert that the FDIC's notice of this sale only met the bare minimum statutory requirements, and again, that no prominent display advertisements were used. (*Id.*)

The FDIC commenced the instant litigation to recover from the

defendants the deficiencies outstanding on the notes following the three referenced foreclosure sales.

### III.  THE SUMMARY JUDGMENT STANDARD

The summary judgment standard in this Circuit is familiar.  When considering the propriety of the entry of summary judgment, the court must determine whether:

> ...the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the court is to examine the materials presented "in the light most favorable to the nonmoving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation*, 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether a factual dispute is "genuine" the

11

court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see also National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff*, 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *National Amusements*, 43 F.3d at 735; *Vasapolli*, 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also National Amusements*, 43 F.3d at 735.

## IV. DISCUSSION

### A. Counts I and II of the FDIC's Complaint

J. Finn bases his opposition to the FDIC's Motion for Summary Judgment solely on the merits of his counterclaims which have also been interposed as affirmative defenses against the FDIC's claims. (Answer, Etc., # 59 at ¶¶ 44 and 46) Since no other basis for opposing the FDIC's motion is stated, the Court will turn to the merits of the Finns' counterclaims.

### B. Count I of the Finns' Counterclaim

To recap, in the first count of the counterclaim, the defendants allege that the foreclosure sales of the Columbus premises, the Botolph premises and the Worcester Square premises were held in a commercially unreasonable manner and, consequently, that the proceeds realized from those sales were significantly less than they otherwise would have been. The defendants rely in large measure upon the purportedly inadequate sales prices to support their contention.

The parties agree that resolution of the issues raised in the counterclaim is controlled by Massachusetts law. As reiterated by the Supreme Judicial Court of the Commonwealth:

13

> We have frequently stated that the basic rule of
> [Massachusetts] law applicable to the foreclosure of
> real estate mortgages is that "a mortgagee in
> exercising a power of sale must act in good faith and
> must use reasonable diligence to protect the interests
> of the mortgagor."

*Seppala & Aho Construction Co., Inc. v. Petersen*, 373 Mass. 316, 320, 367 N.E.2d 613, 616 (1977)(citations omitted).

More recently, the Massachusetts Appeals Court has explained that under the

law of Commonwealth,

> If the statutory norms found in G.L. c. 244, §§
> 11-17B, governing foreclosure of real estate
> mortgages, have been adhered to, Massachusetts cases
> have generally regarded that as satisfying the fiduciary
> duty of the mortgagee to deal fairly with the
> mortgaged property, unless the mortgagee's conduct
> manifested fraud, bad faith, or the absence of
> reasonable diligence in the foreclosure sale process.

*Pemstein v. Stimpson*, 36 Mass. App. Ct. 283, 286-7, 630 N.E.2d 608, 611, review denied, 636 N.E.2d 279, 418 Mass. 1103 (1994).

The federal courts in Massachusetts have followed the state courts' lead.

While addressing a similar claim, the First Circuit has had occasion to write

that:

> Under Massachusetts law, [the defendant] has
> the burden of proving commercial unreasonableness,
> *Chartrand v. Newton Trust Co.*, 296 Mass. 317, 320, 5
> N.E.2d 421, 423 (1936), which is a question of fact,

14

> *John Deere Leasing Co. v. Fraker*, 395 N.W.2d 885, 887
> (Iowa 1986). Absent evidence of bad faith or
> improper conduct, a mortgagee is permitted to buy the
> collateral at a foreclosure sale as "cheaply" as it can,
> *Cambridge Sav. Bank v. Cronin*, 289 Mass. 379, 383,
> 194 N.E. 289, 290 (1936), and "[m]ere inadequacy of
> price will not invalidate a sale unless it is so gross as
> to indicate bad faith or lack of reasonable diligence,"
> *Chartrand*, 296 Mass. at 320, 5 N.E.2d at 423.

*Resolution Trust Corporation v. Carr*, 13 F.3d 425, 429-430 (1 Cir., 1993);
*Federal Deposit Insurance Corporation v. Villemaire*, 849 F. Supp. 116, 123 (D.
Mass., 1994).

The district court in *Villemaire* noted, in addition, that "'[o]n those occasions

when the court held a sale invalid, the bad faith or failure of diligence has

been of an active and conspicuous character.'" *Villemaire*, 849 F. Supp. at 123

quoting *Pemstein v. Stimpson*, 36 Mass. App. Ct. 283, 287, 630 N.E.2d 608

(1994).

It is beyond cavil that under the case law of Massachusetts, the

inadequacy of the price obtained at a foreclosure sale of real estate alone is not

sufficient to indicate that the sale was conducted in a commercially

unreasonable manner absent evidence of other circumstances such as bad faith

or lack of reasonable diligence. *See Carr*, 13 F.3d at 430 (citation omitted);

*Villemaire*, 849 F. Supp. at 123 (citations omitted). Indeed, the defendants do

15

not argue otherwise. "The standard applied...is whether the purchase price at foreclosure as compared with the market value was so grossly inadequate as to invalidate the sale." *Fairhaven Savings Bank v. Callahan*, 391 Mass. 1011, 1012, 462 N.E.2d 112, 114 (1984).

The defendants have proffered an appraisal of the Columbus premises stating that the market value of that property as of June 11, 1993 was $750,000.00. (#80, Exh. B; #81, Exh. B)[7]   Given that their son bid $600,000.00 for the property on December 15, 1993, and that the price ultimately obtained for the premises on June 8, 1994 was $295,000.00, the defendants assert that the sale price was obviously inadequate.   It cannot be said, however, that the evidence leads inexorable to that conclusion.   If the son's bid of $600,000.00 was a true indication of the fair market value in December, 1993, as defendants seem to suggest, and the fair market value was $750,000.00 in June, 1993, as the appraiser concluded, it appears that the value of the Columbus property decreased within a six-month period from June, 1993 to December, 1993 approximately $150,000.00. If the value of the

---

[7]   The defendants have submitted no evidence at all with respect to the market value of the Botolph premises and the Worcester Square premises at any time.   In these circumstances, they have no basis upon which to argue that the prices received at foreclosure were somehow inadequate.

property had diminished by the same amount in the next six months, the market value at the time of the ultimate sale was $450,00.00, making a sale price of $295,000.00 far from inadequate. In other words, an appraisal of the Columbus premises a full year prior to the foreclosure is little aid in establishing the market value of the property at the time of the sale. But even if it is assumed that the fair market value was $600,000.00 in June, 1994, merely showing that the property sold at $295,000.00, or 49% of value, is not sufficient evidence to raise a genuine of issue of material fact under Massachusetts law. As the First Circuit noted, "[i]n canvassing Massachusetts case law, we find ample suggestion that a price deficiency of as much as 39 percent of fair market value can support the granting of a dispositive motion." *Carr*, 13 F.3d at 430 (citations omitted). Thus, even if it is assumed that $600,000.00 was the fair market value in June, 1994, that fact alone would not be sufficient evidence to raise a genuine issue of material fact with regard to the adequacy of the sale price.

In the instant case, the defendants do not contend that the FDIC engaged in any fraudulent activity. Rather, the allegations seem to imply either a lack of diligence or bad faith in conducting the foreclosure sales. Under

17

Massachusetts law,

> the State "reasonable diligence" standard inquires
> whether the sale has been advertised at least as
> required by statute, whether the proceedings have
> been open, and whether the notice of foreclosure sale
> has been given to obviously interested parties,
> especially those who have manifested interest.

*Pemstein*, 36 Mass. App. Ct. at 291, 630 N.E.2d at 614.

It is not disputed by the defendants that the prerequisites of this "reasonable

diligence" standard were met in the foreclosure auction sales of the Columbus

premises, the Botolph premises, and the Worcester Square premises, i.e., that

the sales were advertised, minimally or not, in accordance with the statutory

requirements, the sales were public, and that they, as interested parties, were

notified. Rather, relying on the decision in *Edry v. Rhode Island Hospital Trust

National Bank*, 201 B.R. 604 (D. Mass. 1996), the defendants appear to assert

that they were entitled to something more.

In *Edry*, the court recognized that "[a] disparity between the foreclosure

sales price and fair market value is not sufficient of itself to invalidate a

foreclosure, but such disparity plus other circumstances can be." *Edry*, 201

B.R. at 606 (citations omitted). The court found that the bank in that case had

made no effort to ascertain the market value of the property, that the property

18

had sold at only 45% of its market value, and that the bank gave only "the bare notice required by statute." *Edry*, 201 B.R. at 607.  It was determined that although the Massachusetts Supreme Judicial Court had never been faced with these circumstances, the fact that the bank had consciously decided to place minimal advertising contrary to customary practice lead to the conclusion that the bank had  failed to "make, in good faith, a diligent effort to protect the interest of the Debtor", and so invalidated the foreclosure.  *Id.* at 607-08.

The *Edry* case can quite readily be distinguished factually, first and foremost by the fact that there is absolutely no evidence in this case as to what "common practice" in advertising foreclosures sales is, or that the FDIC made any "conscious decision" not to follow that common practice.  Put another way, the defendants have offered nothing from which it could be inferred that the FDIC somehow acted volitionally against their interest.  Moreover, to the extent that the bankruptcy court viewed the *Pemstein* decision as not inconsistent with its ruling as a matter as a matter of law, I must respectfully disagree.

It is true, as the bankruptcy court noted, that the *Pemstein* case involved

19

the liability of a guarantor on a note and mortgage after a foreclosure. However, the *Pemstein* court specifically stated that the guarantor's "unconditional guarantee is subject to the rules and standards which we have described as generally applicable to real estate mortgage foreclosures." *Pemstein*, 36 Mass. App. Ct. at 291, 630 N.E.2d at 613-14. The court's subsequent discussion bears repeating, at length:

> The difference between the State standard of reasonable diligence, discussed above, and the commercially reasonable standard, as developed, for example, in the instant case, is that the State "reasonable diligence" standard inquires whether the sale has been advertised at least as required by statute, whether the proceeding have been open, and whether notice of foreclosure sale has been given to obviously interested parties, especially those who have manifested interest. The "commercially reasonable" standard, as we have seen in this case, produces inquiry into the competence and aggressiveness of the marketing effort. As the bankruptcy judge expressed it in a memorandum and order issued in connection with this case on February 2, 1990, "[S]tate law [relating to real estate foreclosure] requires only minimal advertising and sales efforts." Adherence to established standards of reasonable diligence in connection with real estate foreclosures commends itself, as well, as a matter of policy. It would not fulfil the reasonable expectations of lenders or borrowers to have, after every real estate foreclosure sale, a postlude of litigation about whether the presale

marketing effort had been sufficiently astute and
aggressive.

*Pemstein*, 36 Mass. App. Ct. at 291-2, 630 N.E.2d at 614 (footnote omitted.)

In short, the Massachusetts Appeals Court specifically confirmed that when

weighing the reasonable diligence involved in a foreclosure sale under

Massachusetts law, consideration of the marketing effort for a foreclosed

property beyond what is mandated by statute does not come into the equation.

Finally, the bad faith element of the reasonable diligence standard has,

in the reported cases, related to issues of notification. *See Pemstein,* 36 Mass.

App. Ct. at 286, 630 N.E.2d at 611-12 (collecting cases). There have been no

allegations of bad faith "of an active and conspicuous character" as to this

aspect.

The defendants contend that Brian Finn's bid on the Columbus premises

was treated differently than the high bidder on the Botolph premises in that

the former was denied an extension of time within which to close and the

latter was granted one. It is suggested that this evidences the FDIC's bad faith.

However, the FDIC has presented evidence as to why that distinction was

made, to wit, that Brian Finn never presented a firm financing commitment

and that the higher bidder on the Botolph premises paid an additional

21

nonrefundable deposit of $20,000.00 in consideration for the extension. The defendants have not disputed these statements, or otherwise demonstrated that Brian Finn was similarly situated. In addition, although the defendants suggest that the account officer at the FDIC rebuffed Brain Finn's mortgage broker when a request for an extension was made and further made derogatory statements about the Finns, the defendants have simply proffered no admissible evidence to support these contentions, as, for example, an affidavit from the mortgage broker. The statements in the affidavits of J. Finn and M. Finn are plainly hearsay and cannot be considered as evidence which would raise a genuine issue of material fact. *See* Rule 56(e), Fed. R. Civ. P.

To summarize, the defendants have failed to present evidence to raise a genuine issue of material fact as to whether the foreclosure sales of the Columbus premises, the Botolph premises, and the Worcester Square premises were conducted in a commercially reasonable manner under Massachusetts law.

### B. Count II of the Finns' Counterclaims

In the second count in the counterclaim, the defendants allege that the FDIC breached the implied covenant of good faith and fair dealing in the

22

manner in which it dealt with the subject premises.  This is a contract claim, and the FDIC argues that it had no contract with the defendants.  Be that as it may, even assuming that the defendants have a claim, it is no more than was alleged in Count I.  No new or different evidence has been added to support the contentions.  Thus, for all the reasons previously stated, this claim too must fail.

### V. CONCLUSION AND ORDER

Based on the reasoning set forth herein, it is ORDERED that the FDIC's Motion For Summary Judgment (#66), to the extent that it seeks the entry of judgment as a matter of law against J. Finn on Counts I and II of its Complaint and in its favor on all counts of the defendant J. Finn's counterclaim and the defendant M. Finn's  counterclaim, be, and the same hereby is, ALLOWED.  It is FURTHER ORDERED that the FDIC's Motion For Summary Judgment (#66), to the extent that it seeks the entry of judgment as a matter of law against M. Finn on Counts I and II of its Complaint, be, and the same hereby is, DENIED.

### VI. PROCEDURAL ORDER RE:
### COUNT III OF COMPLAINT AND FORM OF JUDGMENT

Counsel for the FDIC is directed to file and serve, *IN HAND on or before 2:00 P.M. on Wednesday, March 25, 1998*, a form of judgment to be entered

by the Court and a statement respecting its position as to Count III of its Complaint.

Counsel for J. Finn and the Trustee for M. Finn shall file and serve any objections to the form of judgment or the FDIC's suggested disposition of Count III *IN HAND on or before 2:00 P.M. on Monday, March 30, 1998* .

If any objections are filed, counsel for the FDIC and counsel for any party who has filed an objection shall report for a conference before the Court on *Tuesday, March 31, 1998 at 2:30 P.M.* at Conference Room #920 (9th floor), John W. McCormack Post Office and Court House, Boston, Massachusetts. Claims for attorney's fees shall be filed within fourteen days after entry of judgment as provided in Rule 54(d)(2)(b), Fed. R. Civ. P.

ROBERT B. COLLINGS
United States Magistrate Judge

March 19, 1998.

24