UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


STATES RESOURCES CORP.,        )
      Plaintiff,               )
                               )        CIVIL ACTION NO.
          v.                   )        04-10095-DPW
                               )
MICHAEL CAPIZZI et al.,        )
      Defendants.              )


MEMORANDUM AND ORDER
January 20, 2005


     This interpleader action is the fourth lawsuit to come

before me regarding residential property located at 236 Lincoln

Road, Lincoln, MA (the "Property").  Plaintiff States Resources

Corporation ("SRC") commenced the instant case seeking a judicial

determination regarding the proper apportionment of proceeds from

the foreclosure sale it conducted of the Property on September

26, 2003.  Defendants Michael Capizzi and Catherine Capizzi

(collectively, the "Capizzis") -- the former owners and long-term

residents of the Property who have filed no fewer than eight

lawsuits in this court, various state courts, and the Bankruptcy

Court to challenge the foreclosure by SRC and their subsequent

eviction from the Property -- use the occasion to mount another

challenge.  They are now joined in this battle to contest the

foreclosure auction by one of their creditors, The Architectural

Team, Inc. ("TAT").  For the reasons set forth below, however,

their renewed efforts do not meet with success.

## I. OVERVIEW

**A.    Factual Background**

<u>1.   The Loan and the Mortgage</u>

In October 1988, Michael Capizzi obtained a loan in the form of a $750,000.00 adjustable-rate note (the "Note") from Winchendon Savings Bank ("WSB") for use in development of the Property, specifically, building a home on the site that the Capizzis thereafter occupied as their principal residence.  Mr. Capizzi secured this loan by granting WSB a $750,000.00 mortgage (the "Mortgage") on the Property.  On August 14, 1992, WSB was declared insolvent or in such condition that it was unsafe for it to continue doing business.  The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for WSB, and all WSB mortgages and security documents, including the Mortgage, were transferred to the FDIC.  The FDIC assigned the Mortgage to First Essex Bank, FSB on January 18, 1995, which then assigned it back to the FDIC on June 28, 1995.  SRC obtained the Mortgage from the FDIC on September 30, 1998.

Alleging that Mr. Capizzi was in default on the Note, SRC initiated foreclosure proceedings against the Property in January 1999.  Prior to the scheduled foreclosure auction, the Capizzis made a payment to SRC and the auction was cancelled.  This pattern -- foreclosure proceedings commenced by SRC, foreclosure auction scheduled, payment made by Capizzis, and auction cancelled -- was repeated at least four more times over the following year-and-a-half.  In June 2001, the Capizzis commenced

a civil lawsuit against SRC in the Middlesex Superior Court
seeking a declaratory judgment and monetary damages for breach of
contract and violation of Mass. Gen. Laws ch. 93A.  SRC removed
the case to federal court, where it was assigned to me under
docket number C.A. No. 01-11298-DPW.  On August 20, 2002, I
dismissed the lawsuit due to the failure by the Capizzis both to
meet their discovery responsibilities and to prosecute their
claims.  The Capizzis moved for reconsideration and, following a
hearing, I denied their motion.  On September 30, 2002, I issued
an amended order of dismissal making clear that the action was
dismissed in its entirety without prejudice.

In September 2002, SRC once again commenced foreclosure
proceedings against the Capizzis and scheduled a foreclosure
auction for December 16, 2002.  On December 2, 2002, the Capizzis
brought a second civil action against SRC, this time filing
directly in federal court, reiterating the allegations and
prayers for relief made in their first suit, and also seeking a
preliminary injunction enjoining SRC from proceeding with the
December 16, 2002 foreclosure auction.  This second federal court
case, C.A. No. 02-12319-DPW, was also assigned to my docket.
Following a December 13, 2002 hearing, I entered a stipulated
order cancelling the December 16, 2002 foreclosure auction and
enjoining SRC from rescheduling or advertising the foreclosure
until further order of the court.  Pursuant to my order, the
Capizzis were obligated to pay SRC a sum of $6,177.76 on or
before December 19, 2002 and by the nineteenth of the month each

month thereafter; to post $219,771.95 in an escrow account on or
before February 3, 2003; to provide proof to counsel for SRC that
the real estate taxes on the Property were current and up to date
as of December 31, 2002; and to provide proof to counsel for SRC
that the Property was adequately insured with SRC listed as the
mortgagee.  The order specified that failure by the Capizzis to
meet any one of these four obligations constituted grounds for
SRC to apply to the court for a further order vacating the
preliminary injunction.

On February 28, 2003, Michael Capizzi filed a voluntary
petition for bankruptcy under Chapter 13 of the United States
Bankruptcy Code (the "Code") in the United States Bankruptcy
Court for the District of Massachusetts ("Bankruptcy Court").
SRC moved to dismiss the bankruptcy case on the grounds that, at
the time of filing, Michael Capizzi was not an eligible Chapter
13 debtor because his secured debts exceeded the amounts
permissible for invocation of Chapter 13.  On March 5, 2003, the
Bankruptcy Court granted SRC relief from the automatic stay to
permit the pending lawsuit in this court, C.A. No. 02-12319-DPW,
to proceed to judgment.  Michael Capizzi later filed a motion to
voluntarily dismiss his Chapter 13 petition, which was granted by
the Bankruptcy Court on May 1, 2003.  Meanwhile, notice of
default had entered against the Capizzis on April 9, 2003, in
C.A. No. 02-12319-DPW.

On May 20, 2003, Catherine Capizzi filed a voluntary
petition for bankruptcy under Chapter 11 of the Code.  In

-4-

response, SRC filed various motions in Bankruptcy Court, including motions to dismiss the petition and for relief from the automatic stay in order for the pending federal court case to proceed to judgment.  On May 28, 2003, the Bankruptcy Court -- for reasons including its determination that Catherine Capizzi did not have an interest in the Property within the meaning of Chapter 11 of the Code -- granted SRC relief from the automatic stay.

On June 9, 2003, I granted SRC's motion for default judgment against the Capizzis in C.A. No. 02-12319-DPW due to the Capizzis' failure to plead or otherwise defend against the counterclaims SRC had asserted against them, and allowed SRC's motion to dismiss the Capizzis' complaint with prejudice.  Upon application by SRC, which was supported by the requisite affidavits, I entered judgment for SRC against the Capizzis the same day in the amount of $875,203.38.[1]

### 2.  The Auction Proceedings

SRC, through counsel, had already hired Garrett, Inc. and its president, Garrett Healy (collectively, "Garrett"), to conduct the foreclosure auction of the Property.  SRC and Garrett had agreed that if the Property was purchased at auction by a third party for an amount greater than the balance due on the

---

[1]The Capizzis did not appeal the judgment but did, almost a year to the day later on June 8, 2004, file a motion for relief from judgment under Fed. R. Civ. P. 60(b).  Based on my finding that the Capizzis have failed to establish the "exceptional circumstances" warranting relief under the rule, I deny their motion via separate Memorandum and Order issued this day.

Note, Garrett would be paid a commission of 3.5% of the sale price and be reimbursed for its expenses.[2]

Following the dismissal with prejudice of C.A. No. 02-12319-DPW in which SRC had been enjoined from taking further action to foreclose upon the Property, SRC scheduled a foreclosure auction for July 24, 2004. Garrett conducted an auction at the Property on that date and Linda Micu ("Micu"), with an offer of $2,000,000.00, was the highest bidder. Micu, who -- it was later revealed -- had been acting as a straw person for the Capizzis, was unable to complete the sale and forfeited the $5,000.00 qualifying deposit, drawn on an account in the name of Catherine Capizzi, she had paid to Garrett at the auction.

SRC scheduled a second foreclosure auction for September 26, 2003. Pursuant to statutory requirements, SRC published a Notice of Mortgagee's Sale of Real Estate ("Legal Notice") in The Concord Journal on September 4, 11, and 18, 2003. The Legal Notice provided a legal description of the Property, including its square footage. Garrett, at the direction of SRC and as it had done in advance of the previously scheduled auctions, publicized the auction through various other mechanisms. The marketing efforts undertaken by Garrett included the use of telemarketing and mailings, providing information about the

---

[2]SRC agrees that the 3.5% commission fee is reasonable but has consistently maintained that payment of the commission required prior court approval; Garrett contended that court approval was not necessary in order for it to receive the commission.

auction on its website, and publishing so-called "display advertisements" in The Boston Globe on September 14 and 21, 2003. The display advertisements contained incorrect information about the acreage of the Property and also the number of bedrooms, bathrooms, and fireplaces it contained.

In early August 2003, Garrett received a letter dated August 4, 2003 from Leonard Florence ("Florence") -- a third party he had spoken with recently regarding the Property -- indicating that Florence "would like to make an offer of $2,000,000 for the purchase of the property at foreclosure at 236 Lincoln Road in Lincoln, MA." Enclosed with the letter was a check in the amount of $50,000.00 to serve as a deposit. Garrett notified John Doonan, counsel for SRC, of the offer and deposit. Attorney Doonan informed Garrett that he needed to investigate whether SRC could accept the offer and would get back to Garrett with a response. Neither SRC nor Garrett informed the Capizzis or TAT of Florence's offer.

Attorney Doonan thereafter informed Garrett that under his interpretation of state law, SRC could not accept Florence's proposal because it was made outside of the foreclosure auction process. After receiving this information from SRC, Garrett notified Florence that his offer had been refused and that a second auction would take place on September 26, 2003. Garrett asked Florence whether he wanted Garrett to place a $2,000,000.00 bid on the Property at the auction with the $50,000.00 deposit. Florence responded in the negative, informing Garrett that he was

occupied with a large project in Chicago and did not have time to pursue the Property. Garrett thereafter returned the $50,000.00 deposit to Florence.

On the afternoon of September 25, 2003 -- the day before the scheduled foreclosure auction at the Property -- Michael Capizzi filed his second voluntary petition for bankruptcy, this time under Chapter 11 of the Code. The next day, both SRC and TAT[3] filed emergency motions for, respectively, relief from the automatic stay and to dismiss the bankruptcy case with prejudice. Finding that Mr. Capizzi was barred from filing another bankruptcy petition until 180 days after his voluntary dismissal of his prior Chapter 13 bankruptcy case (i.e., until November 1, 2003), the Bankruptcy Court granted both motions.

As planned, Garrett conducted the foreclosure auction at the Property on September 26, 2003. The Legal Notice was read aloud and the high bid, $1,200,000.00, was made by Kevin Duffy

---

[3]A brief digression is in order to explain the presence of The Architectural Team, Inc. ("TAT") in this action. After filing suit against the Capizzis in Suffolk Superior Court in 1989 regarding a dispute over unpaid fees, TAT obtained and duly recorded a $600,000.00 attachment on the Property in 1994. The lawsuit went to trial and in 1999 the Superior Court entered judgment in favor of TAT in the amount of $200,254.00, with interest accruing from the August 7, 1989 filing date. See The Architectural Team, Inc. v. Capizzi, No. 89-4479-D, slip op. at 3-4 (Mass. Super. February 26, 1999). The Capizzis appealed the decision, which was affirmed by the Massachusetts Appeals Court on February 12, 2003. See The Architectural Team, Inc. v. Capizzi, No. 00-P-118, slip op. at 3-4 (Mass. App. Ct. February 12, 2003). On September 24, 2003, TAT obtained a $541,152.81 execution on its judgment from the Superior Court and recorded the execution with the Middlesex County Registry of Deeds the same day.

("Duffy").  Duffy and Garrett, as agent for SRC, executed a "Memorandum of Terms and Conditions For the Purchase at Mortgagee's Foreclosure Sale" ("Memorandum") and Garrett accepted a $50,000.00 deposit from Duffy.  The Memorandum indicated, in the paragraph immediately above the parties' signatures, that TAT had a $600,000.00 real estate lien on the Property.  As it had in July, TAT attended the auction but did not bid on the Property.

According to SRC, $932,630.87 was outstanding on the Note at the time of the foreclosure auction.  The proceeds of the foreclosure auction exceeded this amount and in November 2003 counsel for SRC and TAT engaged in negotiations regarding disbursing surplus auction funds to TAT in partial satisfaction of the execution it held against the Capizzis.  On November 11, 2003, SRC sent TAT a check in the amount of $210,096.33.  After sending the check, SRC sent TAT an indemnification agreement (the "Indemnification Agreement") pursuant to which TAT would indemnify and hold harmless SRC "from any and all actions, proceedings, claims, demands, costs, damages and expenses . . . in connection with or arising out of the payment."  SRC alleges that the parties had discussed and come to terms on the Indemnification Agreement -- i.e., that in consideration for SRC making the payment to TAT, TAT would indemnify SRC -- prior to its sending TAT the check.  But TAT never executed the Indemnification Agreement.

### 3.  The Eviction

After completing the sale, Duffy commenced a summary process

action against the Capizzis in the Concord District Court in
order to recover possession of the Property.  Following trial,
the District Court entered judgment for possession and monetary
damages in favor of Duffy.  The Capizzis appealed the decision
but failed to post the bond necessary to perfect their appeal.
Duffy obtained execution from the court and notified the Capizzis
on his intent to levy upon it and evict them from the Property on
March 17, 2004.

Repeating a now familiar pattern, on March 16, 2004, the
Capizzis filed a civil action against Duffy and SRC in this
court, C.A. No. 04-10533-DPW, raising allegations similar to
those in the present action and seeking a temporary restraining
order enjoining Duffy from levying on the execution.  I denied
the request for injunctive relief on March 16, 2004 and the
Capizzis thereafter voluntarily dismissed the lawsuit.  On March
17, 2004, the Capizzis filed another civil action against SRC and
Duffy, C.A. No. MICV 2004-01041, this time in the Middlesex
Superior Court, making the same claims it raises in the present
action save for the wrongful eviction claim, which was then
restyled as a request for injunctive relief prohibiting Duffy
from levying on the execution.  Following a hearing on an ex
parte motion by the Capizzis to record a memorandum of lis
pendens, the court denied the motion and dismissed the case on
April 22, 2004, finding that the Capizzis' interest in the
Property had been extinguished by the foreclosure sale and that

their claims were barred by <u>res</u> <u>judicata</u>.[4]  In the meantime, Duffy had levied upon the execution and evicted the Capizzis from the Property over the course of March 17 and 18, 2004.

**B.   Procedural History**

SRC commenced this action on January 15, 2004 interpleading the Capizzis, TAT, Garrett, John Connolly, Jr. ("Connolly"), the Massachusetts Department of Revenue ("DOR"), and James Grumbach.

The Capizzis have counterclaimed against SRC and Duffy, seeking declaratory judgment and an accounting, for unlawful and fraudulent foreclosure, breach of contract, violation of Mass. Gen. Laws ch. 93A, and wrongful eviction.

TAT has raised counterclaims against SRC seeking an accounting and alleging unjust enrichment and various other defects in the foreclosure, as well as a "cross-claim" against Catherine Capizzi, alleging breach of contract and seeking to reach and apply the rights of Michael Capizzi in order to satisfy its judgment against him.

Garrett has filed counterclaims against SRC for breach of contract, violation of Mass. Gen. Laws ch. 93A, unjust enrichment, <u>quantum meruit</u>, and promissory estoppel.

Attorney Connolly, who formerly served as counsel to the Capizzis, previously obtained an attachment on the Property against Mr. Capizzi in the amount of $65,712.14 in his Middlesex Superior Court lawsuit, C.A. No. MICV 2003-00667, against the

---

[4]The appeal by the Capizzis of this decision is still pending in the Massachusetts Appeals Court.

Capizzis to collect unpaid legal fees.  The Capizzis defaulted in the lawsuit and Connolly has moved for an assessment of damages. In the present action, Connolly has cross-claimed against the Capizzis, seeking a monetary judgment in his favor "in an amount to be determined by the Court."

Two named interpleader defendants have effectively disclaimed an interest in the interpled fund.  DOR -- which, according to SRC, has a $9,612.17 tax lien on the Property -- has filed no appearance in the case.  Mr. Grumbach, who obtained a $25,000.00 attachment against Mr. Capizzi in 1998, notified the court by letter dated May 12, 2004 that he neither claimed an interest in the Property nor planned to participate in the court proceedings.

Garrett filed a motion for summary judgment on May 27, 2004. At a June 3, 2004 scheduling conference, this motion was denied without prejudice to renew it after the close of discovery, which concluded on September 7, 2004 pursuant to court order.  Both an "Emergency Motion for Permission to Record Memorandum of <u>Lis Pendens</u>" filed by the Capizzis and a motion for a protective order filed by SRC were denied on November 16, 2004 following hearing.

Currently before me are the following three summary judgment motions: (1) a motion by SRC for partial summary judgment dismissing all counterclaims brought by TAT and the Capizzis; (2) a motion by Duffy for summary judgment in his favor on the third-party complaint filed against him by the Capizzis; and (3) a

motion by Garrett for summary judgment directing SRC to pay it $48,459.29, the amount it claims to be owed for its auction-related expenses and commission.  Also pending are the second motion by TAT to amend its answer, affirmative defenses, counterclaims, and cross-claims; two motions by the Capizzis seeking permission to file amended counterclaims; and a motion by SRC to strike portions of an affidavit filed by TAT with its opposition to the motions for summary judgment by SRC and Garrett.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law," Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and a "'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."  Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996)).  When deciding upon a motion for summary judgment,

all facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party.  <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 17 (1st Cir. 2002).

A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995), <u>cert. denied</u>, 515 U.S. 1103 (1995).  Once the movant has made such a showing, the nonmovant must point to "specific facts demonstrating that there is, indeed, a trialworthy issue."  <u>Id.</u> A genuine dispute of material fact cannot be established through "conclusory allegations, improbable inferences, and unsupported speculation" alone.  <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).  The nonmovant "may not rest upon the mere allegations or denials of the [moving] party's pleading," and instead "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Additionally, if the nonmovant fails to make "a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986), summary judgment must enter against it.  With respect to the nonmovant's burden of proof in establishing the essential elements of its case, the resolution of a motion for summary judgment "implicates the substantive evidentiary standard of proof that would apply at a trial on the merits."  <u>Anderson v.</u>

-14-

Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**B. SRC's Motion for Summary Judgment**

In considering the counterclaims asserted by the Capizzis and TAT upon which SRC seeks summary judgment, a bifurcated framework that distinguishes between claims that relate to whether it was lawful for SRC to foreclose on the Property and those concerning whether SRC conducted the foreclosure, including the auction, lawfully, may be helpful.  For the reasons set forth below, the former category of claims, asserted only by the Capizzis, are barred by res judicata and the latter fail on the merits.

1. Propriety of Foreclosing on the Property

The Capizzis continue to maintain, vehemently, that they never were in default to SRC on the Note and that SRC breached the terms of the underlying loan documents, unlawfully and fraudulently foreclosed on the Property, and engaged in unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A ("ch. 93A").  In the present action, these allegations undergird counts one through four -- declaratory judgment and accounting, breach of contract, unlawful and fraudulent foreclosure, and violation of ch. 93A, respectively -- of the Capizzis' counterclaims.[5]  That the Capizzis are tireless in continuing to pursue these claims does not serve to imbue them

_____

[5] Counts three and four also include allegations regarding both how SRC conducted the foreclosure and the sale of the Property to Duffy at the foreclosure auction.

with any vitality.  By dint of their own conduct -- i.e.,
defaulting in C.A. No. 02-12319-DPW -- the Capizzis have already
tolled the death knell for the claims regarding whether SRC was
entitled to foreclose on the Property.

Before addressing the particular claims at issue, several
basic principles must be set forth.  First, pursuant to the
doctrine of res judicata,[6] the Capizzis are barred from bringing
any claims in this action for which: "(1) there is a final
judgment on the merits in an earlier action; (2) sufficient
identity exists between the parties in the earlier and later
suits[;] and (3) sufficient identity exists between the causes of
action in the two suits."  U.S. v. Cunan, 156 F.3d 110, 114 (1st
Cir. 1998) (internal quotations omitted).  Second, a judgment by
default pursuant to Fed. R. Civ. P. 55(b) "is a 'final
disposition of the case and an appealable order' that has the
same effect as a judgment rendered after a trial on the merits."
U.S. v. $23,000 in U.S. Currency, 356 F.3d 157, 163 (1st Cir.
2004) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary
Kay Kane, Federal Practice and Procedure: Civil 3d, § 2684
(1998)); see also Morris v. Jones, 329 U.S. 545, 550-51 (1947)
("A judgment of a court having jurisdiction of the parties and of

_____

[6]Because the judgment in the first action was issued by a
federal court, federal res judicata principles are employed in
this analysis of a subsequent diversity action.  See Porn v.
Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 33-34 (1st Cir. 1996)
(holding that "the preclusive effect of [the judgment by the
federal court in the first action] in the instant diversity
action is governed by federal res judicata principles").

the subject matter operates as res judicata, in the absence of
fraud or collusion, even if obtained upon a default.") (quoting
Riehle v. Margolies, 279 U.S. 218, 225 (1929)); SMA Life Assur.
Co. v. Sanchez-Pica, 960 F.2d 274, 275 (1st Cir. 1992), cert.
denied 506 U.S. 872 (1992) (endorsing the proposition that a
default judgment "constituted a final judgment with res judicata
effect").

A final observation is necessitated by what could be read as
a mischaracterization on the part of SRC regarding the claim
preclusive effect of a dismissal pursuant to Fed. R. Civ. P.
41(b).  The Supreme Court has held that a dismissal pursuant to
that rule[7] -- which provides, in pertinent part, that a dismissal
with prejudice pursuant to the rule "operates as an adjudication
upon the merits" -- is not necessarily entitled to claim
preclusive effects, at least in other courts.  Semtek Int'l Inc.
v. Lockheed Martin Corp., 531 U.S. 497, 503-06 (2001) ("In short,
it is no longer true that a judgment 'on the merits' is
necessarily a judgment entitled to claim-preclusive effect; and
there are a number of reasons for believing that the phrase

---

[7]The full text of Fed. R. Civ. P. 41(b) reads as follows:

For failure of the plaintiff to prosecute or comply with
these rules or any order of court, a defendant may move for
dismissal of an action or of any claim against the
defendant.  Unless the court in its order for dismissal
otherwise specifies, a dismissal under this subdivision and
any dismissal not provided for in this rule, other than a
dismissal for lack of jurisdiction, for improper venue, or
for failure to join a party under Rule 19, operates as an
adjudication upon the merits.

'adjudication upon the merits' does not bear that meaning in Rule 41(b)."). For present purposes, the holding by the Supreme Court of particular pertinence is that such a dismissal does operate to bar the refiling of the same claim in the court that entered the dismissal. Id. at 506 ("We think, then, that the effect of the 'adjudication upon the merits' default provision of Rule 41(b) . . . is simply that, unlike a dismissal 'without prejudice,' the dismissal in the present case barred refiling of the same claim in the [same court].").

The first two counterclaims made by the Capizzis against SRC in this case track precisely claims they previously made against this same opponent in two prior lawsuits, C.A. No. 01-11298-DPW and C.A. No. 02-12319-DPW. As noted above, the former of these lawsuits was dismissed without prejudice because the Capizzis failed to comply with their discovery obligations and to prosecute their suit. The latter case, however, was dismissed with prejudice, pursuant to Rule 41(b), due to the failure by the Capizzis to plead or otherwise defend against the counterclaims made by SRC and default judgment was entered in favor of SRC in the amount of $875,203.38 pursuant to Rule 55(b). Under these circumstances, the doctrine of res judicata plainly bars the Capizzis from reasserting these claims in this court. They have had not one, but two prior opportunities to litigate these claims here. Their failure to see either action through to its conclusion does not entitle them to a third bite at the apple. Accordingly, I will enter summary judgment against the Capizzis

on counts one and two of their counterclaims against SRC.

The attempt by SRC to characterize the other counterclaims made against it by the Capizzis – i.e., unlawful and fraudulent foreclosure and violation of ch. 93A -- as within the scope of res judicata is not sufficient.  Although these claims do rely, in part, on the same factual predicate as the barred claims -- namely that SRC was not entitled to foreclose upon the Property -- they also rest upon allegations related to the conduct of the foreclosure sale, including the advertising of and the price obtained at the auction.  Accordingly, there is lacking "sufficient identity [] between the causes of action in the two suits," Cunan, 156 F.3d at 114, for the claims to be precluded by res judicata.  Cf. Jarosz v. Palmer, 436 Mass. 526, 536 (2002) (noting that "this court and the Appeals Court have previously held that a dismissal with prejudice constitutes a valid and final judgment for the purposes of claim preclusion," but holding further that "we conclude that this principle does not apply with equal force to issue preclusion").  For the reasons set forth below, however, they fail on the merits.

2. Legality of Subsequent Foreclosure Proceedings

When considering the remaining counterclaims asserted by the Capizzis, as well as those made by TAT, regarding the manner in which SRC conducted the foreclosure sale of the Property, it is essential to bear in mind the standard to which the foreclosing mortgagee, SRC in this instance, is held under Massachusetts law. "In executing the power of sale, the [mortgagee], in addition to

-19-

a literal compliance with the terms of the power, [is] bound to exercise good faith and to put forth reasonable diligence to protect the interests of the mortgagor."  Atlas Mortgage Co. v. Tebaldi, 304 Mass. 554, 555 (1939); see Williams v. Resolution GGF Oy, 417 Mass. 377, 382-83 (1994).  Consequently, SRC was obligated to do more than simply satisfy the strictures of Mass. Gen. Law ch. 183, § 21[8] and ch. 244, § 14,[9] which, respectively,

---

[8]Mass. Gen. Laws ch. 183, § 21 provides that:

The following "power" shall be known as the "Statutory Power of Sale", and may be incorporated in any mortgage by reference:

(POWER.)

But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.


[9]Mass. Gen. Laws ch. 244, § 14 provides, in pertinent part, that:

The mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person, may, upon

define the "statutory power of sale" in mortgages and govern
foreclosing thereunder.  The Supreme Judicial Court has stated in
no uncertain terms that "[f]ailure in these particulars [good
faith and reasonable diligence] will invalidate the sale even
though there be literal compliance with the terms of the power."

---

breach of condition and without action, do all the acts
authorized or required by the power; but no sale under such
power shall be effectual to foreclose a mortgage, unless,
previous to such sale, notice thereof has been published
once in each of three successive weeks, the first
publication to be not less than twenty-one days before the
day of sale, in a newspaper, if any, published in the town
where the land lies or in a newspaper with general
circulation in the town where the land lies and notice
thereof has been sent by registered mail to the owner or
owners of record of the equity of redemption as of thirty
days prior to the date of sale . . . .  If no newspaper is
published in such town, or if there is no newspaper with
general circulation in the town where the land lies, notice
may be published in a newspaper published in the county
where the land lies, and this provision shall be implied in
every power of sale mortgage in which it is not expressly
set forth.

. . .

A notice of sale in the above form, published in accordance
with the power in the mortgage and with this chapter,
together with such other or further notice, if any, as is
required by the mortgage, shall be a sufficient notice of
the sale; and the premises shall be deemed to have been
sold, and the deed thereunder shall convey the premises,
subject to and with the benefit of all restrictions,
easements, improvements, outstanding tax titles, municipal
or other public taxes, assessments, liens or claims in the
nature of liens, and existing encumbrances of record created
prior to the mortgage, whether or not reference to such
restrictions, easements, improvements, liens or encumbrances
is made in the deed; but no purchaser at the sale shall be
bound to complete the purchase if there are encumbrances,
other than those named in the mortgage and included in the
notice of sale, which are not stated at the sale and
included in the auctioneer's contract with the purchaser.

Sandler v. Silk, 292 Mass. 493, 496 (1935).

The counterclaims advanced by the Capizzis regarding the foreclosure sale of the Property are based on its allegations that SRC: (1) "intentionally ignored [the Capizzis'] request to reinstate the mortgage prior to the foreclosure"; (2) "advertised the foreclosure citing substantially less land than was included in the Property"; and (3) sold the Property "at less than 30% of its then fair market value."

Sifting through TAT's voluminous, poorly drafted, and typographically cumbersome pleadings, the following allegations regarding the conduct of the foreclosure can be identified: (1) inadequate notice of foreclosure auction disseminated by SRC; (2) insufficient sale price obtained by SRC for the Property at foreclosure auction; (3) failure by SRC and Garrett to act upon or communicate to the Capizzis or TAT an offer to purchase the Property by a third party; (4) inaccurate advertising resulting in an unlawful foreclosure; (5) that SRC was not registered as a foreign corporation with the Commonwealth of Massachusetts and therefore was not entitled to seek relief in the state's courts; (6) that Garrett, Inc. did not hold an auctioneer's license and therefore could not conduct the foreclosure auction; and (7) that SRC conducted a "questionable" first auction, "infecting" future sales. I will discuss these various allegations under a series of separate headings.

a.  Reinstatement

The contention by the Capizzis that SRC "intentionally

-22-

ignored" their efforts to reinstate the mortgage is entirely without documentary support. As SRC points out, the Capizzis had been reinstated on several prior occasions. The Capizzis offer not a scintilla of evidence regarding when, how, and by whom their claimed subsequent requests to reinstate were "ignored." In any event, the Capizzis cannot demonstrate that they had the financial wherewithal to reinstate the mortgage, an essential element to this claim. See Mondello v. Hanover Trust Co., 252 Mass. 563, 567 (1925) ("To constitute a valid tender the money must be actually produced and offered to the person who is entitled to receive it. . . . A mere offer to pay or a statement that the party has the money and is ready and willing to pay, without actual production of it, is not sufficient to constitute a valid tender."). Accordingly, this component of the fraudulent and illegal foreclosure and ch. 93A counterclaims advanced by the Capizzis against SRC must be rejected.

b.  Statutory Requirements

All allegations by the Capizzis and TAT that SRC failed to comply with statutory requirements governing foreclosing on a mortgage can be dispensed with in short order. Neither TAT nor the Capizzis have made a showing sufficient for this claim, on which they bear the burden of proof at trial, to survive summary judgment. See Celotex, 477 U.S. at 322. SRC has demonstrated that it both disseminated notice of and conducted the September 26, 2003 auction as required by law. Specifically, Notice of Mortgagee's Sale of Real Estate was published in The Concord

-23-

<u>Journal</u> on September 4, 11, and 11, 2003 and timely notice of the auction was sent via certified mail to the Capizzis and TAT.  <u>See</u> Mass. Gen. Laws ch. 244, § 14.  No showing has been made that the auction itself was conducted in a manner not in compliance with the applicable statute.  Thus, to the extent that the Capizzis and TAT have a viable challenge to the foreclosure auction, it rises and falls on the question of whether SRC acted with "good faith" and exercised "reasonable diligence" in pursuing the power of sale.  For the reasons set forth below, I find that TAT and the Capizzis have not made a showing that SRC did not.

    <u>c.  Advertising Inaccuracies</u>

Considering the allegations in chronological order, I address first the supposed inaccuracies in the pre-auction advertisements.  As discussed above, I have found that SRC complied with all statutory requirements regarding publicizing the auction.  The dispute, therefore, concerns only the "display advertisements" disseminated by auctioneer Garrett, with the authorization of SRC.  These additional advertisements understated the acreage associated with the Property -- listing two-and-a-half acres rather than six acres -- and also the number of bedrooms, bathrooms, and fireplaces contained in the Property.  SRC is correct in its contention that it was not required to advertise the Property any more extensively than as dictated by statute.  <u>See</u> <u>West Roxbury Co-op. Bank v. Bowser</u>, 324 Mass. 489, 493 (1949).  But, having elected to do so, it was required to undertake these additional, optional efforts in good faith and

with reasonable diligence.

Garrett maintains -- and SRC does not dispute -- that SRC provided Garrett with the information, some of which is now known to have been inaccurate, about the Property published in the display advertisements. SRC asserts that it obtained the information, including the inaccurate components, from Town of Lincoln records, upon which it reasonably relied. No allegation has been made that SRC was alerted to the inaccuracies in the display advertising prior to the auction and thereafter refused to remedy them. It is not sufficient for the Capizzis and TAT simply to point to the fact that the display advertising contained errors. Rather, they must make a showing of admissible evidence that would permit a reasonable factfinder to conclude that SRC had affirmatively acted in <u>bad faith</u> or <u>without reasonable diligence</u> in placing this advertising. <u>See</u> <u>F.D.I.C. v. Elder Care Services, Inc.</u>, 82 F.3d 524, 527 (1st Cir. 1996); <u>Hull v. Attleboro Sav. Bank</u>, 519 N.E.2d 775, 777-78 (Mass. App. Ct. Feb. 23, 1988). If anything, the reasonable inference to be drawn from SRC's arranging for additional display advertising was that it was attempting to stir up interest among potential buyers of the Property and thereby generate competitive bidding at the auction.

### d. The First Auction

TAT contends that the July 24, 2003 auction "was on its face at least questionable and infecting [sic] all future sales by thereafter branding the <u>locus in quo</u> as having a failed sale and

in effect reducing and chilling the future bidding purchase price, all to the damage of TAT."  As a factual predicate for its counterclaim, TAT points to the winning bid by Linda Micu ("Micu") at this auction having been secured by a $5,000.00 deposit funded by Catherine Capizzi.  TAT alleges that Micu delivered the deposit check to SRC prior to the bidding at the auction, that SRC "knew or ought to have known that Catherine Capizzi could not have been a qualified bidder as her bankruptcy filings evidenced her financial condition," and that the failure by SRC to "reveal the name of Catherine Capizzi on the qualifying check until this litigation indicates the consciousness of guilt or admission of wrongdoing of [SRC], all to the damage of TAT." This bluster does not make a claim.

As it did with the September 26, 2003 auction, SRC conducted the July 24, 2003 auction in compliance with statutory requirements.  In response to TAT's allegations regarding Micu and her source of funding, SRC answers that neither it nor auctioneer Garrett, who was acting as its agent, knew at the time of the July 24, 2003 auction that Micu was functioning as a straw person for the Capizzis.  TAT has neither proposed a legal basis upon which SRC could have refused Micu the opportunity to bid at the auction, nor suggested why, as a matter of law, the unsuccessful first auction should serve to invalidate the subsequent sale.  This counterclaim lacks the factual or legal basis to survive summary judgment.

e.  Pre-Auction Offer

The most serious allegation made by TAT is that SRC improperly handled a pre-auction offer from Leonard Florence to purchase the Property for $2,000,000.00.  The details of this offer and how it was handled are set forth in Section I.A. <u>supra</u>. The heart of TAT's argument is that SRC breached its duty both by not acting on the offer and by not communicating it to TAT and the Capizzis.  SRC counters that had it "acted on the communications its agents had with Florence, made privately outside the public auction forum, [it] would have breached Massachusetts law and its fiduciary duty to the Capizzis, TAT and all junior lienholders to act in good faith and with reasonable diligence . . . [and] would also have breached its contract with the Capizzis under the mortgage."  For purposes of this analysis, the determinative question is not whether SRC erroneously interpreted its obligations and privileges under Massachusetts foreclosure law and/or the Note, but rather whether, through its handling of the Florence "offer," SRC failed to demonstrate good faith and exercise reasonable diligence, a query answered in the negative for the following reasons.

As an initial matter, I note my agreement with SRC regarding its statement that neither it nor Garrett, the auctioneer to whom the Florence offer was made, "could contract to sell the property or were the holders of the equity of redemption."  The only manner in which SRC could sell the Property out from under the Capizzis was by exercise of the statutory power of sale pursuant to Mass. Gen. Laws ch. 183, § 21, in compliance with the terms

-27-

and conditions for such a sale set forth in Mass. Gen. Laws ch. 244, § 14.  Based on its understanding of these limited methods by which it could sell the Property, SRC was compelled to reject the extra-auction offer by Florence.  I find, therefore, that SRC acted with good faith and exercised reasonable diligence in refusing to sell the Property outside of the statutorily-prescribed auction process.

Between the date of the Florence "offer" and the time of the second auction, neither the Capizzis nor TAT were notified of this potential purchaser.  Florence was informed of the auction by Garrett, SRC's agent, and was offered the opportunity to bid on the Property at auction, but, for unrelated reasons, had already decided not to pursue the Property further.  TAT and the Capizzis need not establish that, had they been put in contact with Florence, they would have been able to consummate the sale of the Property to him prior to the auction and for a higher price than that actually obtained by SRC.  Rather, they must show that the failure by SRC to give them notice of Florence's interest and existence demonstrated bad faith and a lack of reasonable diligence.

This is not a situation in which the foreclosing bank itself became the purchaser at auction, a scenario under which one could assume the mortgagee having an interest in driving down the sale price and, accordingly, one in which it would be placed under a heightened duty to act with good faith and reasonable diligence. See Union Mkt. Nat'l Bank of Watertown v. Derderian, 318 Mass.

578, 581-82 (1945) (holding that "[w]hen a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith and the utmost diligence") (internal citations and quotations omitted).  Nor is it the case that the mortgagee blithely ignored the presentation of potential buyers by the mortgagor or junior lienholders.  See Danielczuk v. Ferioli, 388 N.E.2d 724 (Mass. App. Ct. May 4, 1979) (finding that the disputed reasons for the mortgagee's failure to meet with "alleged representative of junior lienor who was prepared to bid an amount in excess of the sum realized at the foreclosure sale" were "material to the question of the good faith and reasonable diligence of the mortgagee in the conduct of the foreclosure sale," therefore precluding summary judgment). Here, by contrast, after being approached by a third party who expressed interest in purchasing outside of the foreclosure process, the mortgagee determined that it was only authorized to sell the subject property at foreclosure auction.  The potential buyer was notified of the foreclosure auction by the auctioneer, the agent of the mortgagee, and given the opportunity to bid at auction.  But the potential buyer was no longer interested.  In these circumstances, where steps were taken both to comply with the statutory mandates and to provide a potential purchaser with every opportunity to see his interest through to fruition via the foreclosure auction, there can be no finding of bad faith or lack of reasonable diligence by SRC or its agent Garrett.  Had these parties failed to notify Leonard of the auction, the outcome

might be otherwise.  See Sandler, 292 Mass. at 497 (1935)
(finding failure by foreclosing mortgagee to give notice of
foreclosure sale to party who had a pre-mortgage attachment on
the subject property and had "stated her intention to protect her
interest by purchase" to be "evidence that good faith was not
used to obtain the best reasonable possible price"); cf. In re
LaPointe, 253 B.R. 496, 500 (1st Cir. BAP 2000) (upholding
finding by Bankruptcy Court of lack of reasonable diligence on
part of foreclosing bank for reasons including the failure by the
bank "to provide notice of the foreclosure sale to a party with
whom it had previously negotiated and knew to be interested in
purchasing the property").

    f.  Adequacy of Price

     Both the Capizzis and TAT claim that SRC sold the Property
at the foreclosure auction for an inadequate price.  TAT grounds
its allegation on the discrepancy between the $1,200,000.00 price
obtained at auction and the $2,000,000.00 third-party offer
discussed supra.  The Capizzis base their contention that the
auction price was less than 30% of the "then fair market value"
of the Property on an assertion, made only in their proposed
amended answer and counterclaims, that a real estate agent had
recommended marketing the Property, if subdivided to include a
two-acre "buildable lot," for between $3,700,000.00 and
$4,100,000.00.  Neither theory of insufficiency is availing.

     Under Massachusetts law, to prevail on an inadequate sale
price theory, the Capizzis and TAT must demonstrate that the

-30-

$1,200,000.00 price obtained for the Property at auction was "so gross as to indicate bad faith, or a want of reasonable judgment and discretion in the mortgagee." Seppala & Aho Constr. Co., Inc. v. Petersen, 373 Mass. 316, 327-28 (1977) (quoting Clark v. Simmons 150 Mass. 357, 361 (1890)). The Supreme Judicial Court explained in Seppala that:

> 'Mere inadequacy of price is no reason for setting aside a sale. . . It is a notorious fact that, when land is sold, by auction, under a power contained in a mortgage, it seldom, if ever, brings a price which reaches its real value. If this is a hardship upon a mortgagor or those claiming under him, it is owing to the contract which he has made, and which the mortgagee has a right to have carried out.'

Id. at 328 (quoting Austin v. Hatch, 159 Mass. 198, 199 (1893)); see also Resolution Trust Corp. v. Carr, 13 F.3d 425, 430 (1st Cir. 1993) ("It is common knowledge in the real world that the potential price to be realized from the sale of real estate . . . usually is considerably lower when sold 'under the hammer' than the price obtainable when it is sold by an owner not under distress and who is able to sell at his convenience and to wait until a purchaser reaches his price."); BFP v. Resolution Trust Corp., 511 U.S. 531, 538 (1994) (noting the "glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other" and commenting that "[n]o one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques").

The case of <u>Fairhaven Savings Bank v. Callahan</u>, 391 Mass. 1011 (1984), is instructive.  In <u>Fairhaven</u>, the Supreme Judicial Court upheld the rejection by the trial court judge of a claim by the defendant mortgagor that a $10,000.00 purchase price on a property securing a $40,000.00 debt was "so inadequate as to constitute a breach of fiduciary duty as a matter of law."  <u>Id.</u> at 1012.  The court held that the "standard applied in circumstances such as this is whether the purchase price at foreclosure as compared with the market price was so grossly inadequate as to invalidate the sale."  <u>Id.</u> (citing <u>Chartrand v. Newton Trust Co.</u>, 296 Mass. 317, 320-21 (1936)).  The "burden of proving commercial unreasonableness" falls on the party challenging the foreclosure.  <u>See Carr</u>, 13 F.3d at 429-30. Finding no evidence of the market value of the subject property in the record, the <u>Fairhaven</u> court could not conclude that the trial judge had erred.  Here, too, there is insufficient evidence of a "market price" of the Property that would permit a reasonable factfinder to conclude that the foreclosure auction price was so "grossly inadequate" in comparison as to indicate "bad faith or lack of reasonable diligence," <u>Chartrand</u>, 296 Mass. at 320, and to justify invalidating the sale.

The Capizzis have failed to adduce any competent evidence to support their allegation that the Property was worth $4,000,000.00.  In their proposed amended counterclaims, they point to the recommendation of a real estate broker that <u>if</u> the Property was subdivided to include a two-acre "buildable lot"

they market it for between $3,700,000.00 and $4,100,000.00.  But
as Michael Capizzi acknowledged during his deposition testimony,
subdividing the Property was neither an automatic nor a one-step
process.  He and his next-door neighbor had discussed combining
their properties to create a single lot and then jointly
presenting a subdivision proposal to the Town of Lincoln, but the
idea had not progressed significantly.  If the neighbors were not
able to reach agreement on lot-combining, Mr. Capizzi observed,
"neither party could do anything other than have a single lot
unless there was a swap of property and a change of some side
yard easements and other things."  Furthermore, a special
variance would be required by the Town of Lincoln to subdivide
the lots without first combining them, an exemption the Capizzis
had not sought.  The Capizzis have produced no evidence of an
appraisal value of the Property as constituted at the time of the
foreclosure, and cannot successfully advance an "inadequate sale
price" argument based on a marketing price suggestion contingent
on an unrealized subdivision possibility.  See Fairhaven, 391
Mass. at 1012 (citing Chartrand, 296 Mass. at 320, regarding the
burden of party challenging sale price at foreclosure auction to
produce evidence of "commercial unreasonableness").  It is worth
mentioning that even were the Capizzis to adduce evidence of a
"market value" for the Property significantly higher than
$1,200,000.00, they would not be assured success in surviving a
motion for summary judgment.  As noted by the First Circuit
following its review of Massachusetts case law on the subject,

-33-

"we find ample suggestion that a price deficiency of as much as 39 percent of fair market value [i.e., a foreclosure sale price of only 39% of the fair market value] can support the granting of a dispositive motion."  Carr, 13 F.3d at 430.

        The argument by TAT that the sale price obtained for the Property at the foreclosure auction was inadequate also falters. TAT asserts that on account of the prior $2,000,000.00 offer by Florence, the $1,200,000.00 auction-winning bid was "not the highest value sale price" for the Property.  That the unpursued Florence "offer" was higher than the price later obtained at auction does not dictate the conclusion that the auction price was inadequate, much less that it was "so gross[ly inadequate] as to indicate bad faith or lack of reasonable diligence," Chartrand, 296 Mass. at 320, as would be necessary to void the sale.  For the reasons discussed supra in section II.B.2.e., I find no sufficient showing that SRC acted in bad faith or failed to exercise reasonable diligence with regard to Florence and his expressed interest in purchasing the Property.  Florence was informed of the upcoming auction and was offered the opportunity to bid on the Property at auction, but for reasons apparently unrelated to either the Property or the foreclosure process, Florence was no longer interested.  In any event, as discussed above, it is expected that the price "under the hammer" will be less than what could be obtained under normal market circumstances.  TAT has failed to demonstrate "bad faith or lack of reasonable diligence" on the part of SRC justifying finding

fault with the sale. See Bowser, 324 Mass. at 493 ("If we assume in favor of the defendants that it could have been found that the price at which the property was sold was inadequate (although there was no evidence as to what the fair market value of the property was at the time of sale), that fact, without more, would not show bad faith or lack of diligence.").

g.  Statutory Non-compliance by SRC and Garrett

Finally, TAT and the Capizzis both allege that SRC, having not registered to business in Massachusetts as a foreign corporation as required by Mass. Gen. Laws ch. 181, §§ 3-4, may not seek recovery in the courts of the Commonwealth because of Mass. Gen. Laws ch. 181, § 9.[10]  TAT further alleges that the foreclosure was defective on account of Garrett, Inc. not possessing an auctioneer's license.[11]  Neither allegation is sufficient to survive summary judgment.

In response to the foreign corporation registration issue, SRC maintains first that it is not "seeking relief" in the courts

---

[10]Mass. Gen. Laws ch. 181, § 9 provides, in relevant part, that:

> Every foreign corporation which fails to file an initial certificate or an amended certificate as required by section four shall, for each such failure and for each year that each such failure shall continue, be fined not more than five hundred dollars.  No such failure shall affect the validity of any contract involving the foreign corporation, but no action shall be maintained or recovery had in any of the courts of the commonwealth by the foreign corporation as long as such failure continues.

[11]TAT does not dispute that Garrett Healy, the president of Garret, Inc., possesses a valid auctioneer's license.

but rather "turning the surplus proceeds from a foreclosure over to the court for distribution," and second, that because it is an out-of-state corporation "engaged exclusively in interstate commerce, with little, if any incidental activity in Massachusetts," the statute is inapplicable.

This interpleader action properly is pending in federal district court pursuant to the court's diversity jurisdiction under 28 U.S.C. § 1332. So far as I can tell, SRC has never commenced state court proceedings against the Capizzis or any other party to this litigation. The foreign corporation registration allegations made by TAT and the Capizzis against SRC do not give rise to an independent cause of action nor do they support any of the pending claims in this case. Accordingly, I disregard them as irrelevant.

The allegations by TAT regarding the auctioneer's license is a red herring. The foreclosure auction of the Property was conducted by Garret Healy, the president and owner of Garret, Inc. and the holder of a duly-issued State Auctioneer License from the Division of Standards of the Commonwealth of Massachusetts. The text of the applicable statute, Mass. Gen. Laws ch. 100, § 2, provides that "no person shall engage in the business of or act as an auctioneer in the commonwealth, directly or indirectly . . . unless licensed under the provisions of this chapter." The licensing requirement clearly applies to a person, not a business, and, as a result, the contention by TAT that the foreclosure was defective on account of Garrett, Inc. not

possessing an auctioneer's license fails on its face.

**C. Duffy's Motion for Summary Judgment**

Third-party defendant Duffy has moved for summary judgment against the Capizzis on all five causes of action they raise by way of counter- and cross-claim: (1) declaratory judgment and accounting; (2) breach of contract; (3) unlawful and fraudulent foreclosure; (4) violation of ch. 93A; and (5) wrongful eviction. As Duffy correctly points out, while only the last of these claims is made directly against him, the first might have implications for his rights as purchaser of the Property.  Having addressed the first four claims at length in Section II.B. supra and found them wanting, I turn my attention now only to the wrongful eviction claim made against Duffy by the Capizzis.

As set forth above in Section I.A., Duffy purchased the Property at the September 26, 2003 foreclosure auction for $1,200,000.00.  In order to recover possession of the Property from the Capizzis, Duffy commenced a summary process proceeding against them in the Concord District Court and, following a trial, received a judgment for possession and monetary damages on December 18, 2003.  The Capizzis appealed the judgment but their appeal was rendered void due to their failure to perfect it by posting the required bond.  Execution thereafter issued to Duffy who levied upon it, evicting the Capizzis from the Property over the course of March 17 and 18, 2004.

On March 16, 2004, the day before Duffy was due to levy on the execution, the Capizzis filed a lawsuit against him and SRC

-37-

in this court, C.A. No. 04-10533-DPW, raising allegations similar to those in the present action and also seeking a temporary restraining order against Duffy levying on the execution.  I denied the request for injunctive relief on March 16, 2004 and the Capizzis thereafter voluntarily dismissed the case.  On March 17, 2004, the Capizzis filed yet another civil action against SRC and Duffy, C.A. No. MICV 2004-01041, this time in the Middlesex Superior Court, unsuccessfully making essentially the same claims the have raised again in the present action.  The appeal by the Capizzis of this decision to the Massachusetts Court of Appeals remains pending.  I am bound to accord <u>res</u> <u>judicata</u> effect to the Superior Court judgment despite the pendency of the appeal. <u>O'Brien v. Hanover Ins. Co.</u>, 427 Mass. 194, 200-01 (1998); 28 U.S.C. § 1738.

Duffy also contends that this court is barred from considering the wrongful eviction claim asserted by the Capizzis due to the <u>Rooker-Feldman</u> doctrine,[12] which stands for the proposition that "[l]ower federal courts are without subject matter jurisdiction to sit in direct review of state court decisions," <u>Hill v. Town of Conway</u>, 193 F.3d 33, 34 (1st Cir. 1999) (internal quotations and citations omitted), such jurisdiction belonging only to the state appellate courts and,

_____

[12]As the First Circuit set forth in <u>Hill v. Town of Conway</u>, 193 F.3d 33 (1st Cir. 1999), the <u>Rooker-Feldman</u> doctrine is the distillation of two Supreme Court decisions: <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923) and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983).  <u>See</u> <u>Hill</u>, 193 F.3d at 34 n.1 (detailing history of <u>Rooker-Feldman</u> doctrine).

ultimately, to the United States Supreme Court.  See Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482-86 (1983).  The Capizzis counter that they "are not challenging the Concord District Court proceeding, but rather the action of Duffy in bringing that proceeding."  Finding this both a distinction without a difference and a misstatement of the relief sought, I will grant summary judgment for Duffy on this counterclaim.

Pursuant to what they have titled a "wrongful eviction" claim, the Capizzis seek monetary damages from Duffy, "including damages for loss or destruction or damage to personal property removed . . . upon levy of the eviction execution."  The Capizzis purport to ground this claim upon the assertion that Duffy "wrongfully purchased" their home at the foreclosure sale and evicted them therefrom "when he and his attorney were fully aware that the foreclosure was fraudulent and illegal and that the foreclosure sale . . . was null and void."  As discussed in greater detail in section II.B.2. supra, the Capizzis have failed to establish that the foreclose by SRC was "fraudulent and illegal" or that the foreclosure sale was "null and void."  But the Capizzis' claim against Duffy, in which they seek relief for damages allegedly sustained because they suffered an eviction authorized by a state court of competent jurisdiction, is barred both by res judicata as a general proposition and particularly, as a matter of federal jurisdiction, by the Rooker-Feldman Doctrine.

The award of possession and monetary damages by the Concord
District Court to Duffy in his summary process action against the
Capizzis necessarily was grounded upon a finding by the state
court that Duffy held good title to the Property and had a
superior claim for possession vis-a-vis the Capizzis.  <u>See</u> Mass.
Gen. Laws ch. 238, § 1, Persons entitled to summary process [for
possession of land] ("if a mortgage to land has been foreclosed
by a sale under power therein contained or otherwise . . . and
the seller or any person holding under him refuses to surrender
possession thereof to the buyer . . . the person entitled to the
land or tenements may recover possession thereof under this
chapter"); <u>see also</u> <u>Wayne Inv. Corp. v. Abbott</u>, 350 Mass. 775
(1966) ("The purpose of summary process is to enable the holder
of the legal title to gain possession of premises wrongfully
withheld.  Right to possession must be shown and legal title may
be put in issue.").

The Capizzis contend that via their self-titled "Wrongful
Eviction" claim that they are challenging "the action of Duffy in
bringing" the summary process action, rather than the proceeding
itself.  They seek damages, however, flowing from the lawful
consequence of that proceeding (<u>i.e.</u>, the levying upon the
execution) and base their claim on allegations that speak to
whether Duffy had legal title to the Property, a determination
already made in favor of Duffy by the state court in the context
of the summary process action.  In situations where "the relief
for which plaintiffs prayed would, if granted, effectively void

the state court's judgment," <u>Hill</u>, 193 F.3d at 40 (quoting <u>Snider v. City of Excelsior Springs, Missouri</u>, 154 F.3d 809, 811-12 (8th Cir. 1998)), or if the plaintiff's claim is "inextricably intertwined" with the state court proceedings, <u>see</u> <u>Feldman</u>, 460 U.S. at 482 n.16, the <u>Rooker-Feldman</u> doctrine precludes federal court jurisdiction.

The Capizzis were limited in the defenses they could raise in the summary process action.  The Supreme Judicial Court has clearly articulated what foreclosure-related defenses can be raised to a summary process action:

> Legal title is established in summary process by proof that the title was acquired strictly according to the power of sale provided in the mortgage; and that alone is subject to challenge.  If there are other grounds to set aside the foreclosure the defendants must seek affirmative relief in equity. . . .  The issue of lack of good faith is not available to a defendant in summary process.

<u>Wayne</u>, 350 Mass. 775 (internal citations omitted).  This limitation, however, does not permit these frustrated litigants to employ the federal courts in a back-door challenge to a final state court ruling.

**D. Garrett's Motion for Summary Judgment**

Through its motion for summary judgment, Garrett seeks a court order compelling SRC to pay it $48,459.20 for the auctioneer services it rendered in connection with the sale of the Property.  As noted above, SRC and Garrett contracted prior to the auction for Garrett to be reimbursed for its auction-related expenses and also paid a commission of 3.5% of the sale price if the Property was sold at auction to a third party.  SRC

-41-

has previously agreed that a 3.5% commission is reasonable and has not opposed the motion by Garrett for summary judgment.  In the opposition memorandum filed by the Capizzis to the three pending motions for summary judgment no mention is made of Garrett's commission or payment request.  The allegations made by TAT in its opposition memorandum include that "States and Garrett, Inc. had an [sic] bonus agreement for fees unknown to TAT; . . . that court approval for charges by Garrett, Inc. was necessary by the terms of the e-mails alleged by both States and Garrett, Inc.; that no court approval of the fee of Garrett, Inc. is alleged although expressly mandated in the alleged engagement of Garrett, Inc. by States; that no evidence of time or reasonableness has been presented by Garrett, Inc.; that a minimum fee by auctioneers has been discussed in private settings by Garrett, Inc.; that Garrett, Inc. had not auctioneers license;" and so on and so forth.  This conclusory <u>omnium gatherum</u> will not suffice to make out a claim.  By merely reciting the self-same allegations made in its pleadings and not, as required in response to a motion for summary judgment, setting forth specific facts "sufficient to establish the existence of an element essential" to its case, <u>Celotex</u>, 477 U.S. 322, TAT has failed to mount a sufficient defense to Garrett's motion.  In light of the competent evidence submitted by Garrett regarding the reasonableness of the agreed-upon fees, I will enter summary judgment in favor of Garrett.

**E. Additional Motions**

TAT has moved to amend its answer, affirmative defenses, counterclaims, and cross-claims for a second time.  TAT seeks now to include an additional counterclaim grounded, apparently, in ch. 93A, against SRC and Garrett and based on their conduct with respect to the foreclosure sale, particularly the $2,000,000.00 offer by Florence to purchase the Property and the related $50,000.00 deposit he made to Garrett, as well as various factual errors regarding the Property in pre-auction advertisements. Pursuant to this claim, TAT seeks both monetary damages, including treble damages under ch. 93A, and injunctive relief. The Capizzis have moved to amend Paragraph 71 of their counterclaims so as to include additional detail about the above-referenced factual errors in the pre-auction advertising and also to make assertions about the value of the Property if subdivided.

Federal Rule of Civil Procedure 15(a) dictates that leave to amend a complaint "shall be freely given when justice so requires."  Id.  Among the permissible reasons for denying a motion to amend, however, is that the amendment would be futile. See Foman v. Davis, 371 U.S. 178, 181 (1962).  As is apparent from my analysis of the summary judgment motions against TAT and the Capizzis on all of their foreclosure-related claims, their respective motions to amend -- each of which relate either to these insufficient claims or to the factual allegations underlying them -- fail for futility.  See Hatch v. Dept. for Children, Youth & Families, 274 F.3d 12, 19 (1st Cir. 2001) ("Where an amendment would be futile or would serve no legitimate

purpose, the district court should not needlessly prolong matters.") (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir., 1990) (overruled on unrelated grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004)).  Accordingly, I will deny the motions to amend by TAT and the Capizzis.

SRC has moved to strike certain portions of the affidavit by Robert Verrier ("Verrier") submitted by TAT in support of its opposition to the motions for summary judgment filed by SRC and Garrett.  SRC made this motion on the grounds that portions of the affidavit fail to comply with Fed. R. Civ. P. 56(e), which governs the submission of affidavits in support of or in opposition to motions for summary judgment and provides that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters statement therein.

Id. Among the bases upon which SRC challenges the Verrier affidavit are the failure to demonstrate the requisite personal knowledge and the inclusion of conclusory or otherwise inadmissible statements.  In view of the ruling granting SRC summary judgment on TAT's counterclaims, the motion to strike is denied as moot.

### III. CONCLUSION

For the reasons set forth more fully above, I:

Grant the summary judgment motions: (1) in favor of SRC against TAT and the Capizzis [89], in favor of Duffy against the Capizzis [95], and in favor of Garrett[85];

Deny the motions to amend by TAT [52] and by the Capizzis [73]; and

Deny the motion to strike by SRC [106].

SRC shall file on or before January 26, 2005 a proposal for final judgment resolving any remaining issues, including proper disposition of the interpled fund.  The remaining parties may file responsive submissions on or before February 2, 2005.

/s/ Douglas P. Woodlock

_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE